

*Parties Added.*
*Amended Summons Issued).*

Amended Complaint:
Adding parties - George Bolen
Adding/amending allegations - ¶¶ 15, 16,
28, 120, 124–26, 130, 132, 134, 136, 157,
158, 160, 163, 165, 168, and Count III

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JEFFREY DESKOVIC,** ) | |
| ) | |
| **Plaintiff,** ) | U.S. DISTRICT COURT FILED JUN 13 2008 S.D. W.P. OF N.Y. |
| ) | |
| **v.** ) | |
| ) | |
| **CITY OF PEEKSKILL, PUTNAM COUNTY,** ) | **No. CV-07-8150** |
| **WESTCHESTER COUNTY, DAVID LEVINE,** ) | |
| **THOMAS MCINTYRE, WALTER** ) | |
| **BROVARSKI, EUGENE TUMOLO, JOHN** ) | |
| **AND JANE DOE SUPERVISORS, DANIEL** ) | |
| **STEPHENS, LOUIS ROH, MILLARD** ) | |
| **HYLAND, GEORGE BOLEN, and** ) | |
| **ALAN TWEED** ) | |
| ) | |
| **Defendants.** ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Jeffrey Deskovic, by and through his attorneys, the law firm of Cochran, Neufeld &

Scheck, LLP, states as follows:

1. On November 15, 1989, a fifteen year old Peekskill High School sophomore, A.C.,[1] left her

home after school to take pictures for her high school photography class.  A.C., by all accounts a

quiet and gentle girl with a sweet disposition who had recently immigrated from Colombia,

walked to a nearby park to photograph the fall foliage.

---

[1] The victim will be referred to as "A.C." throughout the complaint in an effort to protect
the privacy of her family.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

2. A.C. never returned home. That afternoon, Steven Cunningham, a twenty-nine-year-old with a drug habit and a criminal record, spotted A.C. in the park as he sat smoking crack. He attacked her, then he raped her, and ultimately he murdered her, leaving behind a trail of evidence demonstrating his involvement in the crime - including, critically, his semen.

3. The horrible tragedy of A.C.'s death was inexcusably compounded when her classmate, Jeffrey Deskovic, who had just turned sixteen years old, was wrongly arrested, prosecuted, and convicted of the crime. Unbelievably, Mr. Deskovic was convicted despite DNA testing on Cunningham's semen which proved, months prior to Mr. Deskovic's criminal trial, that he could not have committed the terrible crime with which he was charged.

4. Mr. Deskovic spent almost sixteen years of his adolescence and young adulthood fighting from behind bars to prove his innocence. He was finally vindicated in 2006, when new DNA testing established that the semen found on A.C.'s body came from Cunningham, who subsequently confessed, pled guilty to, and was convicted of the crime. Even worse, not only was an innocent youth wrongly convicted and A.C.'s actual killer allowed to go free, but in a final sickening turn of events Cunningham killed again, murdering another Peekskill woman just four years after his rape and murder of A.C.

5. Mr. Deskovic's wrongful conviction and years of wrongful incarceration, despite the fact that police and prosecutors knew of the DNA evidence and other clearly exculpatory facts, was the direct result of a veritable perfect storm of misconduct by virtually every actor at every stage of his investigation and prosecution.

6. Peekskill detectives and supervisors investigating A.C.'s rape and murder targeted Mr. Deskovic as a suspect, and then failed to investigate evidence pointing to his innocence. Instead,

2

they built their case by systematically coercing and fabricating Mr. Deskovic's false confession,

by similarly coercing and fabricating allegedly corroborating evidence from witnesses, and by

hiding evidence of Mr. Deskovic's innocence and their improper investigation from prosecutors

and the defense - even after learning that DNA evidence proved Mr. Deskovic's innocence.

7. So, too, did Westchester County officials systematically fabricate false proof of Mr.

Deskovic's guilt and conceal evidence that supported his innocence.   Deputy Medical Examiner

Louis Roh provided Westchester County prosecutors with fabricated "evidence" that purported

to explain how Mr. Deskovic could have raped A.C. despite the presence of another man's

semen inside of her.  Thus, Dr. Roh told prosecutors before trial - and provided testimony that

was central to the trial prosecutor's presentation to the jury - that based upon his autopsy of

A.C., he had scientific proof that she had in fact been sexually active on multiple occasions prior

to her rape.  In fact, not only did Dr. Roh lack any credible observational evidence or scientific

basis for such conclusions, but the assertion that the victim was ever sexually active was

completely contrary to all known facts about A.C. - who was by all accounts a reserved,

traditionally Catholic, and completely sexually inexperienced young girl.

8. The pervasive and systematic official misconduct that led to Mr. Deskovic's wrongful

conviction did not occur in isolation, outside of official bureaucratic channels.  Rather, the actors

who deprived Mr. Deskovic of his constitutional protections and caused him to be wrongly

arrested, prosecuted, and convicted were acting with the direct participation, knowledge, and/or

acquiescence of supervisors and policymakers in Peekskill and Westchester County, and

pursuant to policies, customs, or patterns and practices of misconduct and egregious failures of

supervision and oversight within the Peekskill Police Department, the Westchester County

District Attorney's Office, and the Westchester County Medical Examiner's Office.

9. The victimization of Jeffrey Deskovic did not end with his wrongful conviction. Throughout his nearly sixteen years imprisoned as a juvenile and a young adult, Mr. Deskovic endured sexually humiliating acts inflicted upon him by corrections officer Alan Tweed, who, like those who caused Mr. Deskovic's wrongful conviction, preyed upon Mr. Deskovic's obvious weakness to magnify the horror of his wrongful incarceration.

10. This civil rights action seeks accountability for the official misconduct and abuses of power that led to Mr. Deskovic's wrongful arrest, prosecution, and conviction, and that robbed Mr. Deskovic of sixteen years of youth and young adulthood.

### JURISDICTION

11. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

12. Supplemental jurisdiction over Mr. Deskovic's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

13. Plaintiff has complied with the requirements of New York General Municipal Law Section 50-I. Mr. Deskovic made and served a notice of claim on all municipal defendants, within the time required by New York General Municipal Law Section 50-e. More than thirty days have elapsed since the service of those notices, and no offer of settlement has been made.

14. At the request of the City of Peekskill, Putnam County, and Westchester County, on June 28, 2007 Mr. Deskovic submitted to a hearing pursuant to New York General Municipal Law Section 50-e.

### VENUE

4

15.  Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Southern District of New York, the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred

16. Venue is also proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1), as Mr. Deskovic currently resides within the Southern District and all defendants reside in the State of New York.

**JURY DEMAND**

17. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

**PARTIES**

18.  Plaintiff Jeffrey Deskovic is, and at all times material to this Complaint was, a citizen and resident of the State of New York.  He resides in Tarrytown, New York.

19.  Defendant City of Peekskill is a municipality that is a political subdivision of the State of New York, was the employer of defendants Levine, McIntyre, Brovarski, Tumolo, and John and Jane Doe Supervisors, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Peekskill Police Department ("PPD").

20. Defendant Putnam County is a municipality that is a political subdivision of the State of New York, was the employer of defendant Stephens, and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Putnam County Sheriff's Department.

21. Defendant Westchester County  is a municipality that is a political subdivision of the State of New York, was the employer of defendants Roh and Hyland, and is and was at all times relevant

to this complaint responsible for the policies, practices, and customs of the Westchester County District Attorney's Office and the Westchester County Medical Examiner's Office.

22. Defendant David Levine at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

23. Defendant Thomas McIntyre at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

24. Defendant Walter Brovarski at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. He is sued in his individual capacity.

25. Defendant Eugene Tumolo at all times relevant to this complaint was a duly appointed and acting police officer of the PPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Peekskill and the State of New York. Defendant Tumolo is sued in his individual capacity for that conduct undertaken by him when he possessed the rank of lieutenant with the PPD. He is sued in his official capacity as the current Chief of the PPD.

26. Defendants John and Jane Does at all times relevant to this complaint were duly appointed and acting supervisors of the PPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the City of Peekskill and the State of New York. They are sued in their individual capacities.

27. Defendant Daniel Stephens at all times relevant to this complaint was a duly appointed and acting investigator of the Putnam County Sheriff's Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Putnam County and the State of New York. Defendant Stephens is sued in his individual capacity.

28. Defendant George Bolen at all times relevant to this complaint was a duly appointed and acting assistant district attorney for the Westchester County District Attorney's Office, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York. Defendant Bolen is sued in his individual capacity.

29. Defendant Louis Roh at all times relevant to this complaint was a duly appointed and acting Deputy Medical Examiner in the Westchester County Medical Examiner's Office, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York. Defendant Roh is sued in his individual capacity.

30. Defendant Millard Hyland at all times relevant to this complaint was the duly appointed and acting Chief Medical Examiner for Westchester County, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of Westchester County and the State of New York. Defendant Hyland is sued in his individual and official capacities.

31. Defendant Alan Tweed at all times relevant to this complaint was a duly appointed and acting corrections officer for the State of New York at the Elmira Correctional Facility, acting

under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York. Defendant Tweed is sued in his individual capacity.

## FACTS

### The Crime and Initial Investigation

32. On the afternoon of November 15, 1989, fifteen-year-old Peekskill High School sophomore A.C. came home from school, and then went out again to take photographs very close to her home, for a photography class assignment. When A.C. did not return home that day, her family contacted the Peekskill Police Department and reported her missing.

33. From November 15 until November 17, the PPD conducted, at best, a reckless investigation into A.C.'s disappearance. As a result, although A.C.'s body would ultimately be found only a few hundred yards from her home, the PPD was unable to adduce any leads as to her location for more than thirty-six hours. Ultimately, the New York State Police were brought in to assist in the investigation, which, together with A.C.'s family's distress, greatly increased the pressure on PPD detectives and supervisors to solve the case.

34. On the morning of November 17, PPD officers and members of the State Police found the body of A.C. in a heavily wooded area of Hillcrest Park near Griffins Pond, very close to her family's home. Her body was discovered covered with leaves and naked from the waist down in a part of the park known as "the Pit." A.C. had been raped, and had died from asphyxiation and blunt trauma to the head.

35. Between the time of A.C.'s disappearance and when her body was discovered, heavy storms and tornado conditions had blown through Peekskill.

36. More than a dozen police officers, medical personnel, and employees of the Westchester

8

County District Attorney's office responded to the Griffins Pond area in the hours following the discovery of A.C.'s body. Although crime scene tape was put up around the scene, public access to the area - which included several walking paths and was located near an apartment complex - was not otherwise restricted. Hence, passers-by were able to visit and examine the area prior and subsequent to the police investigation there on the 17th.

37. PPD personnel, including defendants Levine, McIntyre, Brovarski, and Tumolo, and additional PPD patrol officers, detectives, and supervisors, assisted by the New York State Police, canvassed the crime scene and collected and vouchered dozens of items of evidence. Among the evidence recovered by the police were a torn note found underneath A.C.'s body, a white bra found along a dirt path that led to A.C.'s body, and a 35 millimeter camera found along a paved park path.

38. Immediately in the investigation PPD personnel, including the PPD defendants, developed very specific theories as to how A.C.'s rape and murder had transpired. The PPD defendants built and pursued their investigation around leads that correlated to their initial theories, and those theories were adopted by the prosecutor and argued to the jury at Jeffrey Deskovic's trial.

39. Thus, based upon the note found under A.C.'s body - which appeared to be in her handwriting and to refer an individual named "Freddy" - the PPD defendants concluded that A.C. had been in a romantic relationship with a Peekskill High School student named Freddy Claxton, and that her rape and murder was connected to that relationship.

40. This initial theory also led the PPD defendants to create, with the assistance of the New York City Police Department, a suspect profile suggesting, among other characteristics, that A.C. had known her attacker, that the perpetrator was a white or Hispanic man younger than nineteen

9

years old and approximately five feet, ten inches tall, and that he was a loner with physical or mental handicaps.

41. Additionally, on November 17, PPD investigators, including but not limited to defendants Levine, McIntyre, Brovarski, and Tumolo, surmised that the crime had occurred in three separate locations: crime scene "one," where the police thought A.C. had left her camera when initially assaulted by her attacker; crime scene "two," where the police believed A.C. had been raped and her bra left behind; and crime scene "three," the place to which A.C.'s body was dragged after the rape. PPD detectives, including defendants Levine and McIntyre, photographed, diagramed, and, upon information and belief, marked the three crime scene areas.

42. In fact, the theories and profile developed by the PPD defendants in the earliest hours and days of their investigation bore almost no relationship to the manner in which the actual perpetrator, Steven Cunningham, carried out the crime. Cunningham was a twenty-nine-year-old African American man who was over six feet tall. He had never known or seen A.C. prior to November 15. On the day of A.C.'s murder Cunningham had been drinking at a local bar, bought crack, and then went to the Pit, where he smoked the crack and four cigarettes. Cunningham carried out the crime in only two locations: He grabbed A.C. from behind on a park path, and dragged her to the Pit area, where he raped and killed her, and left her body.

43. Cunningham left four cigarette butts at the crime scene, as well as his crack pipe and full vials of crack. Before he left the scene, he spoke to two boys who were playing basketball at a court in Hillcrest Park. Cunningham was known to the PPD, had been arrested prior to November 15, and, upon information and belief, his fingerprints were on file with the PPD.

44. A.C.'s body was taken from the crime scene by Deputy Medical Examiner Dr. Louis Roh

10

and his assistant, and an autopsy was performed on November 17. The results of the autopsy, contained in a report dated November 20, 1989, included that A.C. had died from asphyxia due to ligature strangulation, and a fractured skull.

45. Dr. Roh found loose hairs on A.C.'s right breast, right leg, and left arm, and in A.C.'s pubic region, which he submitted to a hair examiner in the Westchester County Department of Laboratories and Research for analysis. Dr. Roh also prepared oral, rectal, and vaginal swabs, and submitted them along with A.C.'s bra, jeans, and underwear for serological analysis by the Westchester County laboratory.

**Peekskill Police Focus on Peekskill High School for Suspects**

46. Defendants Levine and McIntyre were the assigned detectives handling the A.C. investigation, and they conducted the investigation with the assistance of other PPD detectives, including but not limited to defendant Brovarski, and under the supervision of defendants Tumolo and John and Jane Doe Supervisors not known at this time.

47. Within a week of A.C.'s rape and murder, Freddy Claxton was called to the office of Peekskill High School Principal Sheldon Levine - who, upon information and belief, was the brother of defendant Detective David Levine. When Freddy arrived Principal Levine was present with multiple PPD investigators, including, upon information and belief, one or more of the PPD defendants, who expressed that they wished to speak with Freddy in connection with A.C. In the presence of and/or with the knowledge of the PPD investigators, Principal Levine called Freddy's mother to obtain her permission for the questioning, and she refused.

48. At or prior to that meeting, Freddy had told PPD investigators, including, upon information and belief, one or more PPD defendants, that he lived in an apartment complex next to Hillcrest

11

Park, and that there was a male drifter who was frequently spotted in, and possibly lived in, Hillcrest Park, who may have committed the crime. Upon information and belief, PPD personnel never investigated Freddy's information concerning this drifter.

49. Later that day, one or more of the same PPD investigators who had been present in Principal Levine's office, including upon information and belief one or more PPD defendants, went to Freddy's house. Freddy answered the door, and the investigators asked Freddy to accompany them to the PPD stationhouse. When Freddy refused, reiterating that his mother did not want him to speak to the police, and that he needed to stay home to take care of his younger brother, the investigators told Freddy, in substance, that they just needed his assistance, that it was okay for him to accompany them to the stationhouse, and that he should bring his younger brother along.

50. Once at the PPD stationhouse, Freddy was separated from his younger brother and placed in an office with multiple investigators, including, upon information and belief, one or more PPD defendants. The detectives asked Freddy what his relationship was with A.C., and Freddy told them that he knew A.C. but never spoke with her. The detectives began to interrogate Freddy aggressively, standing around him while he was seated in a chair, and repeatedly accusing him of having exchanged romantic notes with A.C. and hiding a romantic relationship with her. Freddy repeatedly and consistently denied the detectives' allegations.

51. The interrogation continued until Freddy's father entered the interrogation room and interrupted the questioning. Upon information and belief, Freddy's father had arrived at the PPD stationhouse approximately a half hour previously, having learned of the interrogation, but had been prevented by PPD investigators, including one or more PPD defendants, from seeing his

12

son and ending the interrogation.

### The PPD Defendants Conceal Material, Exculpatory and Impeachment Evidence

52. The interrogation of Freddy Claxton, the circumstances under which PPD detectives isolated, deceived, and coercively questioned Freddy, and the substance of Freddy's denials that he and A.C. had any romantic relationship, were never documented by PPD detectives.

53. PPD detectives continued to investigate Freddy Claxton by interviewing other witnesses, including, for example, other Peekskill High School students, both prior to and, upon information and belief, subsequent to the indictment. PPD detectives, including but not limited to the defendants, were consistently told by multiple sources that Freddy and A.C. had not had any romantic relationship. During those interviews one or more PPD defendants coerced or attempted to coerce witnesses to state that Freddy and A.C. had been in a romantic relationship. Detectives, including the defendants, failed to document or disclose to prosecutors material, exculpatory and impeachment evidence concerning interviews conducted by them, the circumstances of their coercion of witnesses, and the substance of multiple witnesses' statements denying the existence of a relationship between Freddy and A.C.

54. Furthermore, PPD investigators, including the PPD defendants, interviewed multiple witnesses, many on multiple occasions, who provided information that A.C. had never been involved in any romantic relationship - let alone a sexual relationship - prior to her death. The PPD defendants failed to document or disclose to prosecutors this material, exculpatory and impeachment evidence concerning A.C.'s sexual history.

55. The subsequent revelation that DNA testing proved the sperm found inside A.C. had not come from Jeffrey, and ensuing efforts by the prosecution and defendant Roh to advance a

theory of Jeffrey's guilt notwithstanding the presence of sperm from another man inside of A.C.,
meant that evidence concerning Freddy and A.C.'s alleged relationship and/or any consensual
sexual partners that A.C. could have had was critical to the continued existence of probable
cause to prosecute Jeffrey and to his ultimate conviction.

### The Investigation Focuses on Jeffrey Deskovic

56. In November 1989 Jeffrey Deskovic had just turned sixteen and was a Peekskill High School
sophomore. He was white, approximately five feet, ten inches tall, and was acquainted with
A.C. as a classmate.

57. Jeffrey had struggled socially and academically in school in the years leading up to A.C.'s
death. Although his grades were improving his sophomore year, he had been evaluated by and
received assistance from schools and outside sources in connection with his academic struggles
and learning disabilities. School records also reflected that Jeffrey was seeing a school social
worker.

58. Jeffrey had also received emotional and psychological counseling and treatment from a
number of outside sources since a relatively young age. Jeffrey had been evaluated and treated
for a variety of psychological symptoms, including anxiety, depression, and, for a time,
complaints of hearing voices.

59. Jeffrey had also received counseling and other mental health evaluation and treatment in
connection with his family life. Jeffrey never met his biological father, whom his mother never
married, and he and his half brother were raised by his mother and grandmother. With the
exception of a brief and abusive relationship between Jeffrey's mother and the father of Jeffrey's
brother, Jeffrey grew up without any father figure in the home.

14

60. Jeffrey was deeply affected by A.C.'s death, which prompted his feelings for her, previously casual, to intensify into a deeper admiration and attachment. Jeffrey attended multiple wakes held for A.C. as well as her funeral, and was visibly distraught at these events. Jeffrey also visited the crime scene shortly after A.C.'s body was found - following a map that had been published in the local newspaper, as well as other public descriptions of the area, which he was generally familiar with from prior visits to Hillcrest Park.

### PPD Investigators Exploit Jeffrey's Emotional and Psychological Vulnerabilities

61. The attention of PPD investigators, including the PPD defendants, was drawn to Jeffrey after receiving reports that he had been extremely emotional at A.C.'s wakes and funeral, and appeared to be taking an unusual interest in A.C.'s death.

62. Immediately upon beginning their investigation of Jeffrey Deskovic, the PPD defendants learned that Jeffrey was affected by emotional and psychological difficulties, struggled academically and socially in school, and led a troubled family life. Indeed, Jeffrey's known difficulties in these regards were, upon information and belief, a significant factors in causing the PPD defendants to view Jeffrey as a suspect, and to initiate questioning of Jeffrey in connection with the crime.

63. The PPD defendants, knowing of Jeffrey's emotional and psychological problems, deliberately and recklessly devised a strategy for investigating and questioning Jeffrey that played upon and exploited those vulnerabilities, and carried out that strategy throughout the course of their investigation and numerous meetings with and interrogations of Jeffrey. The tactics devised by the defendants included, without limitation, the following: building a false relationship of friendship, trust, and cooperation with Jeffrey by repeatedly telling him that the

police needed his assistance in the investigation of A.C.'s death and that he had unique abilities

and access that enabled him to provide important assistance to the police; encouraging Jeffrey to

conduct his own investigation into the crime and to share with them any information or leads that

he was able to acquire; and otherwise building a false relationship of trust and cooperation with

Jeffrey. The defendants' tactics were deliberately calculated, and were calibrated to Jeffrey's

known emotional and psychological vulnerabilities, to mislead Jeffrey concerning the nature of

his relationship and interactions with the police.

64. Several weeks after A.C.'s death, defendants Levine and McIntyre approached Jeffrey on the

street as he was walking to school in the morning. Levine and McIntyre asked Jeffrey to

accompany them to the PPD stationhouse to speak with them about A.C. Jeffrey agreed to

accompany them, and specifically requested that the detectives not contact his mother to inform

her of his whereabouts.

65. Prior to that day, Jeffrey had never been arrested, had never been to the PPD stationhouse,

and had never been questioned by police.

66. Assistant district attorney Neary was notified by defendant Tumolo that Jeffrey was being

questioned, and Neary was present at the PPD stationhouse for some of that morning. Neary did

not speak with Deskovic, but instructed the PPD defendants to obtain Jeffrey's consent to take a

polygraph examination.

67. Upon information and belief, assistant district attorney George Bolen, who was the

supervising trial attorney in the Westchester District Attorney's Office, was also notified

concerning the December 12 questioning of Jeffrey Deskovic, and was told of all subsequent

important investigative events and decisions of which the District Attorney's Office was aware

concerning Jeffrey Deskovic.

68. Upon Jeffrey's arrival, he was taken to an office where, for the next several hours, he was alone with and questioned by McIntyre and Levine. Jeffrey told the PPD defendants, among other things, that he had visited the crime scene within twenty-four hours of A.C.'s body being found, and that he had learned certain facts about the crime from the newspaper and other public sources.

69. In the course of McIntyre and Levine's questioning of Jeffrey, McIntyre accused Jeffrey of the rape and murder of A.C. When Jeffrey reacted by denying the accusation, McIntyre discouraged Jeffrey from ending the interview by suggesting to him that it was a sign of guilt and encouraging Jeffrey, again, to assist the PPD in its investigation.

70. During the questioning Jeffrey was shown one or more photographs of the deceased A.C. and of the crime scenes. McIntyre and Levine also shared with Jeffrey details of the crime and the investigation that had not been made public - including, but not limited to, the fact that a note concerning Freddy Claxton had been found under A.C.'s body, and the PPD's theory that A.C. and Freddy had been romantically involved.

71. In fact, during the first and subsequent meetings with and interrogations of Jeffrey, PPD investigators, including the PPD defendants, provided Jeffrey with information about numerous non-public details and investigative theories concerning A.C.'s death. Throughout their numerous meetings with and interrogations of Jeffrey, the PPD defendants encouraged and coerced Jeffrey to incorporate those details into his own statements concerning the crime. The PPD defendants subsequently falsely represented, in police reports and conversations with prosecutors, that Jeffrey actually had independent knowledge of the facts provided by them.

17

72. The PPD defendants also became aware that Jeffrey had learned, through newspapers and other sources, certain facts about the crime and the investigation that had not been kept confidential by the police. The PPD defendants subsequently falsely represented, in police reports, conversations with prosecutors before trial, pretrial hearings, and at trial that these public facts were actually the product of Jeffrey's independent knowledge about the crime.

73. The details and theories provided to Jeffrey by the PPD defendants, and/or known by the PPD defendants to have been learned by Jeffrey through public sources rather than by his independent knowledge of the crime, included but were not limited to the following facts: (a) that a note referring to Freddy Claxton was discovered under A.C.'s body; (b) that a bra was found away from A.C.'s body; (c) that A.C.'s body was covered in leaves; (d) the manner in which police believed A.C. to have been asphyxiated; (e) the nature and location of A.C.'s head trauma;(f) the location where A.C.'s camera was discovered; (g) that A.C. had lost a set of keys; (h) the possibility that the rapist had not ejaculated; and (I) the three crime scene locations identified by the PPD.

74. Jeffrey's alleged independent knowledge of the above facts was critical to obtaining a probable cause determination from the grand jury and in procuring Jeffrey's conviction at his criminal trial.

### Jeffrey Obtains Legal Counsel - Which the Defendants Disregard

75. After leaving the PPD stationhouse, Jeffrey went to Peekskill High School and informed one of his teachers, Mr. Tompkins, that he had been interrogated by the police and accused of the murder of A.C. That afternoon a meeting was convened that included Mr. Tompkins, Jeffrey, school administrators including Principal Sheldon Levine, and, eventually Jeffrey's mother.

18

76. At the meeting, Jeffrey told the school officials present that he had been interrogated and accused of A.C.'s murder. The school officials then questioned Jeffrey concerning the crime, and asked him if he had committed it. Jeffrey denied any involvement.

77. When Jeffrey's mother arrived at the meeting she expressed to all those present that she did not want Jeffrey to speak with the Peekskill Police, and that she would be retaining an attorney to represent Jeffrey.

78. Upon information and belief, one or more school officials present at this meeting subsequently informed one or more of the PPD defendants that Jeffrey's mother did not wish for him to speak to the police, and that she was retaining an attorney to represent her son.

79. The day after his interrogation and subsequent meeting with school officials, Jeffrey and his mother met with attorney Lou Ecker. Jeffrey and Ecker spoke privately, and at the conclusion of the meeting Ecker informed Jeffrey and his mother that he would contact the Peekskill Police Department, inform them that Jeffrey was represented by counsel, and request that no further questioning of Jeffrey occur outside the presence of counsel. Jeffrey understood then and up through the time of his alleged confession that Lou Ecker was representing him as his attorney.

80. Within days of Ecker's meeting with Jeffrey, Ecker contacted the PPD, spoke with defendant Tumolo, and informed Tumolo that he represented Jeffrey and that Jeffrey should not be questioned any further. This information was shared with all of the PPD defendants, and with representatives of the Westchester County District Attorney's Office, including but not limited to assistant district attorneys Bolen and Neary.

81. Subsequent to Ecker's call to Tumolo, defendant Levine reached out to Jeffrey to attempt to speak with him. Jeffrey told Levine that he was represented by attorney Ecker, and that pursuant

to Ecker's instructions Jeffrey was not to speak with the police concerning the A.C. investigation. Although, upon information and belief, Levine knew that Ecker had told prosecutors that he no longer represented Jeffrey and had referred Jeffrey to Legal Aid, Levine did not inform Jeffrey of this fact or otherwise attempt to resolve the evident confusion regarding the status of Ecker's representation. Rather, Levine told Jeffrey, in substance, that it was okay for Jeffrey to speak to the police notwithstanding Ecker's advice. Levine's statements deliberately disregarded Jeffrey's invocation of his right to counsel, and were a deliberate effort to mislead Jeffrey into believing that the police were not required to cease all contact with him if he requested and/or was represented by an attorney.

82. Levine's advice concerning the status and significance of Jeffrey's legal representation was erroneous, deceptive, and deliberately coercive, such that any subsequent waiver by Jeffrey of his right to counsel in speaking with the police was not knowing or voluntary.

### The PPD Defendants Conceal Their Fifth Amendment Violations

83. Trusting Levine's representation, and believing representations by the PPD defendants that he could be of assistance to their investigation, Jeffrey agreed to meet again with the police in connection with the A.C. investigation. PPD investigators, including but not limited to the PPD defendants, met with and questioned Jeffrey on many occasions over the course of many hours on many days, up to and including January 25, 1990. Jeffrey told the PPD defendants on numerous occasions in the course of these interviews that his mother did not want him to be with the police, did not know that he was with the police, and that the police should not inform her of Jeffrey's whereabouts.

84. At these meetings, Jeffrey was repeatedly given <u>Miranda</u> warnings, and the PPD defendants,

including but not limited to Levine and McIntyre, prepared <u>Miranda</u> waiver forms representing that Jeffrey's waivers of his <u>Miranda</u> rights were knowing and voluntary.  In light of defendant Levine's earlier statement to Jeffrey that, despite Jeffrey's understanding and invocation of his legal representation it was okay for Jeffrey to speak to the police, Jeffrey's waivers of his <u>Miranda</u> rights at those subsequent meetings were not in fact knowing or voluntary.  The defendants deliberately obtained and documented Jeffrey's alleged waivers of his <u>Miranda</u> rights in order to conceal Levine's knowing misrepresentation concerning the status and significance of Jeffrey's legal representation.

85. Throughout their numerous meetings with Jeffrey, the PPD defendants also deliberately employed tactics to denigrate and minimize the importance of the rights about which they were advising Jeffrey.  Those tactics included but were not limited to deliberately portraying interrogation sessions as meetings in which Jeffrey was assisting the police, and telling and suggesting to Jeffrey that assertion of his rights to counsel and to terminate questioning would be signs of guilt and would impede the A.C. investigation.

86.  Throughout the numerous meetings and interrogations that the PPD conducted with Jeffrey, the PPD defendants had access to one or more microcassette recorders, and understood the importance of recording suspect interrogations for the purpose of later establishing, in legal proceedings, the content of those interrogation sessions.  The PPD defendants deliberately recorded only a small portion of their interactions with Jeffrey in order to misrepresent the nature of their course of conduct with Jeffrey, to hide the deliberately coercive and deceptive tactics employed by them, and to conceal exculpatory and impeachment evidence.  Upon information and belief, the PPD defendants subsequently lied to prosecutors and to the jury in Jeffrey's

criminal proceedings concerning the circumstances of their recordings and the reasons why large portions of their meetings with Jeffrey were unrecorded. The defendants' selective recording tactics culminated in their final interrogation session on January 25, 1990, which the defendants knew was aimed at coercing Jeffrey's confession to the crime, and of which no recordings were made.

**The Police Question Jeffrey and Fabricate Additional Evidence of Guilt**

87. Subsequent to informing Levine and the other PPD defendants that he was represented by counsel, Jeffrey met with Levine and the PPD defendants for a day-long session on a school day. This day-long session was later documented by the PPD defendants in police reports, partially recorded by the PPD defendants in audiotapes, and discussed by the PPD defendants in trial and pretrial testimony, and, upon information and belief, in pretrial conversations with prosecutors.

88. According to the PPD defendants' version of events, Jeffrey came to the Peekskill stationhouse with typewritten notes that he had prepared of his own investigation and discussed his investigation with Detective Levine. Then, according to the PPD defendants, Jeffrey independently drew crime scene maps indicating the three crime scene locations identified by the police and the fact that A.C.'s body was covered by leaves, and showing the path that A.C. walked from her home to Hillcrest Park - all, according to the PPD defendants, based on non-public information that Jeffrey knew because he was A.C.'s killer. Later that day, according to the PPD defendants, Jeffrey accompanied them to the crime scene and further demonstrated his knowledge of non-public facts about the crime, including but not limited to the three crime scene locations and where A.C.'s camera had been found. Following the crime scene trip, Jeffrey allegedly returned to the Peekskill stationhouse where he answered more questions about the

crime scene and, according to the PPD defendants, used the map he had drawn earlier in the day to show detective McIntyre where A.C.'s camera had been found.

89. In fact, the PPD defendants deliberately misrepresented critical facts and concealed material, exculpatory and impeachment evidence concerning that meeting as well as other sessions in which Jeffrey and the PPD defendants discussed the A.C. investigation. Contrary to the PPD defendants' representation that Jeffrey's crime scene maps depicted his own, independent knowledge of non-public facts, in fact the PPD defendants knew or in the absence of their deliberate and reckless indifference should have known that they had provided Jeffrey non-public facts about the crime, that other facts provided by Jeffrey were in fact public, and that Jeffrey had incorporated those facts into his maps. The PPD defendants deliberately concealed and manipulated their interactions with Jeffrey by selectively recording only short segments of the many hours of questioning and deliberately failing to record critical events, including but not limited to Jeffrey's drawing of crime scene maps, the visit to the crime scene, and an hour or more period of interrogation by defendant Levine during which he directly accused Jeffrey of raping and murdering A.C.

90. Levine requested that Jeffrey sign the crime scene maps drawn by him, and showed the maps to defendants McIntyre and Tumolo. The maps were subsequently provided to prosecutors.

### The Police Plan to Procure Jeffrey's Confession

91. In the course of his meetings with the PPD, the PPD defendants encouraged Jeffrey to submit to a polygraph examination. The PPD defendants convinced Jeffrey to take the polygraph "test" by telling him that if he "passed," they would permit him to be more fully involved in the A.C. investigation, and would provide him with access to their police files. Jeffrey ultimately agreed

to come to the PPD stationhouse on January 25, 1990 for the polygraph exam.

92. In fact, the polygraph "test" was a deliberate tactic employed by the defendants, including but not limited to Levine, McIntyre, and Tumolo, to escalate substantially the aggressiveness of their interrogation of Jeffrey and to exploit his intellectual, emotional, and psychological vulnerabilities in a manner that would produce a confession to A.C.'s rape and murder.

93. Upon information and belief, the PPD defendants, including Levine, McIntyre, and Tumolo, had polygraph testing services available to them through other law enforcement agencies and routinely used the services of those other agencies in order to conduct routine polygraphs. However the defendants, including but not limited to Levine, McIntyre, and Tumolo, jointly agreed to depart from their usual procedure for Jeffrey's polygraph examination, and to enlist the services of a polygrapher from the Putnam County Sheriff's Department, defendant Dan Stephens. Defendant Stephens performed polygraph "testing" out of a private, non-law-enforcement office in Brewster, New York, approximately an hour's drive from Peekskill.

94. The PPD defendants conveyed to Stephens, and Stephens understood, that his job on January 25 was not to obtain polygraph results from Jeffrey, but to obtain his confession. The PPD defendants and defendant Stephens deliberately and recklessly agreed and mutually planned and understood that the interrogation of Jeffrey by Stephens, under the guise of a polygraph examination, would produce a confession by, among other means, isolating Jeffrey in a location that was unfamiliar to him, deceiving him by interrogating him in a non-law-enforcement setting, aggressively interrogating him in a manner that would confuse and threaten him, confusing Jeffrey as to the nature of his knowledge of and involvement in the crime, increasing Jeffrey's dependency upon familiar investigators, including in particular defendant McIntyre, and

24

otherwise deliberately exploiting Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities.

95. No personnel from the Westchester County District Attorney's Office were present at, and no recording equipment was brought by the PPD defendants to, Stephens's office on January 25. Upon information and belief, these were departures from the ordinary policies, procedures, customs, and practices followed by the PPD and the Westchester County District Attorney's Office in connection with confessions, and were deliberately done by the PPD defendants in order to conceal the nature and substance of the coercive interrogation they had planned to carry out with Jeffrey.

**The Coerced "Confession"**

96. On the morning of January 25, 1990, a school day, Jeffrey arrived at the PPD stationhouse with his friend, Martin Burrett, in order to take the polygraph examination. Martin was asked to leave, and at approximately 10:00 a.m. Jeffrey was driven by defendant McIntyre to Stephens's office in Brewster, New York, approximately an hour away from Peekskill. Defendants Levine and Tumolo accompanied Jeffrey and McIntyre in a separate car.

97. Upon information and belief, defendants McIntyre, Levine, and Tumolo knew that Jeffrey's mother did not know of his whereabouts, believed him to have been in school, and would not have permitted Jeffrey to take the polygraph test if she had known.

98. When Jeffrey arrived in Brewster, Stephens was dressed in civilian clothing, and was not identified to him as a law enforcement officer. Jeffrey told Stephens that he had come to take a polygraph examination in order to be permitted to assist the PPD with their investigation into A.C.'s death.

99. Shortly after his arrival, defendant Stephens escorted Jeffrey to a small room with a table, two chairs, and a polygraph machine. Jeffrey remained in that room from approximately 11:00 a.m. until approximately 7:00 p.m. He had not eaten prior to arriving in Brewster, and he was given no food for at least the first six hours that he was in the room. Defendant Stephens and other individuals provided Jeffrey with multiple cups of coffee throughout the course of the day.

100. Defendants Levine, McIntyre, and Tumolo, who remained in a separate room monitoring the questioning and interrogation through a listening device, either witnessed or heard the words spoken to and by Jeffrey while at the Brewster office.

101. Stephens told Jeffrey, in substance, that once the polygraph examination began, it could not be stopped. One or more pieces of polygraph equipment was affixed to Jeffrey throughout the entire time that he spoke about and was questioned concerning A.C.'s death.

102. As PPD investigators had done in prior sessions with Jeffrey, Stephens provided Jeffrey with and obtained Jeffrey's signature on numerous waivers and releases, including on a "participatory" Miranda warning form and on consents to the polygraph examination.

103. Stephens began to question Jeffrey concerning the rape and murder of A.C., and Jeffrey told Stephens what he believed he knew about the crime and had discussed previously with PPD investigators. Jeffrey's responses incorporated details and theories that had been provided and suggested to him by the PPD defendants and/or Stephens, as well as facts that the PPD defendants knew to be publicly ascertainable.

104. During the course of his questioning of Jeffrey, Stephens employed interrogation tactics that were designed to trick, deceive, confuse, and intimidate Jeffrey, including but not limited to

26

shouting at Jeffrey, invading Jeffrey's personal space, repeatedly accusing Jeffrey of raping and

murdering A.C., and telling Jeffrey that he had failed the polygraph test and had already told

Stephens "within himself" that he was guilty of the crime. Jeffrey repeatedly denied his

involvement in the crime to Stephens.

105. Several hours into the questioning and interrogation, at a point when Jeffrey was visibly and

obviously distraught, frightened, and confused, Stephens turned to another deliberate tactic,

"good cop-bad cop," and told Jeffrey that he could speak with his "favorite" PPD detective.

Jeffrey chose defendant McIntyre. Upon information and belief, defendants Levine, McIntyre,

Tumolo, and Stephens knew that Jeffrey viewed McIntyre as his friend and a "father figure," and

intended that McIntyre's interaction with Jeffrey at this point would be the culmination of their

deliberate manipulation to obtain Jeffrey's involuntary confession.

106. Stephens left the room in which Jeffrey was sitting, and continued to listen to the remainder

of the interrogation in the nearby room where Levine, McIntyre, and Tumolo had been

monitoring the earlier questioning.

107. When McIntyre entered the room with Jeffrey, he was not the friend and father figure that

he had been previously and which he knew Jeffrey expected from their interactions. McIntyre

told Jeffrey, among other things, that he had known for weeks that Jeffrey was guilty of the

crime. He told Jeffrey in substance that Levine, Tumolo, and Stephens would physically harm

Jeffrey if he did not confess, and that McIntyre was trying to hold them back but that he didn't

have any "bullets" in his "gun," and that Jeffrey needed to give him some "bullets" by

confessing.

108. Upon information and belief, McIntyre drew upon his knowledge that Jeffrey had in the