past suffered from hearing "voices," as well as other symptoms of mental illness, to coerce Jeffrey's admission of guilt. After threatening Jeffrey with physical violence, McIntyre walked to the sole window in the small room, gestured to the sky, and told Jeffrey that A.C. was looking down from heaven, and wanted Jeffrey's help to find her killer. McIntyre also promised Jeffrey that if Jeffrey confessed he could go home, and that the only punishment Jeffrey would receive was treatment in a mental facility.

109. Frightened, confused, hungry, and trusting McIntyre's word that he would be physically harmed if he did not give the PPD defendants a confession, Jeffrey provided information that drew upon details concerning the crime that had been provided to him by the PPD defendants - many of which were inaccurate. By the end of his statement Jeffrey was sobbing uncontrollably. He eventually fell from his chair and curled himself in a fetal position under the table at which he had been sitting.

110. When Jeffrey finished his statement to McIntyre, defendants Tumolo and Stephens burst in the room, and Tumolo yelled, in substance, that Jeffrey had to repeat his confession, and that they would stay all night if he didn't. Jeffrey attempted to repeat the story that he had told McIntyre.

111. Jeffrey was placed under arrest in Brewster, and was transported by the PPD defendants back to the PPD stationhouse. During the ride back to Peekskill, McIntyre, Levine, and/or Tumolo attempted to convince Jeffrey to provide a more detailed confession. Jeffrey did not do so.

112. Subsequent to January 25, 1990, defendant McIntyre prepared a police report purporting to describe the events that transpired that day with respect to Jeffrey. McIntyre's report

documenting Jeffrey's statements and alleged confession on January 25 falsely represented that critical details originated with Jeffrey, when in fact they had been provided and/or suggested to Jeffrey by various PPD defendants over the course of their multiple interviews and interrogations. Upon information and belief, those details included but were not limited to the following: the fact that A.C.'s bra had been ripped and removed from her body; the fact that A.C.'s body was covered with leaves; the fact that the perpetrator had covered A.C.'s mouth with his hand; the fact that A.C. had been struck on the back of the head; the fact that A.C. had lost her keys; and the location where A.C.'s camera was found.

113. In addition to failing to disclose that critical details in Jeffrey's January 25 statements had been supplied by the PPD defendants, McIntyre's police report also deliberately excluded material, exculpatory and impeachment evidence concerning the coercive circumstances of Jeffrey's interrogation on January 25, including but not limited to the threats of violence against Jeffrey by the PPD defendants and the promise to Jeffrey that if he confessed he could go home and would receive mental health treatment.

114. Stephens prepared documentation of his questioning of Jeffrey during the alleged polygraph, including the words that Jeffrey allegedly spoke to him concerning A.C.'s rape and murder. This documentation falsely represented that facts relayed by Jeffrey originated with him, rather than with the defendants, and does not document material, exculpatory and impeachment evidence including but not limited to the coercive tactics utilized in his questioning, and the sources of the details that he attributed to Jeffrey. The details of the crime that were falsely attributed to Jeffrey's independent knowledge include but were not limited to the following: that A.C. suffered a blow to the back of her head with a blunt object; the

possibility that the perpetrator did not ejaculate; that A.C.'s body was covered with leaves; that A.C. dropped her keys; and that A.C.'s camera was lost; and the locations of the crime.

### Police Coerced, Fabricated, and Concealed Exculpatory Evidence Concerning Additional Investigation of Jeffrey Deskovic

115. Prior to and, upon information and belief, subsequent to Jeffrey's false confession and arrest, PPD investigators interviewed additional witnesses, including but not limited to Jeffrey's friends Martin Burrett and John Laurino, Martin's and John's family members, and additional witnesses whose statements were not documented and/or were misrepresented in critical respects. In the course of these interviews investigators, including but not limited to defendants Levine, McIntyre, and Brovarski, coerced and intimidated witnesses into providing false inculpatory information concerning Jeffrey, fabricated inculpatory statements, including statements portraying Jeffrey as violent or threatening, and failed to document and disclose to prosecutors interviews or portions of interviews that revealed material, exculpatory and impeachment evidence. This undisclosed evidence included, but was not limited to (a) the coercive and intimidating tactics utilized by police in interviewing the witnesses; (b) evidence that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder; (c) evidence that A.C. and Freddy Claxton had no romantic or sexual relationship; and (d) evidence that A.C. had not had consensual sex prior to her rape and murder.

116. The PPD defendants' multiple interviews with Jeffrey's friend Martin Burrett became a centerpiece of their investigation. The PPD defendants knew that Jeffrey and Martin were best friends who spent much of their free time together, and as a result the defendants met with Martin, as well as his parents, both to attempt to obtain inculpatory information concerning

Jeffrey as well as to monitor Jeffrey's response to their questioning of him. In the course of these meetings, the defendants deliberately and recklessly employed many of the same tactics of deception and coercion that they employed with Jeffrey and, previously, with Freddy Claxton, including but not limited to aggressively questioning and threatening Martin into making false inculpatory statements about Jeffrey, and selectively recording their interactions with Jeffrey. Upon information and belief, the PPD defendants fabricated inculpatory information allegedly provided by Martin and his parents, including but not limited to statements alleging that Jeffrey had threatened to kill Martin, and statements concerning Jeffrey's relationship with A.C. The PPD defendants also learned from Matin's statements to them that Jeffrey had learned non-public facts concerning A.C.'s death and the investigation from PPD investigators.

117. The PPD defendants deliberately failed to document and affirmatively concealed material, exculpatory and impeachment evidence concerning interviews conducted with Martin Burrett and his family, including but not limited to the coercive tactics they utilized to obtain inculpatory statements from Martin, their fabrications of allegedly inculpatory evidence, and information provided to them from Martin that revealed that investigative facts known by Jeffrey had been provided to him by the PPD defendants.

### Jeffrey's Indictment Is Procured With Fabrications and Concealment of Material, Exculpatory and Impeachment Evidence

118. Prior to Jeffrey's false confession and subsequent indictment, PPD defendants and prosecutors had taken steps to obtain DNA testing to definitively include or exclude Jeffrey as the perpetrator. Prior to his false confession, Jeffrey consented to have his blood drawn and tested by the PPD, based upon his desire to assist the police, and upon the PPD defendants'

representation that a blood test could clear Jeffrey of any involvement in the crime. Jeffrey's

blood sample and a vaginal swab with semen that was taken from A.C. were sent to the FBI for

DNA testing. In a letter accompanying the samples and requesting DNA testing, defendant

Tumolo stated that the PPD "anticipate[d] that semen evidence will match that from Deskovic's

blood; hence either incriminating or exonerating him in this matter."

119. The PPD defendants and prosecutors were aware that the results of that testing would be

available in a short period of time. However rather than delay Jeffrey's indictment in order to

present the grand jury with the results of the DNA testing, which could conclusively prove or

disprove Jeffrey's guilt or innocence, prosecutors chose to seek Jeffrey's indictment

immediately, without the benefit of those results.

120. On February 27, 1990 Jeffrey Deskovic was indicted on three counts of murder in the

second degree, one count of first degree rape, and one count of fourth degree possession of a

weapon. Prior to his indictment, after approximately a month of incarceration at the Westchester

County Jail, Mr. Deskovic was released from custody pursuant to bail conditions, and was

subject to those bail conditions through the time of his trial. Additionally, for approximately six

months between his indictment and the time of trial Mr. Deskovic was ordered by the court to be

held at psychiatric facilities in Westchester and Rockland Counties.

121. Jeffrey Deskovic was charged and indicted based upon evidence that was fabricated by the

defendants and by means of the defendants' concealment from prosecutors and the grand jury of

material, exculpatory and impeachment evidence that undermined a probable cause

determination. These material misrepresentations included, but were not limited to, the

following: (a) the PPD defendants' creation of false police reports and false statements to

32

prosecutors representing that Jeffrey Deskovic possessed independent knowledge of numerous non-public facts concerning A.C.'s death, when in fact those facts were provided to him by PPD investigators and/or were known by the PPD defendants to be public knowledge; (b) the defendants' fabrication of evidence to make Jeffrey's statements and ultimate confession appear knowing and voluntary, including but not limited to preparing <u>Miranda</u> waiver forms that falsely represented Jeffrey to have knowingly and voluntarily waived his right to counsel when in fact because of Levine's misrepresentations to Jeffrey concerning Lou Ecker Jeffrey's waivers were not knowing and voluntary; (c) the PPD defendants' concealment of material facts concerning the coercive, deceptive, and intimidating tactics employed by them in the course of questioning Jeffrey on and prior to January 25, including but not limited to their concealment of Stephens' and McIntyre's coercive promises and direct and indirect threats of physical harm; and (d) the PPD defendants' concealment of additional material, exculpatory and impeachment evidence concerning witness interviews conducted by them in the case, including but not limited to coercive tactics utilized in witness interviews, evidence that A.C. and Freddy Claxton had no romantic or sexual relationship, evidence that A.C. had not had consensual sex prior to her rape and murder, and other evidence that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder.

## DNA Evidence Exonerates Jeffrey - But the Prosecution Continues

122. Just days after Jeffrey's indictment, DNA testing by the FBI lab excluded Jeffrey as the source of the semen found on the vaginal swab taken from A.C.  The Westchester County District Attorney's Office, including but not limited to Bolen, and the PPD, including but not limited to defendants Levine, McIntyre, and Tumolo, were informed of this result, which was

33

documented in a March 26, 1990 report.

123. Additionally, microscopic hair analysis and comparison of the hairs found on A.C.'s arm, leg, breast, and pubic area with the head and pubic hairs of Jeffrey Deskovic excluded Jeffrey as the source of those hairs. Critically, the hair analyst concluded that at least one hair found on A.C. was consistent with a "negroid-type" hair, typically shed by an African American individual. The Westchester County District Attorney's Office, including but not limited to Bolen, and the PPD, including but not limited to defendants Levine, McIntyre, and Tumolo, were informed of these results.

124. Bolen understood that in the absence of evidence that A.C. had been raped and murdered by multiple perpetrators, or that the semen found in A.C. was attributable to a consensual sexual encounter shortly before her death, the DNA evidence establishing that Jeffrey was not the source of the semen definitively proved Jeffrey's innocence, eviscerated probable cause, and was fatal to his prosecution. Accordingly, Bolen directed that additional investigation be done by the PPD, and personally conducted and personally directed further investigation in order to obtain evidence supporting probable cause to prosecute Jeffrey, and in particular to provide an explanation for the presence of another man's semen inside A.C. following her rape and murder. This investigation began immediately after the DNA results were received within days of Jeffrey's indictment and more than eight months prior to trial.

125. In furtherance of his investigation in the days after he was informed of the DNA results to determine whether prosecution could go forward in light of those results, Bolen also turned to defendant Deputy Medical Examiner Louis Roh, to provide evidence to support the continued prosecution of Jeffrey Deskovic in the face of exonerative DNA evidence. Between March 4,

1990 and March 21, 1990, Bolen and Roh discussed and agreed that Roh would provide

evidence that in his scientific opinion A.C. had been sexually active on multiple occasions prior

to her rape and death, and that during his autopsy he had observed scarring on A.C.'s hymen that

proved this fact. Roh had on previous occasions provided, with Bolen's knowledge and at his

request, baseless and/or false scientific evidence to support Bolen's prosecutions.

126. In fact, Bolen and/or Roh knew, or in the absence of their deliberate and reckless

indifference should have known, that Roh had no scientific basis for stating that A.C. had been

sexually active on multiple occasions, and had not in fact observed the scarring that he reported

to Bolen. Roh and/or Bolen concealed that Roh's conclusions and findings concerning A.C.'s

sexual history were fabricated - a fact which was material, exculpatory and impeachment

evidence - and affirmatively misrepresented the basis for Roh's conclusions and findings to the

defense and the court, beginning as early as a March 21 court conference eight months prior to

trial and continuing through trial and to the present time.

127. Additionally, Bolen deliberately and recklessly failed to investigate known exculpatory

evidence. For example, prior to trial, the State's hair comparison expert contacted Bolen and

requested that he obtain hair reference samples from Roh, Roh's assistant, and Freddy Claxton,

in order to prove or disprove the theory that the hairs found on A.C. that did not match Jeffrey

Deskovic originated with those individuals. Bolen represented to the hair examiner that he

would obtain those samples, and then deliberately or recklessly failed to do so. Bolen also

deliberately or recklessly failed to obtain DNA testing on blood samples from Freddy Claxton,

or from any other potential consensual donor of semen.

128. The PPD defendants also understood, in light of the exonerative DNA results, that the DNA

35

evidence conclusively establishing that Jeffrey was not the source of the semen fatally

undermined their theory of his guilt and the validity of his confession.

129. This was all the more evident in light of the PPD defendants' investigative misconduct prior

to Jeffrey's indictment - including, but not limited to, the defendants' interference with Jeffrey's

right to counsel; their coercion of allegedly inculpatory statements from Jeffrey; their providing

to Jeffrey one or more of the non-public facts contained in his allegedly inculpatory statements;

their fabrications of allegedly inculpatory witness statements; and their withholding of additional

exculpatory and impeachment evidence that undermined probable cause, including but not

limited to evidence concerning their coercive tactics in witness interviews, witness statements

and other evidence that Freddy Claxton and A.C. had not had a romantic relationship, witness

statements and other evidence that A.C. was not sexually active, and other evidence undermining

Jeffrey Deskovic's guilt.  Even after learning of the DNA test results, however, the PPD

defendants continued to conceal from prosecutors their previously undisclosed misconduct and

still failed to disclose exculpatory and impeachment evidence to the prosecution.

130. Moreover, the PPD defendants conducted further post-DNA, pretrial investigation on their

own initiative and at the direction of prosecutors including Bolen.  Upon information and belief,

in the course of that investigation the PPD defendants uncovered additional exculpatory and

impeachment evidence, including but not limited to evidence that was material to the

prosecution's efforts to account for the fact that Jeffrey was not the source of the semen found

inside A.C.  The PPD defendants failed to document and disclose this evidence.

131. Had the PPD defendants taken basic steps prior to and following Jeffrey's indictment to

investigate known exculpatory evidence and leads, instead of blindly investigating only to

36

corroborate theories of guilt, they would have uncovered readily available evidence that not only exonerated Jeffrey, but also undermined their initial theories of the case and led them to the actual perpetrator. These investigative steps include, but are not limited to, the following: (a) conducting and documenting thorough interviews with individuals who were near the crime scene on November 15, 1989, including two individuals who were playing basketball and who spoke to Steven Cunningham that day; (b) conducting and documenting a complete and thorough canvass of the crime scene, and collecting and vouchering all available evidence, which upon information and belief would have led to the discovery of physical evidence traceable to Steven Cunningham; (c) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that Freddy Claxton and A.C. had not had a romantic relationship of any kind; (d) thoroughly and completely investigating and documenting information provided to the police by witnesses who stated unequivocally that A.C. had not had consensual sex prior to her rape and murder; (e) thoroughly and completely investigating and documenting the possible sources for details and theories contained in Jeffrey Deskovic's statements to the police, which would have undermined the contention by the police and prosecutors that he had independent knowledge that could only have been possessed by the perpetrator.

### Prosecutorial and Police Misconduct Deprive Jeffrey of a Fair Trial

132. A critical challenge facing the prosecution at Jeffrey's criminal trial was to explain how Jeffrey could have raped A.C. despite scientific proof that the semen found inside of her, and hairs found on her body, were not his. At trial, Bolen explained to the jury why his theory of the case was true, despite clearly exculpatory evidence to the contrary, by arguing false and

37

unsupported evidentiary inferences to the jury through baseless allegations concerning a

consensual sexual relationship between Freddy Claxton and A.C., and through Roh's

fabrications. Bolen's misconduct at trial provides further evidence that his post-indictment,

investigative conduct, beginning at least eight months prior to trial, in jointly fabricating

evidence with Roh was knowing and deliberate.

133. Bolen elicited from Roh the false and fabricated testimony that they had discussed prior to

trial: (a) that Roh had a scientific basis for concluding that A.C. had been sexually active on

multiple occasions prior to her death; and (b) that during his autopsy Roh had observed scarring

on A.C.'s hymen. Bolen relied upon Roh's fabrications in his opening and closing arguments to

the jury as the sole evidence supporting the prosecution theory that the semen found in A.C. had

come from a consensual sex partner - namely Freddy Claxton. Roh and/or Bolen concealed the

critical, exculpatory fact that Roh's critical testimony on this score had been fabricated prior to

trial.

134. In truth, there was no factual basis for Roh's conclusions in his testimony that A.C.'s

hymen showed multiple areas of previous, healed tear, and no factual basis by history or autopsy

to suggest that A.C. engaged in multiple prior acts of sexual intercourse.

135. Furthermore, Bolen explained to the jury the presence on A.C.'s body of hairs that did not

match Jeffrey - including hairs consistent with a "negroid" type - by advancing the baseless

theory that the hairs had in fact been shed by Roh, his African American assistant, and Freddy

Claxton. Bolen advanced this argument despite his deliberate and reckless decision never to

obtain hair samples from Roh, his assistant, or Claxton for comparative analysis to confirm or

conclusively refute his theory - despite Bolen's representation to the State's hair expert that such

samples would be obtained for comparison.

136. Additionally, Bolen argued to the jury at trial that Freddy Claxton was the actual donor of the semen found inside of A.C., despite the fact that he knew, or in the absence of his deliberate and reckless indifference should have known, that there was no basis in fact for such an assertion. Specifically, Bolen learned during his own investigation and/or through investigations conducted by PPD officers at his direction after DNA testing vitiated probable cause, that there was no evidence supporting the assertion that Freddy and A.C. had ever had a sexual relationship. In an effort to conceal that knowledge, Bolen deliberately and/or recklessly failed to investigate his theory of Freddy Claxton's relationship with the victim, including by failing to order or request that DNA testing be conducted on Freddy Claxton - a procedure which would have definitively disproved Bolen's theory.

137. The PPD defendants' fabrications and concealment of material, exculpatory and impeachment evidence adduced in their investigation also were critical in obtaining Mr. Deskovic's conviction.

138. The PPD defendants' fabrications formed the basis for Bolen's argument at trial that Jeffrey's January 25 confession and prior allegedly incriminating statements were knowing and voluntary, and demonstrated that he knew facts that only the perpetrator of A.C.'s rape and murder could have known. In particular, Bolen argued that Jeffrey's knowledge of the note referring to Freddy Claxton proved that he had been present at and motivated to commit the crime; that Jeffrey's statement that he ripped off A.C.'s bra was consistent with the non-public fact that A.C.'s bra had been found away from her body; that Jeffrey's statement that he held his hand over A.C.'s mouth matched non-public details concerning A.C.'s injuries; that Jeffrey's

statement that he hit A.C. on the back of the head with a Gatorade bottle matched non-public

facts concerning A.C.'s cause of death; that Jeffrey's knowledge that A.C. had lost her keys

corroborated his involvement in the crime; that Jeffrey's statement that the perpetrator might not

have ejaculated confirmed that he could have committed the crime and not left behind semen;

and that Jeffrey's drawing of three crime scenes and the location where A.C.'s camera was found

was consistent with the PPD's non-public theory of how the crime was committed.

139. Furthermore, the PPD defendants' deliberate concealment of material, exculpatory and

impeachment evidence was material to the jury's consideration of all of the issues raised at trial -

including but not limited to the voluntariness and truthfulness of Jeffrey's confession, and the

prosecutor's arguments concerning a relationship between Freddy Claxton and A.C. and A.C.'s

sexual history - as well as to the jury's assessment of the credibility of the State's witnesses and

the integrity of the investigation of the case.

### Mr. Deskovic's Incarceration and Efforts to Prove His Innocence

140. On December 7, 1990 Jeffrey Deskovic was convicted by a Westchester County jury of

murder, rape, and possession of a weapon.  On January 18, 1991, at a sentencing proceeding

where Jeffrey proclaimed his innocence and pleaded for mercy from the court, Judge Collabella

sentenced Jeffrey to fifteen years to life in prison.

141. From the time of his conviction until his ultimate release in 2006 Jeffrey Deskovic fought

tirelessly to vindicate his innocence, through the courts on appeal and through habeas petitions,

and by direct appeals to policymakers, including former Westchester County District Attorney

Jeanine Pirro, that his case and criminal trial be reexamined.

142. Mr. Deskovic appealed his conviction to the New York Appellate Division, Second

40

Department. The court affirmed his conviction on February 14, 1994. On July 6, 1994 the New

York Court of Appeals denied Jeffrey leave to appeal the decision of the Second Department.

143. Mr. Deskovic sought relief from his wrongful conviction through a petition for a writ of

habeas corpus, which was denied by District Judge Barbara Jones on November 21, 1997. In his

December 4, 1997 appeal of that denial to the Second Circuit Court of Appeals, Mr. Deskovic

argued that he should have "the opportunity to further establish his innocence by additional and

new DNA testing employing the state of the art of DNA investigation in a science which can be

even more certain today." The appeal was rejected on April 26, 2000, and Mr. Deskovic's

petition for certiorari was denied by the United States Supreme Court on January 8, 2001

### Jeffrey Endures Physical and Sexual Assault by Correctional Officers

144. Throughout the many years that Jeffrey Deskovic was incarcerated at Elmira Correctional

Facility, and on multiple occasions on or subsequent to September 18, 2004, defendant Tweed,

in the course of conducting routine searches of Jeffrey's person outside the confines of his prison

cell, repeatedly, routinely, and deliberately conducted pat-down searches of Jeffrey in a manner

that was contrary to prison policy for the purpose of subjecting Jeffrey to unnecessary, invasive,

assaultive, and violative physical contact, including contact of a sexual nature.

145. Defendant Tweed's conduct included, but was not limited to, violating policies and

procedures for pat-down searches that required prisoners to remove items from their own pockets

prior to pat-down, and instead removing items from Jeffrey's pockets himself, for the purpose of

groping Jeffrey's sexual organs and otherwise assaulting and harassing Jeffrey.

146. Upon information and belief, defendant engaged in this conduct openly and notoriously, as

a matter of routine pattern and practice, and with the knowledge and express or tacit approval of

41

his colleagues and supervisors.

### The Real Killer Is Identified and Jeffrey Is Exonerated

147. Jeffrey Deskovic continued his tireless efforts to obtain DNA retesting and comparison, until 2006 when newly elected Westchester County District Attorney Janet DiFiore consented to conduct STR DNA testing on the semen found on the vaginal swab taken from A.C., and to run the results of that testing against the available DNA databases for convicted offenders.

148. In September 2006 the DNA profile obtained from the semen found on the vaginal swab was matched to Steven Cunningham, who was already incarcerated in New York for the 1993 murder of a Peekskill school teacher.  In March 2007 Mr. Cunningham pleaded guilty to the rape and murder of A.C., and on May 2, 2007 he was sentenced to an additional twenty years in prison for the crime.

149. Jeffrey Deskovic did not know Steven Cunningham, and had never met or seen him prior to attending court proceeding in 2007.

150. On September 20, 2006 Jeffrey Deskovic's conviction was vacated and he was released from prison based upon a joint CPL § 440.10 motion by the Westchester County District Attorney's Office and counsel for Mr. Deskovic.

151. On November 2, 2006, on motion by the Westchester County District Attorney, the indictment against Mr. Deskovic was dismissed on the ground of actual innocence.

### Policies and Customs of the PPD, the Westchester County District Attorney's Office, and the Westchester County Medical Examiner's Office

152. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey Deskovic, the City of Peekskill and the PPD, by and through their final policymakers,

42

maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning

improper, illegal, and unconstitutional investigative techniques, including but not limited to the

following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants; (b)

fabricating evidence; (c) failing to document and disclose material, exculpatory and

impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence

and otherwise failing to conduct constitutionally adequate investigations.

153. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey

Deskovic, the City of Peekskill and the PPD, by and through their final policymakers,

maintained a policy, custom, or pattern and practice of failing to adequately train and supervise

PPD investigators in connection with fundamental investigative tasks implicating the

constitutional rights of witnesses and suspects, including but not limited to conducting custodial

interrogations and witness interviews, and documenting and disclosing exculpatory and

impeachment evidence to prosecutors.

154. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to

train and supervise PPD investigators were reflected by the multiple acts of misconduct and

illegality committed by multiple PPD detectives and supervisors in relation to multiple suspects

and witnesses in the A.C. investigation, as described above.

155. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to

supervise and train were also reflected in numerous prior cases and investigations which, upon

information and belief, were known to the PPD defendants and policymakers prior to the A.C.

investigation.  The misconduct committed in those cases by PPD investigators, including but not

limited to defendant Tumolo and other investigators involved in Mr. Deskovic's case, was

43

actually or constructively known to PPD supervisors and policymakers prior to the A.C. investigation - including by means of their direct participation in the investigations, and/or by published judicial decisions exposing the investigative misconduct - and, upon information and belief, PPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate PPD investigators in response to such notice.

156. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to adequately supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional duties, including but not limited to (a) the disclosure of exculpatory and impeachment evidence to the defense; (b) investigating and acting upon exculpatory evidence that vitiates probable cause; and (c) constitutional prohibitions on fabricating evidence and suborning perjury.

157. Pursuant to this policy, custom, or pattern and practice, policymakers for the District Attorney's Office abdicated and effectively delegated to senior assistant district attorneys and supervisors, including but not limited to Bolen, the authority and discretion to conduct and supervise investigations and prosecutions with deliberate and reckless disregard for their constitutional and ethical duties.  As a result, assistant district attorneys and supervisors, including but not limited to Bolen, routinely and knowingly engaged in investigative and prosecutorial misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

158. In particular, as a direct result of policymakers' and supervisors' abdication of authority for

44

supervising, training, and disciplining prosecutors, assistant district attorney Bolen routinely, notoriously, and as a matter of policy, custom, and pattern or practice violated constitutional and ethical norms by concealing material, exculpatory and impeachment evidence from the defense and deliberately and recklessly failing to investigate known exculpatory leads in order to permit him to argue evidentiary inferences to juries that he knew, or in the absence of his deliberate indifference should have known, were unsupported or contradicted by known facts.  In furtherance of this policy, custom, and pattern or practice Bolen routinely failed to disclose material, exculpatory and impeachment evidence to the defense; deliberately and recklessly failed to investigate known exculpatory evidence, and in particular forensic evidence; deliberately and recklessly relied upon forensic experts, including Deputy Medical Examiner Roh, to provide fabricated, baseless, and/or misleading scientific inculpatory evidence; and engaged in additional acts of prosecutorial misconduct aimed at securing convictions at all costs.

159. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was reflected by the multiple acts of misconduct and illegality committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, as described above.  The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was also reflected by multiple high priority and highly publicized prosecutions and post-conviction proceedings prior and subsequent to the prosecution of Jeffrey Deskovic, in which senior district attorneys and supervisors, including but not limited to Bolen, engaged in, condoned, and facilitated prosecutorial misconduct.

160. Bolen's prior record of fabricating, concealing, and failing to investigate evidence in

furtherance of his theories of prosecution included but was not limited to his work, individually

and in concert with Roh, on the prosecution of Jean Harris for the murder of Herman Tarnower.

Bolen's and Roh's conduct included the following:

    a.   On March 10, 1980 Dr. Herman Tarnower died of gunshot wounds in Westchester

        County, New York.  Jean Harris was arrested and charged with second degree murder.

    b.   Bolen was the lead Westchester County District Attorney's Office prosecutor on the case,

        and Roh was the Deputy Medical Examiner who conducted an autopsy on the body of

        Dr. Tarnower, prepared a report of that autopsy, and provided expert forensic pathology

        consultation and testimony on behalf of and at the request of the State.

    c.   The prosecution's theory of the case was that Ms. Harris, who had been in a romantic

        relationship with Dr. Tarnower, had intentionally shot him in the course of a dispute.

        Ms. Harris's defense was that on the night of Dr. Tarnower's murder she had attempted

        to commit suicide by shooting herself, and that Dr. Tarnower was accidentally shot in a

        struggle when he attempted to prevent her from killing herself.

    d.   Bolen and Roh discussed and agreed early on in the prosecution of Ms. Harris, and on an

        ongoing basis through the trial, that Roh would materially misrepresent scientific

        evidence in support of the State's theory of intentional murder.  Specifically, Bolen and

        Roh agreed that Roh would testify to having made observations and drawn conclusions,

        supported by scientific evidence, that Dr. Tarnower had been shot while his hand was

        raised in a "defensive" posture - and specifically that Roh had performed histologic

        examinations of tissues from a bullet wound in Dr. Tarnower's chest, and that in the

        course of those examinations Roh had observed and analyzed evidence supporting the

46

conclusion that a single bullet had traveled through Dr. Tarnower's hand and chest. In fact, both Bolen and Roh knew, or in the absence of their deliberate and reckless disregard of the truth should have known, that Roh had not in fact made the histologic observations he claimed to have made, and that the Roh's assertions in written and oral reports and in trial testimony that he had in fact seen and analyzed the histological evidence that allegedly provided the scientific basis for his forensic conclusions were baseless, false, and fabricated.

161. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was known, or in the absence of their deliberate and reckless indifference should have been known, to policymakers for the District Attorney's Office, at and prior to the time of Jeffrey Deskovic's prosecution. Policymakers were on actual and constructive notice of the misconduct of Bolen and other assistant district attorneys through, among other mechanisms, their direct involvement in Jeffrey Deskovic's prosecution, Bolen's widely known reputation for engaging in and condoning prosecutorial misconduct, and misconduct perpetrated in multiple high priority and highly publicized prosecutions and post-conviction proceedings prior to Mr. Deskovic's conviction.

162. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through its final policymakers and their delegees, maintained a policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial. In particular, defendant

47

and Deputy Medical Examiner Roh routinely, notoriously, and as a matter of policy, custom, and pattern or practice fabricated evidence, gave perjured testimony, and/or engaged in deliberate and reckless overreaching with respect to allegedly inculpatory scientific conclusions.

163. Roh's acts of fabricating evidence, giving perjured testimony, and/or engaging in deliberate and reckless overreaching with respect to allegedly inculpatory scientific conclusions prior and subsequent to Jeffrey Deskovic's case include but are not limited to the following:

   a.  As described above, Roh, in concert with Bolen, provided false and fabricated scientific conclusions prior to and at the time of trial in the Jean Harris prosecution.

   b.  Roh also conducted a deliberately or reckless inadequate investigation into, and false and baseless testimony concerning, the 1994 death of Daniel Vassello in Orange County, New York. Pursuant to a contractual agreement with Orange County, Roh investigated Daniel's death, including by performing an autopsy and preparing an autopsy report, and stated a conclusion, later repeated by him at in pretrial conversations with prosecutors and at trial, that Daniel had died as a result of the effects of gasoline inhalation. Based in part on Roh's autopsy report, Daniel's parents, Daniel and Dona Vassello, were indicted on charges of criminally negligent homicide. In fact, as Judge Jeffrey G. Berry found in his August 4, 1995 decision acquitting the Vassellos on all charges, and rejecting the conclusions and testimony of Roh, the cause of Daniel's death was not gasoline inhalation, but rather bacterial meningitis. Roh knew, and/or in the absence of his deliberate and reckless indifference should have known, that his autopsy of Daniel Vassello had contravened fundamental standards of forensic pathology, that his autopsy report contained baseless and/or false conclusions concerning Daniel's cause of death,

48

and that he lacked a scientific basis for his pretrial assertions and trial testimony that to a reasonable degree of medical certainty Daniel died of gasoline fume inhalation.

c.  Following the Vassello case, on August 17, 1995, Orange County District Attorney Francis Phillips wrote to the County Coroner Anthony Ingrassia to inform him that, "in various criminal cases" Dr. Roh's findings had been "either incomplete, inadequate, or erroneous," and that "a suitable replacement" must be found for Dr. Roh to do forensic work on behalf of Orange County.  (Phillips Letter, attached as Exhibit 1.)

d.  In 1997 Michael Maragh was prosecuted and tried in Orange County in connection with the death of his girlfriend.  Roh testified on behalf of Orange County pursuant to his contract with the County to conduct autopsies and other pathology-related investigation into suspicious deaths in the County.  On November 12, 1997, during Roh's cross-examination in the Maragh case, Roh was shown the August 17, 1995 Francis Phillips letter.  Roh testified that he had never seen the letter before that day.

e.  In January 1998, two months later, Roh testified as a retained expert for the defendant in the Dutchess County case of People v. Kilmer.  On cross-examination, Assistant District Attorney Marjorie Smith asked Roh whether he was aware of the Phillips letter that was shown to him during the Maragh trial.  Roh first testified that he was not aware of the letter, then gave evasive answers to further questions about whether he had ever seen the letter.  On February 11, 1998, Judge Thomas J. Dolan, who presided over the Kilmer trial, wrote to Dutchess County District Attorney William Grady to "formally advise" Grady of "inconsistent" and "disturbing" testimony given by Roh in Dutchess County and in the Maragh case.  (Judge Dolan Letter, attached as Exhibit 2.)

f.   On March 16, 1998 Grady wrote to the New York State Department of Health, Office of Professional Medical Conduct, which is the State entity responsible for medical licensing in New York State, and described Roh's conduct in the <u>Maragh</u> and <u>Kilmer</u> cases as a "serious breach of [Roh's]  ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment."  (Grady Letter, attached as Exhibit 3.)

g.   In 2001, Charles Bodenburg was tried in Suffolk County in connection with the death of three-year-old Kayla Zachman.  Autopsy evidence, including head trauma with diffuse axonal injury, pointed to shaken infant syndrome and smothering being the cause of death; toxicology analysis revealed a blood alcohol concentration of .03% and a brain alcohol concentration of .01% in the girl. On June 7, 2001 Bodenburg was convicted of second degree murder.  Roh was retained by the defense as a pathology expert, and he testified at trial.  Roh testified that the actual cause of death was alcohol poisoning. Rebuttal evidence was presented by the prosecution citing medical and toxicologic literature indicating children may survive very high levels of alcohol.  On July 16, 2001 Dr. Charles Wetli, Chief Medical Examiner for Suffolk County, Dr. Stuart Dawson, Deputy Chief Medical Examiner for Suffolk County, and Dr. Edward Briglia, Chief of the Suffolk County Toxicology Laboratory, wrote to the New York State Department of Health, the entity responsible for State medical licensing, concerning Roh's conduct in the case.  The letter described Roh's testimony as lacking scientific basis, and stated that Roh "went far beyond what would be expected of a defense expert," and that "his testimony was misleading and had no reasonable basis in fact."  (July 16, 2001 Letter,

50

attached as Exhibit 4.)

h.   On December 31, 2002, 83-year-old Aniele Walker died in White Plains, Westchester

County, New York.  Her nephew, John Spruill, was charged with and acquitted of her

murder.  Roh was the Deputy Medical Examiner who conducted an autopsy on the body

of Ms. Walker.  Roh was deposed over the course of several in connection with a

Westchester County Surrogate's Court proceeding, In the Matter of Aniela Walker, No.

074/2003, that was brought in connection with Ms. Walker's death.  In the course of

those proceedings, Roh was examined extensively concerning his autopsy and cause-of-

death findings in the Walker case, including questioning concerning whether the

examinations and observations that he made in that case were consistent with minimally

accepted practices in pathology and with Roh's own practices over his more-than-two-

decades of experience.  On October 31, 2003, Roh admitted under oath, and in the

presence of a Westchester County Assistant District Attorney, that following an earlier

session of his deposition on October 20, 2003 he willfully destroyed twenty-to-thirty file

drawers of index cards documenting his prior instances of testimony as a pathology

expert, in order to avoid having to produce them in response to a subpoena. (Excerpt of

Roh Testimony in In the Matter of Aniela Walker, attached as Exhibit 5.)

164. Additionally, prior to and at the time of the investigation, prosecution, and conviction of

Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final

policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing

to supervise, train and discipline deputy medical examiners.  The absence of supervision,

training, and discipline as a matter of policy, custom, or pattern and practice established a

51

climate of impunity in which the misconduct of defendant Roh and others was condoned and

facilitated, and created a known and obvious risk that the constitutional rights of criminal

suspects would be violated.

165. Policymakers for the Westchester County Medical Examiner's Office were on actual and

constructive notice of the misconduct of Roh and other deputy medical examiners through,

among other mechanisms, their direct involvement in and knowledge of Jeffrey Deskovic's

prosecution, Roh's widely known reputation for fabricating engaging in and condoning

prosecutorial misconduct including in the investigations and prosecutions described above, and

specific publicity and notoriety generated from Roh's conduct in highly publicized criminal

proceedings prior to Mr. Deskovic's conviction.

## DAMAGES

166. The actions of the defendants deprived plaintiff Jeffrey Deskovic of his civil rights under

the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and

under the laws of New York.

167. The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and

omissions of the defendants caused Jeffrey Deskovic to be wrongly seized, maliciously

prosecuted, unfairly tried, wrongfully convicted, subjected to illegal searches and cruel and

unusual punishment during the course of his incarceration, and forced to serve nearly sixteen

years in prison for a crime he did not commit.

168. The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or

bad-faith acts and omissions of the defendants caused Jeffrey Deskovic the following injuries

and damages, which were foreseeable to the defendants at the time of their acts and omissions,

and which continue to date and will continue into the future: multiple physical assaults and

batteries, including assaults of a sexual nature, and other physical injuries; pain and suffering;

severe mental anguish; multiple suicide attempts; emotional distress; loss of family relationships;

severe psychological damage; loss of educational opportunity; loss of professional opportunity;

loss of income; out-of-pocket legal expenses for appellate representation; infliction of physical

illness; inadequate medical care; humiliation, indignities and embarrassment; degradation;

permanent loss of natural psychological development; and restrictions on all forms of personal

freedom including but not limited to diet, sleep, personal contact, educational opportunity,

vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family

relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled

monetary relief.

169. All the acts and omissions committed by the defendants described herein for which liability

is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently

and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages

## COUNT I

### 42 U.S.C. § 1983 Claim for Violation of Mr. Deskovic's
### Right Against Self-Incrimination and to a Fair Trial
### Against Defendants Levine, McIntyre, Tumolo, and Stephens

170. Mr. Deskovic  hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

171. Defendants Levine, McIntyre, Tumolo, and Stephens, acting individually and in concert,

deliberately and recklessly coerced and compelled allegedly inculpatory statements from Jeffrey

Deskovic and caused those statements to be introduced against him in connection with his

53

indictment and prosecution, in violation of Jeffrey's Fifth and Fourteenth Amendment rights not to be compelled to be a witness against himself, not to be deprived of liberty without due process of law, and to a fair criminal trial.

172. Specifically, on and prior to January 25, 1990, defendants Levine, McIntyre, Tumolo, and Stephens deliberately and recklessly exploited Jeffrey Deskovic's youth, inexperience with law enforcement, emotional and psychological vulnerabilities, and lack of advice and assistance of legal or parental counsel to convince Jeffrey, through physical threats, trickery, deceptive promises, and other means to make false inculpatory statements that were not voluntarily and freely given.  Furthermore, Jeffrey's waivers, on and prior to January 25, 1990, of his right not to submit to questioning by the police without the presence or assistance of legal counsel were not freely and voluntarily made, as a result of the defendants' deliberate and reckless actions to deceive Jeffrey concerning the status and legal significance of his representation and the defendants' questioning.

173. Additionally, defendants Levine, McIntyre, Tumolo, and Stephens, individually and in concert, deliberately and recklessly provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime.

174.  Because of the PPD defendants' coercion and trickery Jeffrey's will was overborne such that the confession was not the product of his free will and rational intellect.

175.  At the time that Jeffrey Deskovic allegedly confessed to the rape and murder of A.C., a reasonable person in Jeffrey's position would have perceived his freedom to be significantly

54

restricted and would not have understood himself to be free to leave, and hence Jeffrey was in

the defendants' custody. Among the circumstances that rendered Jeffrey's alleged confession

custodial were factors that were not documented and were affirmatively concealed from

prosecutors and the court by the defendants, including but not limited to the defendants' direct

and indirect threats on January 25 that Jeffrey would be physically harmed if he did not confess,

and the defendants' deceptive and coercive promises concerning the consequences of Jeffrey's

January 25 confession.

176. The false and involuntary confession obtained from Jeffrey Deskovic on January 25, 1990

was introduced against him in pretrial proceedings and at his criminal trial.

177. Defendants' actions to compel Mr. Deskovic to be a witness against himself were in

violation of clearly established constitutional law, and no reasonable police officer in 1989 and

1990 would have believed that the defendants' actions were lawful.

178. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

convicted and imprisoned for sixteen years, and suffered the other grievous and continuing

injuries and damages as set forth above.

## COUNT II

### 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material, Exculpatory and Impeachment Evidence, and Failing to Investigate in Violation of the Fourteenth Amendment Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh

179. Mr. Deskovic hereby incorporates and references all of the foregoing paragraphs and

further alleges as follows.

180. Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh, acting individually and in

55

concert, fabricated evidence, concealed material, exculpatory and impeachment evidence, and deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation, thereby depriving Mr. Deskovic of his Fourteenth Amendment right not to be deprived of liberty without due process of law and to a fair criminal trial.

181. Specifically, defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens, deliberately and recklessly coerced inculpatory statements from Mr. Deskovic which were not the product of Mr. Deskovic's free will and rational intellect, supplied Mr. Deskovic with specific details of the crime which Mr. Deskovic subsequently incorporated and repeated in allegedly inculpatory statements, and/or knew that details known to Mr. Deskovic were readily obtainable through public sources.  The defendants falsely represented to prosecutors in police reports, in the course of charging and indicting Mr. Deskovic, and at trial, that Mr. Deskovic's statements were in fact freely and voluntarily given, and that Mr. Deskovic had independent knowledge of non-public details of the crime that actually had been provided to him by the defendants and/or were available from public sources.  The false evidence which the defendants thereby fabricated was introduced against Mr. Deskovic at trial, was a basis for the jury's verdict against him, and thus deprived him of a fair criminal trial.

182. Additionally, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and recklessly coerced and/or fabricated allegedly inculpatory statements from witnesses including but not limited to Freddy Claxton, Martin Burrett, and Martin Burrett's parents, and concealed additional material, exculpatory and impeachment evidence concerning witness interviews conducted by them in the case, including but not limited to coercive tactics utilized in witness interviews, evidence that A.C. and Freddy Claxton had no romantic or sexual relationship,

56

evidence that A.C. had not had consensual sex prior to her rape and murder, and other evidence from witnesses that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder.

183. Furthermore, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence. The defendants' deliberate and reckless failure to investigate exculpatory evidence that was known to them, or that in the absence of their deliberate and reckless indifference should have been known to them, caused Mr. Deskovic to be deprived of a fair criminal trial.

184. Defendant Roh deliberately and recklessly fabricated allegedly inculpatory evidence concerning A.C.'s prior sexual history, and concealed material, exculpatory and impeachment evidence concerning those fabrications. In the course of pretrial investigations and conversations with Bolen, Roh falsely, deliberately, and with reckless disregard for the truth represented (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by

57