Department. The court affirmed his conviction on February 14, 1994. On July 6, 1994 the New York Court of Appeals denied Jeffrey leave to appeal the decision of the Second Department.

143. Mr. Deskovic sought relief from his wrongful conviction through a petition for a writ of habeas corpus, which was denied by District Judge Barbara Jones on November 21, 1997. In his December 4, 1997 appeal of that denial to the Second Circuit Court of Appeals, Mr. Deskovic argued that he should have "the opportunity to further establish his innocence by additional and new DNA testing employing the state of the art of DNA investigation in a science which can be even more certain today." The appeal was rejected on April 26, 2000, and Mr. Deskovic's petition for certiorari was denied by the United States Supreme Court on January 8, 2001

### Jeffrey Endures Physical and Sexual Assault by Correctional Officers

144. Throughout the many years that Jeffrey Deskovic was incarcerated at Elmira Correctional Facility, and on multiple occasions on or subsequent to September 18, 2004, defendant Tweed, in the course of conducting routine searches of Jeffrey's person outside the confines of his prison cell, repeatedly, routinely, and deliberately conducted pat-down searches of Jeffrey in a manner that was contrary to prison policy for the purpose of subjecting Jeffrey to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature.

145. Defendant Tweed's conduct included, but was not limited to, violating policies and procedures for pat-down searches that required prisoners to remove items from their own pockets prior to pat-down, and instead removing items from Jeffrey's pockets himself, for the purpose of groping Jeffrey's sexual organs and otherwise assaulting and harassing Jeffrey.

146. Upon information and belief, defendant engaged in this conduct openly and notoriously, as a matter of routine pattern and practice, and with the knowledge and express or tacit approval of

41

his colleagues and supervisors.

### The Real Killer Is Identified and Jeffrey Is Exonerated

147. Jeffrey Deskovic continued his tireless efforts to obtain DNA retesting and comparison, until 2006 when newly elected Westchester County District Attorney Janet DiFiore consented to conduct STR DNA testing on the semen found on the vaginal swab taken from A.C., and to run the results of that testing against the available DNA databases for convicted offenders.

148. In September 2006 the DNA profile obtained from the semen found on the vaginal swab was matched to Steven Cunningham, who was already incarcerated in New York for the 1993 murder of a Peekskill school teacher. In March 2007 Mr. Cunningham pleaded guilty to the rape and murder of A.C., and on May 2, 2007 he was sentenced to an additional twenty years in prison for the crime.

149. Jeffrey Deskovic did not know Steven Cunningham, and had never met or seen him prior to attending court proceeding in 2007.

150. On September 20, 2006 Jeffrey Deskovic's conviction was vacated and he was released from prison based upon a joint CPL § 440.10 motion by the Westchester County District Attorney's Office and counsel for Mr. Deskovic.

151. On November 2, 2006, on motion by the Westchester County District Attorney, the indictment against Mr. Deskovic was dismissed on the ground of actual innocence.

### Policies and Customs of the PPD, the Westchester County District Attorney's Office, and the Westchester County Medical Examiner's Office

152. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey Deskovic, the City of Peekskill and the PPD, by and through their final policymakers,

42

maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

153. Prior to and at the time of the unlawful investigation, prosecution, and conviction of Jeffrey Deskovic, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

154. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise PPD investigators were reflected by the multiple acts of misconduct and illegality committed by multiple PPD detectives and supervisors in relation to multiple suspects and witnesses in the A.C. investigation, as described above.

155. The PPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train were also reflected in numerous prior cases and investigations which, upon information and belief, were known to the PPD defendants and policymakers prior to the A.C. investigation. The misconduct committed in those cases by PPD investigators, including but not limited to defendant Tumolo and other investigators involved in Mr. Deskovic's case, was

43

actually or constructively known to PPD supervisors and policymakers prior to the A.C. investigation - including by means of their direct participation in the investigations, and/or by published judicial decisions exposing the investigative misconduct - and, upon information and belief, PPD supervisors and policymakers failed to train, supervise, discipline, or otherwise remediate PPD investigators in response to such notice.

156. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to adequately supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional duties, including but not limited to (a) the disclosure of exculpatory and impeachment evidence to the defense; (b) investigating and acting upon exculpatory evidence that vitiates probable cause; and (c) constitutional prohibitions on fabricating evidence and suborning perjury.

157. Pursuant to this policy, custom, or pattern and practice, policymakers for the District Attorney's Office abdicated and effectively delegated to senior assistant district attorneys and supervisors, including but not limited to Bolen, the authority and discretion to conduct and supervise investigations and prosecutions with deliberate and reckless disregard for their constitutional and ethical duties. As a result, assistant district attorneys and supervisors, including but not limited to Bolen, routinely and knowingly engaged in investigative and prosecutorial misconduct, and condoned and facilitated the misconduct of subordinates, in a climate of impunity.

158. In particular, as a direct result of policymakers' and supervisors' abdication of authority for

44

supervising, training, and disciplining prosecutors, assistant district attorney Bolen routinely, notoriously, and as a matter of policy, custom, and pattern or practice violated constitutional and ethical norms by concealing material, exculpatory and impeachment evidence from the defense and deliberately and recklessly failing to investigate known exculpatory leads in order to permit him to argue evidentiary inferences to juries that he knew, or in the absence of his deliberate indifference should have known, were unsupported or contradicted by known facts. In furtherance of this policy, custom, and pattern or practice Bolen routinely failed to disclose material, exculpatory and impeachment evidence to the defense; deliberately and recklessly failed to investigate known exculpatory evidence, and in particular forensic evidence; deliberately and recklessly relied upon forensic experts, including Deputy Medical Examiner Roh, to provide fabricated, baseless, and/or misleading scientific inculpatory evidence; and engaged in additional acts of prosecutorial misconduct aimed at securing convictions at all costs.

159. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was reflected by the multiple acts of misconduct and illegality committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, as described above. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was also reflected by multiple high priority and highly publicized prosecutions and post-conviction proceedings prior and subsequent to the prosecution of Jeffrey Deskovic, in which senior district attorneys and supervisors, including but not limited to Bolen, engaged in, condoned, and facilitated prosecutorial misconduct.

160. Bolen's prior record of fabricating, concealing, and failing to investigate evidence in

45

furtherance of his theories of prosecution included but was not limited to his work, individually and in concert with Roh, on the prosecution of Jean Harris for the murder of Herman Tarnower. Bolen's and Roh's conduct included the following:

a. On March 10, 1980 Dr. Herman Tarnower died of gunshot wounds in Westchester County, New York. Jean Harris was arrested and charged with second degree murder.

b. Bolen was the lead Westchester County District Attorney's Office prosecutor on the case, and Roh was the Deputy Medical Examiner who conducted an autopsy on the body of Dr. Tarnower, prepared a report of that autopsy, and provided expert forensic pathology consultation and testimony on behalf of and at the request of the State.

c. The prosecution's theory of the case was that Ms. Harris, who had been in a romantic relationship with Dr. Tarnower, had intentionally shot him in the course of a dispute. Ms. Harris's defense was that on the night of Dr. Tarnower's murder she had attempted to commit suicide by shooting herself, and that Dr. Tarnower was accidentally shot in a struggle when he attempted to prevent her from killing herself.

d. Bolen and Roh discussed and agreed early on in the prosecution of Ms. Harris, and on an ongoing basis through the trial, that Roh would materially misrepresent scientific evidence in support of the State's theory of intentional murder. Specifically, Bolen and Roh agreed that Roh would testify to having made observations and drawn conclusions, supported by scientific evidence, that Dr. Tarnower had been shot while his hand was raised in a "defensive" posture - and specifically that Roh had performed histologic examinations of tissues from a bullet wound in Dr. Tarnower's chest, and that in the course of those examinations Roh had observed and analyzed evidence supporting the

46

conclusion that a single bullet had traveled through Dr. Tarnower's hand and chest. In fact, both Bolen and Roh knew, or in the absence of their deliberate and reckless disregard of the truth should have known, that Roh had not in fact made the histologic observations he claimed to have made, and that the Roh's assertions in written and oral reports and in trial testimony that he had in fact seen and analyzed the histological evidence that allegedly provided the scientific basis for his forensic conclusions were baseless, false, and fabricated.

161. The District Attorney's Office's failure to supervise, train, and discipline assistant district attorneys was known, or in the absence of their deliberate and reckless indifference should have been known, to policymakers for the District Attorney's Office, at and prior to the time of Jeffrey Deskovic's prosecution. Policymakers were on actual and constructive notice of the misconduct of Bolen and other assistant district attorneys through, among other mechanisms, their direct involvement in Jeffrey Deskovic's prosecution, Bolen's widely known reputation for engaging in and condoning prosecutorial misconduct, and misconduct perpetrated in multiple high priority and highly publicized prosecutions and post-conviction proceedings prior to Mr. Deskovic's conviction.

162. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through its final policymakers and their delegees, maintained a policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial. In particular, defendant

47

and Deputy Medical Examiner Roh routinely, notoriously, and as a matter of policy, custom, and pattern or practice fabricated evidence, gave perjured testimony, and/or engaged in deliberate and reckless overreaching with respect to allegedly inculpatory scientific conclusions.

163. Roh's acts of fabricating evidence, giving perjured testimony, and/or engaging in deliberate and reckless overreaching with respect to allegedly inculpatory scientific conclusions prior and subsequent to Jeffrey Deskovic's case include but are not limited to the following:

a. As described above, Roh, in concert with Bolen, provided false and fabricated scientific conclusions prior to and at the time of trial in the Jean Harris prosecution.

b. Roh also conducted a deliberately or reckless inadequate investigation into, and false and baseless testimony concerning, the 1994 death of Daniel Vassello in Orange County, New York. Pursuant to a contractual agreement with Orange County, Roh investigated Daniel's death, including by performing an autopsy and preparing an autopsy report, and stated a conclusion, later repeated by him at in pretrial conversations with prosecutors and at trial, that Daniel had died as a result of the effects of gasoline inhalation. Based in part on Roh's autopsy report, Daniel's parents, Daniel and Dona Vassello, were indicted on charges of criminally negligent homicide. In fact, as Judge Jeffrey G. Berry found in his August 4, 1995 decision acquitting the Vassellos on all charges, and rejecting the conclusions and testimony of Roh, the cause of Daniel's death was not gasoline inhalation, but rather bacterial meningitis. Roh knew, and/or in the absence of his deliberate and reckless indifference should have known, that his autopsy of Daniel Vassello had contravened fundamental standards of forensic pathology, that his autopsy report contained baseless and/or false conclusions concerning Daniel's cause of death,

48

and that he lacked a scientific basis for his pretrial assertions and trial testimony that to a reasonable degree of medical certainty Daniel died of gasoline fume inhalation.

c. Following the Vassello case, on August 17, 1995, Orange County District Attorney Francis Phillips wrote to the County Coroner Anthony Ingrassia to inform him that, "in various criminal cases" Dr. Roh's findings had been "either incomplete, inadequate, or erroneous," and that "a suitable replacement" must be found for Dr. Roh to do forensic work on behalf of Orange County. (Phillips Letter, attached as Exhibit 1.)

d. In 1997 Michael Maragh was prosecuted and tried in Orange County in connection with the death of his girlfriend. Roh testified on behalf of Orange County pursuant to his contract with the County to conduct autopsies and other pathology-related investigation into suspicious deaths in the County. On November 12, 1997, during Roh's cross-examination in the Maragh case, Roh was shown the August 17, 1995 Francis Phillips letter. Roh testified that he had never seen the letter before that day.

e. In January 1998, two months later, Roh testified as a retained expert for the defendant in the Dutchess County case of People v. Kilmer. On cross-examination, Assistant District Attorney Marjorie Smith asked Roh whether he was aware of the Phillips letter that was shown to him during the Maragh trial. Roh first testified that he was not aware of the letter, then gave evasive answers to further questions about whether he had ever seen the letter. On February 11, 1998, Judge Thomas J. Dolan, who presided over the Kilmer trial, wrote to Dutchess County District Attorney William Grady to "formally advise" Grady of "inconsistent" and "disturbing" testimony given by Roh in Dutchess County and in the Maragh case. (Judge Dolan Letter, attached as Exhibit 2.)

f.  On March 16, 1998 Grady wrote to the New York State Department of Health, Office of Professional Medical Conduct, which is the State entity responsible for medical licensing in New York State, and described Roh's conduct in the <u>Maragh</u> and <u>Kilmer</u> cases as a "serious breach of [Roh's] ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment." (Grady Letter, attached as Exhibit 3.)

g.  In 2001, Charles Bodenburg was tried in Suffolk County in connection with the death of three-year-old Kayla Zachman. Autopsy evidence, including head trauma with diffuse axonal injury, pointed to shaken infant syndrome and smothering being the cause of death; toxicology analysis revealed a blood alcohol concentration of .03% and a brain alcohol concentration of .01% in the girl. On June 7, 2001 Bodenburg was convicted of second degree murder. Roh was retained by the defense as a pathology expert, and he testified at trial. Roh testified that the actual cause of death was alcohol poisoning. Rebuttal evidence was presented by the prosecution citing medical and toxicologic literature indicating children may survive very high levels of alcohol. On July 16, 2001 Dr. Charles Wetli, Chief Medical Examiner for Suffolk County, Dr. Stuart Dawson, Deputy Chief Medical Examiner for Suffolk County, and Dr. Edward Briglia, Chief of the Suffolk County Toxicology Laboratory, wrote to the New York State Department of Health, the entity responsible for State medical licensing, concerning Roh's conduct in the case. The letter described Roh's testimony as lacking scientific basis, and stated that Roh "went far beyond what would be expected of a defense expert," and that "his testimony was misleading and had no reasonable basis in fact." (July 16, 2001 Letter,

50

attached as Exhibit 4.)

h.    On December 31, 2002, 83-year-old Aniele Walker died in White Plains, Westchester County, New York. Her nephew, John Spruill, was charged with and acquitted of her murder. Roh was the Deputy Medical Examiner who conducted an autopsy on the body of Ms. Walker. Roh was deposed over the course of several in connection with a Westchester County Surrogate's Court proceeding, In the Matter of Aniela Walker, No. 074/2003, that was brought in connection with Ms. Walker's death. In the course of those proceedings, Roh was examined extensively concerning his autopsy and cause-of-death findings in the Walker case, including questioning concerning whether the examinations and observations that he made in that case were consistent with minimally accepted practices in pathology and with Roh's own practices over his more-than-two-decades of experience. On October 31, 2003, Roh admitted under oath, and in the presence of a Westchester County Assistant District Attorney, that following an earlier session of his deposition on October 20, 2003 he willfully destroyed twenty-to-thirty file drawers of index cards documenting his prior instances of testimony as a pathology expert, in order to avoid having to produce them in response to a subpoena. (Excerpt of Roh Testimony in In the Matter of Aniela Walker, attached as Exhibit 5.)

164. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. The absence of supervision, training, and discipline as a matter of policy, custom, or pattern and practice established a

51

climate of impunity in which the misconduct of defendant Roh and others was condoned and facilitated, and created a known and obvious risk that the constitutional rights of criminal suspects would be violated.

165. Policymakers for the Westchester County Medical Examiner's Office were on actual and constructive notice of the misconduct of Roh and other deputy medical examiners through, among other mechanisms, their direct involvement in and knowledge of Jeffrey Deskovic's prosecution, Roh's widely known reputation for fabricating engaging in and condoning prosecutorial misconduct including in the investigations and prosecutions described above, and specific publicity and notoriety generated from Roh's conduct in highly publicized criminal proceedings prior to Mr. Deskovic's conviction.

### DAMAGES

166. The actions of the defendants deprived plaintiff Jeffrey Deskovic of his civil rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and under the laws of New York.

167. The unlawful, intentional, wilful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Jeffrey Deskovic to be wrongly seized, maliciously prosecuted, unfairly tried, wrongfully convicted, subjected to illegal searches and cruel and unusual punishment during the course of his incarceration, and forced to serve nearly sixteen years in prison for a crime he did not commit.

168. The unlawful, intentional, willful, deliberately indifferent, reckless, negligent, and/or bad-faith acts and omissions of the defendants caused Jeffrey Deskovic the following injuries and damages, which were foreseeable to the defendants at the time of their acts and omissions,

and which continue to date and will continue into the future: multiple physical assaults and batteries, including assaults of a sexual nature, and other physical injuries; pain and suffering; severe mental anguish; multiple suicide attempts; emotional distress; loss of family relationships; severe psychological damage; loss of educational opportunity; loss of professional opportunity; loss of income; out-of-pocket legal expenses for appellate representation; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

169. All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages

## COUNT I

### 42 U.S.C. § 1983 Claim for Violation of Mr. Deskovic's Right Against Self-Incrimination and to a Fair Trial Against Defendants Levine, McIntyre, Tumolo, and Stephens

170. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

171. Defendants Levine, McIntyre, Tumolo, and Stephens, acting individually and in concert, deliberately and recklessly coerced and compelled allegedly inculpatory statements from Jeffrey Deskovic and caused those statements to be introduced against him in connection with his

53

indictment and prosecution, in violation of Jeffrey's Fifth and Fourteenth Amendment rights not to be compelled to be a witness against himself, not to be deprived of liberty without due process of law, and to a fair criminal trial.

172. Specifically, on and prior to January 25, 1990, defendants Levine, McIntyre, Tumolo, and Stephens deliberately and recklessly exploited Jeffrey Deskovic's youth, inexperience with law enforcement, emotional and psychological vulnerabilities, and lack of advice and assistance of legal or parental counsel to convince Jeffrey, through physical threats, trickery, deceptive promises, and other means to make false inculpatory statements that were not voluntarily and freely given. Furthermore, Jeffrey's waivers, on and prior to January 25, 1990, of his right not to submit to questioning by the police without the presence or assistance of legal counsel were not freely and voluntarily made, as a result of the defendants' deliberate and reckless actions to deceive Jeffrey concerning the status and legal significance of his representation and the defendants' questioning.

173. Additionally, defendants Levine, McIntyre, Tumolo, and Stephens, individually and in concert, deliberately and recklessly provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime.

174. Because of the PPD defendants' coercion and trickery Jeffrey's will was overborne such that the confession was not the product of his free will and rational intellect.

175. At the time that Jeffrey Deskovic allegedly confessed to the rape and murder of A.C., a reasonable person in Jeffrey's position would have perceived his freedom to be significantly

54

restricted and would not have understood himself to be free to leave, and hence Jeffrey was in

the defendants' custody. Among the circumstances that rendered Jeffrey's alleged confession

custodial were factors that were not documented and were affirmatively concealed from

prosecutors and the court by the defendants, including but not limited to the defendants' direct

and indirect threats on January 25 that Jeffrey would be physically harmed if he did not confess,

and the defendants' deceptive and coercive promises concerning the consequences of Jeffrey's

January 25 confession.

176. The false and involuntary confession obtained from Jeffrey Deskovic on January 25, 1990

was introduced against him in pretrial proceedings and at his criminal trial.

177. Defendants' actions to compel Mr. Deskovic to be a witness against himself were in

violation of clearly established constitutional law, and no reasonable police officer in 1989 and

1990 would have believed that the defendants' actions were lawful.

178. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly

convicted and imprisoned for sixteen years, and suffered the other grievous and continuing

injuries and damages as set forth above.

## COUNT II

### 42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material, Exculpatory and Impeachment Evidence, and Failing to Investigate in Violation of the Fourteenth Amendment Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh

179. Mr. Deskovic hereby incorporates and references all of the foregoing paragraphs and

further alleges as follows.

180. Defendants Levine, McIntyre, Brovarski, Tumolo, and Roh, acting individually and in

55

concert, fabricated evidence, concealed material, exculpatory and impeachment evidence, and deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation, thereby depriving Mr. Deskovic of his Fourteenth Amendment right not to be deprived of liberty without due process of law and to a fair criminal trial.

181. Specifically, defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens, deliberately and recklessly coerced inculpatory statements from Mr. Deskovic which were not the product of Mr. Deskovic's free will and rational intellect, supplied Mr. Deskovic with specific details of the crime which Mr. Deskovic subsequently incorporated and repeated in allegedly inculpatory statements, and/or knew that details known to Mr. Deskovic were readily obtainable through public sources. The defendants falsely represented to prosecutors in police reports, in the course of charging and indicting Mr. Deskovic, and at trial, that Mr. Deskovic's statements were in fact freely and voluntarily given, and that Mr. Deskovic had independent knowledge of non-public details of the crime that actually had been provided to him by the defendants and/or were available from public sources. The false evidence which the defendants thereby fabricated was introduced against Mr. Deskovic at trial, was a basis for the jury's verdict against him, and thus deprived him of a fair criminal trial.

182. Additionally, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and recklessly coerced and/or fabricated allegedly inculpatory statements from witnesses including but not limited to Freddy Claxton, Martin Burrett, and Martin Burrett's parents, and concealed additional material, exculpatory and impeachment evidence concerning witness interviews conducted by them in the case, including but not limited to coercive tactics utilized in witness interviews, evidence that A.C. and Freddy Claxton had no romantic or sexual relationship,

56

evidence that A.C. had not had consensual sex prior to her rape and murder, and other evidence from witnesses that Jeffrey played no role in and had no independent knowledge of A.C.'s rape and murder.

183. Furthermore, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence. The defendants' deliberate and reckless failure to investigate exculpatory evidence that was known to them, or that in the absence of their deliberate and reckless indifference should have been known to them, caused Mr. Deskovic to be deprived of a fair criminal trial.

184. Defendant Roh deliberately and recklessly fabricated allegedly inculpatory evidence concerning A.C.'s prior sexual history, and concealed material, exculpatory and impeachment evidence concerning those fabrications. In the course of pretrial investigations and conversations with Bolen, Roh falsely, deliberately, and with reckless disregard for the truth represented (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by

57

Bolen to the court in pretrial conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

185. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment evidence of his fabrications from prosecutor Bolen.

186. This false and fabricated evidence concerning A.C.'s prior sexual history was introduced against Mr. Deskovic at trial and relied upon by Bolen in his opening and closing statements, was a basis for the jury's verdict, and thus deprived him of a fair criminal trial.

187. The truth of the defendants' fabrications and the other material, exculpatory and impeachment evidence that was concealed by them could not have been discovered by the Mr. Deskovic or his attorney through the exercise of due diligence.

188. Had the defendants' fabrications and material, exculpatory and impeachment evidence known to them been documented and/or disclosed they would have tended to prove Mr. Deskovic's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of defendants Levine, McIntyre, Stephens, Roh, and other witnesses. The exculpatory and impeachment evidence withheld by the defendants, considered individually and collectively, undermines confidence in the verdict against Mr. Deskovic, and the concealment of this evidence deprived Mr. Deskovic of a fair criminal trial.

189. The defendants' conduct violated Mr. Deskovic's clearly established constitutional rights to a fair trial and not to be deprived of liberty without due process of law, as guaranteed by the

58

Fourteenth Amendment. No reasonable police officer or medical examiner in 1989 and 1990 would have believed that the actions taken by the defendants in fabricating evidence, failing to document and disclose material, exculpatory evidence, and failing to investigate exculpatory evidence were lawful.

190. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT III

### 42 U.S.C. § 1983 Claim for Malicious Prosecution and Unlawful Prolonged Detention Based on Post-Indictment Failure to Investigate in Violation of the Fourth and Fourteenth Amendments Against Defendants Levine, McIntyre, Tumolo, Stephens, Bolen, and Roh

191. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

192. Defendants Levine, McIntyre, Tumolo, Stephens, Bolen, and Roh, despite knowing that probable cause did not exist to arrest, continually detain, and/or prosecute Mr. Deskovic for the rape and murder of A.C., and despite the fact that the grand jury's probable cause determination was vitiated by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested, continually detained, and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful conviction.

193. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of

59

their deliberate and reckless indifference to the truth should have known of information that probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to January 25, 1990 were not the product of his free will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants, and that those factors as well as additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Mr. Deskovic.

194. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's prosecution to continue despite knowing that probable cause had been vitiated. Specifically, after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their pre-indictment misconduct, and committed additional misconduct in the course of post-indictment investigation, including but not limited to concealing from prosecutors additional material, exculpatory evidence that undermined probable cause.

195. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution. The deliberate and reckless investigative failures of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory

information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

196. Defendants Bolen and Roh caused Mr. Deskovic to be detained and prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history that was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Bolen and Roh knew or in the absence of their deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution to continue. Furthermore, Bolen deliberately and recklessly failed to investigate additional evidence that he knew, or in the absence of his deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution.

197. Specifically, shortly after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., and in furtherance of investigation conducted to obtain evidence to support the continued prosecution of Mr. Deskovic, Bolen and Roh met, discussed, and agreed that Roh would provide a fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by Bolen to the court in a March 21 court hearing more than eight months before trial discussing the DNA testing and the viability of Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

198. In fact Bolen and/or Roh knew, or in the absence of their deliberate and reckless

61

indifference should have known, that Roh had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to Bolen.

199. The above-described acts were shocking, and were performed by the defendants deliberately, with reckless disregard for the truth, and with malice.

200. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006, the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on motion of the Westchester County District Attorney, following the vacatur of his conviction and his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

201. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1989 and 1990 would have believed that the defendants' actions were lawful.

202. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Claim for Engaging in Conduct that Shocks the Conscience in Violation of the Fourteenth Amendment Against Defendants Levine, McIntyre, Brovarski, and Tumolo

203. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

204. In their drive to secure Mr. Deskovic's wrongful conviction, defendants Levine, McIntyre, Brovarski, and Tumolo deliberately engaged in arbitrary and conscious-shocking conduct that

62

contravened fundamental canons of decency and fairness and violated Jeffrey Deskovic's substantive due process right under the Fourteenth Amendment.

205. Specifically, the defendants deliberately exploited Jeffrey Deskovic's vulnerabilities, tricked, and threatened Jeffrey to coerce his confession; provided investigative facts to Jeffrey that fabricated a false confession and concealed the defendants' coercion and other misconduct; fabricated additional allegedly inculpatory evidence from witnesses and other sources to corroborate Jeffrey's guilt prior to his indictment; deliberately concealed from prosecutors their pre-indictment misconduct, as well as additional exculpatory and impeachment evidence provided to them by witnesses; deliberately concealed, after DNA evidence conclusively exposed the falsity of his confession, additional exculpatory and impeachment evidence that undermined any basis for Jeffrey's guilt and continued prosecution; deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's innocence; and engaged in additional, conscience-shocking misconduct that led to the conviction and wrongful imprisonment of an innocent man.

206. The defendants' conduct violated Mr. Deskovic's clearly established constitutional right to substantive due process, as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1989 and 1990 would have believed that the actions taken by the defendants in deliberately failing to conduct a constitutionally adequate investigation were lawful.

207. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT V**

63

## 42 U.S.C. § 1983 Claim for Supervisory Liability Against PPD Supervisors

208. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

209. Defendants Tumolo and John and Jane Doe Supervisors knew or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Deskovic of his clearly established constitutional rights through misconduct that included but was not limited to coercing and compelling allegedly inculpatory statements from Mr. Deskovic, providing Mr. Deskovic with non-public details concerning A.C.'s rape and murder and the PPD investigation, fabricating witness statements and other evidence, concealing material, exculpatory and impeachment evidence, and failing to conduct a constitutionally adequate investigation of Mr. Deskovic. Defendants Tumolo and John and Jane Doe Supervisors, by deliberately, recklessly, and grossly negligently failing to supervise their subordinate police officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Mr. Deskovic of his clearly established constitutional rights, including but not limited to his rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to a fair trial.

210. Moreover, defendants Levine, McIntyre, Brovarski, Tumolo, and other PPD detectives acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Tumolo and John and Jane Doe Supervisors, and in which they knew that their violations of Mr. Deskovic's constitutional rights would be facilitated, approved, and/or condoned by the defendant supervisors.

64

211. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendants Tumolo and John and Jane Doe Supervisors violated their clearly established duty, in 1989 and 1990, to supervise subordinate detectives including defendants Levine, McIntyre, and Brovarski, and no reasonable police supervisor in 1989 and 1990 would have believed that deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

212. Defendants Tumolo and John and Jane Doe Supervisors' actions and omissions proximately and directly caused Mr. Deskovic to be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### 42 U.S.C. § 1983 Claim for Supervisory Liability Against Chief Medical Examiner Hyland

213. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

214. Defendant Hyland acted with deliberate indifference, recklessness, and/or gross negligence to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of his subordinate, Deputy Medical Examiner Roh, and thereby caused Roh to deprive Mr. Deskovic of his rights not to be convicted on the basis of fabricated evidence, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair criminal trial, as guaranteed by the Fourth and Fourteenth Amendments.

215. Specifically, defendant Hyland knew or should have known - based on, among other facts, Roh's reputation for and open and notorious practice of fabricating scientific conclusions and

providing perjured testimony, his widely reported and criticized false and baseless scientific

testimony high priority and highly publicized cases prior to Mr. Deskovic's conviction, and,

upon information and belief, his actual knowledge and/or approval of the reports prepared and

testimony given in Jeffrey Deskovic's case - of a high degree of risk that defendant Roh would

perform his duties as Deputy Medical Examiner in a manner that violated the constitutional

rights of citizens.

216. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendant Hyland

violated his clearly established duty, in 1989 and 1990, to supervise subordinate medical

examiners, and no reasonable medical examiner in 1989 and 1990 would have believed that

deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or

constructive notice of misconduct by their subordinate officers was lawful.

217. Defendant Hyland's actions and omissions proximately and directly caused Mr. Deskovic to

be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other

grievous and continuing injuries and damages as set forth above.

### COUNT VII

**42 U.S.C. § 1983 Claim for Failure to Intercede**
**Against Defendants Levine, McIntyre, Brovarski, Tumolo,**
**and John and Jane Doe Supervisors**

218. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

219. By their conduct and under color of state law, defendants Levine, McIntyre, Brovarski,

Tumolo, and John and Jane Doe Supervisors had opportunities to intercede on behalf of Mr.

Deskovic to prevent his coerced confession, malicious prosecution, and deprivation of liberty

66

without due process of law, but, due to their intentional conduct and/or deliberate or reckless indifference, declined or refused to do so.

220. The defendants' failures to intercede violated Mr. Deskovic's clearly established constitutional rights not to be compelled to be a witness against himself, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair trial as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer or police supervisor in 1989 and 1990 would have believed that failing to intercede to prevent the defendants from coercing suspect statements, fabricating evidence, failing to document and disclose material, exculpatory and impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Deskovic to be arrested and prosecuted without probable cause were lawful.

221. As a direct and proximate result of the defendants' failures to intercede Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

### COUNT VIII

#### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim
#### Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens

222. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

223. Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others yet unknown agreed among themselves and with other individuals to act in concert in order to deprive Mr. Deskovic of his clearly established Fourth, Fifth, and Fourteenth Amendment rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures,

67

not to be deprived of his liberty without due process of law, and to a fair criminal trial.

224. In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a)  Defendants Levine, McIntyre, Tumolo, Stephens, and others planned to obtain Jeffrey's confession through physical threats, trickery, deceptive promises, and other means deliberately designed to exploit Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities;

b)  Defendants Levine, McIntyre, Tumolo, and others provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime;

c)  Defendant Levine and others deceived Jeffrey concerning the status and legal significance of his representation by Lou Ecker in relation to the defendants' questioning of him, and defendants Levine, McIntyre, Stephens, and others subsequently caused Jeffrey to waive his Miranda rights under circumstances that were not knowing and voluntary;

d)  Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens deliberately and recklessly created false police reports, reported false facts to prosecutors, and otherwise fabricated evidence that falsely inculpated Mr. Deskovic and concealed the defendants' investigative misconduct, including but not limited to police reports and other documents falsely representing that Mr. Deskovic had independent knowledge of non-public facts

68

concerning A.C.'s rape and murder; <u>Miranda</u> waiver forms falsely representing that Mr. Deskovic's waivers were knowing and voluntary; and allegedly inculpatory witness statements.

e)   Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others deliberately concealed additional material, exculpatory and impeachment evidence from prosecutors, including but not limited to facts concerning the coercive and intimidating tactics used by them to interview witnesses and interrogate Jeffrey Deskovic; evidence that Freddy Claxton and A.C. had not been in a romantic or sexual relationship; evidence that A.C. had not been sexually active prior to her rape and murder; and other evidence tending to establish Jeffrey Deskovic's innocence, including material, exculpatory and impeachment evidence discovered subsequent to Mr. Deskovic's indictment which vitiated probable cause;

f)   Prior and subsequent to Mr. Deskovic's arrest, charging, and indictment for the crime, defendants Levine, McIntyre, Brovarski, Tumolo, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr. Deskovic's guilt had been fatally undermined by known exculpatory evidence;

69

g) Defendants Levine, McIntyre, Stephens, and others hid their misconduct and secured Mr. Deskovic's wrongful conviction by deliberately provided perjured testimony in the grand jury and/or in Mr. Deskovic's criminal trial.

225. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Deskovic was wrongly arrested, prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IX

### 42 U.S.C. § 1983 Claim Against the City of Peekskill

226. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

227. The City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular juveniles; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

228. Furthermore, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to conducting and documenting

70

criminal investigations, conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

229. The PPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise PPD investigators, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple investigators and supervisors in the PPD in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent cases.

230. PPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise PPD investigators created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

231. The misconduct and constitutional violations committed by the PPD defendants in the course of the investigation and prosecution of Jeffrey Deskovic were carried out pursuant to the PPD's policy, custom, or pattern and practice of investigative misconduct, and were directly and proximately caused by the PPD's failure to train and supervise investigators. As a direct and proximate result of the PPD's policies, customs, or patterns and practices, Jeffrey Deskovic was wrongly prosecuted, convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

### COUNT X

### 42 U.S.C. § 1983 Claim Against Westchester County

232. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

71

alleges as follows.

233. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional and ethical duties.

234. This policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys was evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent investigations and prosecutions, including but not limited to, as described above, the Jean Harris case.

235. As a direct and proximate result of the Westchester County District Attorney's Office policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys, prosecutors, including but not limited to assistant district attorney Bolen, committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Assistant district attorney Bolen deliberately or recklessly obtained Mr. Deskovic's conviction by means of fabricated evidence, including but not limited to defendant Roh's deliberately and recklessly false pretrial statements and testimony that (a) there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and murder, and (b) Roh had observed scarring of A.C.'s hymen during his

72

autopsy, which caused Mr. Deskovic to be maliciously prosecuted and subjected to an unfair

criminal trial on the basis of material fabrications;

b) Bolen concealed from the defense material, exculpatory and impeachment evidence,

including but not limited to, upon information and belief, that Roh's conclusions and

findings concerning A.C.'s sexual history were fabricated;

c) Bolen deliberately or recklessly failed to investigate known exculpatory evidence,

including but not limited to deliberately and recklessly failing to obtain reference hair

samples from Roh, his assistant, and Freddy Claxton, and deliberately or recklessly failing to

obtain DNA testing from Freddy Claxton or any other potential consensual sex partner.

d) Bolen deliberately or recklessly suborned perjury and made false arguments that lacked

evidentiary foundation in order to obtain Mr. Deskovic's conviction, including but not

limited to arguing at trial that hairs found on A.C. had come from Roh, his assistant, and

Freddy Claxton, and that the semen found inside A.C. had come from Freddy Claxton.

236. Westchester County District Attorney's Office policymakers were deliberately indifferent

to the known and obvious risk that the policy, custom, or pattern and practice of failing

supervise, train, and discipline assistant district attorneys in connection with fundamental and

recurring ethical and constitutional duties created a risk that the constitutional rights of criminal

suspects like Mr. Deskovic would be violated.

237. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of

Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final

policymakers and their delegees, maintained a policy, custom, or pattern and practice of

providing false and scientifically unsupported scientific conclusions to Westchester County

prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial.

238. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. County policymakers maintained this policy, custom, or pattern and practice despite the fact that they knew or, in the absence of their deliberate indifference should have known, that deputy medical examiners, including defendant Roh, openly and notoriously fabricated scientific evidence, gave perjured testimony, and otherwise committed misconduct in connection with their duties as deputy medical examiners.

239. The Westchester County Medical Examiner's Office policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions, and its policy, custom, or pattern and practice of failing to supervise, train, and discipline deputy medical examiners, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County Medical Examiner's Office in the course of the investigation and prosecution of Jeffrey Deskovic, misconduct committed by Roh in the Jean Harris case, reported and/or admitted misconduct by Roh in the Vassello, Maragh, Kilmer, Bodenburgh, and Walker/Spruill cases, and in the course of other prior and subsequent cases.

240. As a direct and proximate result of the Westchester County Medical Examiner's Office's policy, custom, or pattern and practice of providing false and scientifically unsupported

74

conclusions to Westchester County prosecutors, and of failing to supervise, train, and discipline deputy medical examiners, Deputy Medical Examiner Louis Roh committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Roh deliberately and recklessly fabricated the false fact that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and murder, in order to support the prosecution's theory that the semen found in A.C. had come from a consensual donor;

b) Roh deliberately and recklessly fabricated the false fact that he had observed scarring of A.C.'s hymen;

c) Roh concealed material, exculpatory and impeachment evidence from assistant district attorney Bolen, including, upon information and belief, the fact that his conclusions and findings concerning A.C.'s sexual history were false;

d) Roh perjured himself on multiple occasions during Mr. Deskovic's trial, including by deliberately and recklessly misstating and overstating his scientific conclusions.

241. Westchester County Medical Examiner's Office policymakers were deliberately indifferent to the known and obvious risk that the Office's policy, custom, or pattern and practice of providing false and scientifically unsupported evidence to prosecutors, and of failing supervise, train, and discipline deputy medical examiners created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

242. As a direct result of the policies, customs, or patterns and practices of Westchester County, Jeffrey Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and

suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### 42 U.S.C. § 1983 Claim for Unreasonable Search and Unnecessary and Wanton Infliction of Pain in Violation of the Fourth, Eight, and Fourteenth Amendments Against Defendant Tweed

243. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

244. Defendant Tweed, acting under color of law, conducted searches of Mr. Deskovic's person that were unreasonable violations of Mr. Deskovic's legitimate expectation of privacy, lacked any legitimate penalogical objective, and therefore violated Mr. Deskovic's Fourth and Fourteenth Amendment right to bodily integrity.

245. Furthermore, defendant Tweed repeatedly, maliciously, sadistically, and without any legitimate penalogical objective subjected Mr. Deskovic to invasive, assaultive, and violative physical and sexual conduct, and otherwise unnecessarily and wantonly inflicted pain upon Mr. Deskovic.  Tweed acted with deliberate disregard for Mr. Deskovic's health and safety, in violation of Mr. Deskovic's right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment.

246. Defendant Tweed's actions to deprive Mr. Deskovic of his Fourth, Eighth, and Fourteenth Amendment rights violated clearly established constitutional law, and no reasonable corrections officer in 2004 would have believed that defendant's actions were lawful.

247. Defendant Tweed's conduct directly and proximately caused Mr. Deskovic to suffer the grievous injuries enumerated above at the time of the constitutional violations and continuing to this day and into the future.

76

## Count XII

### State Law Claim for Malicious Prosecution
### Against Defendants Levine, McIntyre, Tumolo, Stephens, and Roh

248. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

249. Defendants Levine, McIntyre, Tumolo, Stephens, and Roh, despite knowing that probable cause did not exist to arrest and prosecute Mr. Deskovic for the rape and murder of A.C., and despite the fact that the grand jury's probable cause determination was vitiated by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful conviction.

250. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of their deliberate and reckless indifference to the truth should have known of information that probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to January 25, 1990 were not the product of his free will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants, and that those factors as well as additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Mr. Deskovic.

77

251. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's prosecution to continue despite knowing that probable cause had been vitiated. Specifically, after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their pre-indictment misconduct, and committed additional misconduct in the course of post-indictment investigation, including but not limited to concealing from prosecutors additional material, exculpatory evidence that undermined probable cause.

252. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution. The deliberate and reckless investigative failures of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

253. Defendant Roh caused Mr. Deskovic to be maliciously prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history, which was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Roh knew or in the absence of his deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution to continue.

78

254. Specifically, just weeks after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., Roh provided assistant district attorney Bolen with a fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by Bolen to the court in pretrial conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

255. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring that he described to Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment evidence of his fabrications from Bolen.

256. The defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

257. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006, the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on motion of the Westchester County District Attorney, following the vacatur of his conviction and his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

258. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1989 and 1990 would have believed that the defendants' actions were lawful.

79

259. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XIII

### State Law Claim for Intentional or Reckless Infliction of Emotional Distress
### Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh

260. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

261. The conduct of defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh in deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution, and incarceration of Jeffrey Deskovic was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

262. The conduct of defendant Tweed in deliberately subjecting Mr. Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

263. Defendants' actions intentionally to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XIV

### State Law Claim for Negligent Infliction of Emotional Distress
### Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh

80

264. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

265. Defendants Levine, McIntyre, Tumolo, Brovarski, Stephens, and Roh negligently and grossly negligently, and in breach of their duties owed to Mr. Deskovic to refrain from (a) compelling him to be a witness against himself, (b) fabricating evidence, (c) withholding material, exculpatory and impeachment evidence, (d) failing to conduct a constitutionally adequate investigation, and (e) maliciously prosecuting and causing Mr. Deskovic's false arrest and imprisonment, directly and proximately caused Mr. Deskovic, an innocent man, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for sixteen years. The defendants' actions caused Mr. Deskovic to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

266. Defendant Tweed negligently and grossly negligently breached his duty to refrain from subjecting Jeffrey Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, and thereby caused Mr. Deskovic to suffer physical harm and to fear for his physical safety throughout his incarceration.

267. Defendants' actions negligently to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XV

## Respondeat Superior Claim Against the City of Peekskill

81

268. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

269. At all times relevant to this complaint defendants Levine, McIntyre, Brovarski, and Tumolo acted as agents of, and in the scope of their employment with, defendant City of Peekskill. The conduct by which the defendants committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while the defendants were carrying out their routine investigative functions as PPD detectives, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

270. The City of Peekskill is liable for its agents' state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVI

### Respondeat Superior Claim Against Putnam County

271. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

272. At all times relevant to this complaint defendant Stephens acted as an agent of, and in the scope of his employment with, defendant Putnam County. The conduct by which defendant Stephens committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Stephens was carrying out his routine investigative function as a Putnam County police officer, and was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen

82

by, his employer.

273. Putnam County is liable for Stephens's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVII

### Respondeat Superior Claim Against Westchester County

274. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

275. At all times relevant to this complaint defendant Roh acted as an agent of, and in the scope of his employment with, defendant Westchester County. The conduct by which defendant Roh committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Roh was carrying out his routine function as a Deputy Medical Examiner, and while Roh was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen by, their employer. Westchester County is liable for Roh's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

**WHEREFORE**, Jeffrey Deskovic prays as follows:

    A. That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

    B. That the Court award punitive damages to him, and against all non-municipal defendants, in an amount, to be determined at trial, that will deter such conduct by defendants in

the future;

    C.  For a trial by jury;

    D.  For pre-judgment and post-judgment interest and recovery of his costs, including

reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

    E.  For any and all other relief to which he may be entitled.

Respectfully submitted,

June 9, 2008

Barry Scheck
Nick Brustin (NB0605)
Jennifer Laurin (JL9668)
Cochran, Neufeld & Scheck LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel:  (212) 965-9081
Fax: (212) 965-9084
Attorneys for Plaintiff Jeffrey Deskovic

84



# ORANGE COUNTY DISTRICT ATTORNEY

ORANGE COUNTY GOVERNMENT CENTER, GOSHEN, NEW YORK 10924-1627

FAX: 914-294-5958    TEL: 914-294-5471

August 17, 1995

**FRANCIS D. PHILLIPS II**
*District Attorney*

Hon. Anthony Ingrassia
Orange County Coroner
59 Eisenhower Drive
Middletown, New York 10940

RE: DR. LOUIS ROH

Dear Anthony:

We have had substantial problems with quality of the work of Dr. Louis Roh. In various criminal cases his findings have been either incomplete, inadequate, or erroneous. I cannot in good conscience rely upon his findings in cases where the cause of death is more than a simple gunshot wound or stab wound. All of the Coroners must understand that we need to find a suitable replacement for him who will perform forensic work on behalf of the County of Orange.

There have also been problems with regard to Dr. Roh's fees which, if I thought we would be able to retain him in the future, would be a problem in and of itself. In the meantime it is critical that the Coroners, District Attorney, and members of law enforcement work together to find and retain another forensic pathologist.

I must candidly advise you that if Dr. Roh continues to do forensic work I will be forced to retain an independent forensic pathologist to review all of his autopsy findings. I want to present input from police agencies who are in a better position to articulate the problems we have had. I would like to set up a meeting in early September. Please advise me of a convenient date on which all or most of the Coroners will be able to attend.

Very truly yours,

FRANCIS D. PHILLIPS II
DISTRICT ATTORNEY

PEOPLE'S
EXHIBIT
66

ROH000051



STATE OF NEW YORK
## COUNTY COURT OF THE COUNTY OF DUTCHESS
COUNTY COURT HOUSE
POUGHKEEPSIE, NY 12601

431-1810

THOMAS J. DOLAN
COUNTY JUDGE

February 11, 1998

William V. Grady
Dutchess County District Attorney
236 Main Street
Poughkeepsie, New York 12601

RE:   People v. Kilmer/Testimony of Dr. Roh

Dear Bill:

During the Kilmer trial, Dr. Louis Roh, who is the Deputy Medical Examiner for Westchester County, testified for the defendant.

I have enclosed a copy of the appropriate part of the record of trial containing Dr. Roh's testimony in the Kilmer case. Also provided to you is a copy of the appropriate section of the minutes of an Orange County trial, People v. Maragh, dated November 12, 1997.

Obviously, the inconsistent nature of Dr. Roh's testimony under oath in both of these cases is very disturbing and I feel constrained to formally advise you of the situation for whatever action you feel is appropriate under the circumstances.

Very truly yours,

Thomas J. Dolan
County Court Judge

TJD/ds

encl.

PRINTED ON RECYCLED PAPER

ROH000027



STATE OF NEW YORK

COUNTY COURT OF THE COUNTY OF DUTCHESS

COUNTY COURT HOUSE

POUGHKEEPSIE, NY 12601

431-1810

THOMAS J. DOLAN
COUNTY JUDGE

February 11, 1998

William V. Grady
Dutchess County District Attorney
236 Main Street
Poughkeepsie, New York 12601

RE:   People v. Kilmer/Testimony of Dr. Roh

Dear Bill:

During the Kilmer trial, Dr. Louis Roh, who is the Deputy Medical Examiner for
Westchester County, testified for the defendant.

I have enclosed a copy of the appropriate part of the record of trial containing Dr.
Roh's testimony in the Kilmer case.  Also provided to you is a copy of the
appropriate section of the minutes of an Orange County trial, People v. Maragh,
dated November 12, 1997.

Obviously, the inconsistent nature of Dr. Roh's testimony under oath in both of
these cases is very disturbing and I feel constrained to formally advise you of the
situation for whatever action you feel is appropriate under the circumstances.

Very truly yours,

Thomas J. Dolan
County Court Judge

TJD/ds

encl.

Ⓡ PRINTED ON RECYCLED PAPER

ROH000027