

March 16, 1998

Ms. Agnes Larson, Program Director
New York State Department of Health
Office of Professional Medical Conduct
145 Huguenot Street, 6th Floor
New Rochelle, New York 10801

    RE:   DR. LOUIS ROH

Dear Ms. Larson:

During a recent homicide trial conducted in the Dutchess County Court, Dr. Louis Roh, a Board Certified Forensic Pathologist, appeared as an expert witness for the defense. In this case, Dr. Roh, testified as a private physician but professionally holds employment as the Deputy Chief Medical Examiner in Westchester County.

As part of his testimony, Dr. Roh made certain remarks which the presiding County Court Judge, Thomas Dolan, found very disturbing; I concur with his assessment. Certainly ethical and professional responsibility require of a public servant the highest degree of candor, whether testifying in that capacity or not, and it is for that reason that I am bringing this matter to your attention.

As enclosures to this correspondence, I have provided you with certain portions of Dr. Roh's testimony in the Dutchess County case. That testimony occurred in January of 1998. Within that testimony, reference is made to a letter written by Orange County District Attorney Francis Phillips; I have enclosed a copy of that correspondence as well. I have also provided you with relevant portions of Dr. Roh's testimony as transcribed from a trial that took place on November 12, 1997 in Orange County Court before the Hon. Jeffrey G. Berry. A member of my staff has spoken personally with the presiding Judge, the Judge's Law Clerk, the prosecutor and the defense attorney in the Orange County case and confirmed that Dr. Roh was actually shown a copy of the letter in question and provided with an opportunity to read it as appears in the record of the trial proceedings. Also

Ms. Agnes Larson, Program Director
Office of Professional Medical Conduct
Page 2
16 March 1998

enclosed are copies of two (2) newspaper articles authored by Paula McMahon, a reporter with the *Middletown Times Herald Record*. Ms. McMahon had discussed the issue of this letter with Dr. Roh on at least one occasion after the November 12, 1997 appearance in Orange County Court.

It should be noted that in both the Orange County case and the Dutchess County case, the Court permitted inquiry and cross-examination regarding the underlying incident referenced in Mr. Phillips' letter. However, given the circumstances, while Dr. Roh's denying knowledge of the letter and his effort to avoid any knowledge of its contents, would not constitute perjury, I believe it does constitute a serious breach of his ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment.

This information is being provided to you for whatever action you deem appropriate under the circumstances.

                    Very truly yours,


                    WILLIAM V. GRADY
                    District Attorney

wmu
Enclosures - 5

ROH000029



March 16, 1998

Ms. Agnes Larson, Program Director
New York State Department of Health
Office of Professional Medical Conduct
145 Huguenot Street, 6th Floor
New Rochelle, New York 10801

    RE:   DR. LOUIS ROH

Dear Ms. Larson:

During a recent homicide trial conducted in the Dutchess County Court, Dr. Louis Roh, a Board Certified Forensic Pathologist, appeared as an expert witness for the defense. In this case, Dr. Roh, testified as a private physician but professionally holds employment as the Deputy Chief Medical Examiner in Westchester County.

As part of his testimony, Dr. Roh made certain remarks which the presiding County Court Judge, Thomas Dolan, found very disturbing; I concur with his assessment. Certainly ethical and professional responsibility require of a public servant the highest degree of candor, whether testifying in that capacity or not, and it is for that reason that I am bringing this matter to your attention.

As enclosures to this correspondence, I have provided you with certain portions of Dr. Roh's testimony in the Dutchess County case. That testimony occurred in January of 1998. Within that testimony, reference is made to a letter written by Orange County District Attorney Francis Phillips; I have enclosed a copy of that correspondence as well. I have also provided you with relevant portions of Dr. Roh's testimony as transcribed from a trial that took place on November 12, 1997 in Orange County Court before the Hon. Jeffrey G. Berry. A member of my staff has spoken personally with the presiding Judge, the Judge's Law Clerk, the prosecutor and the defense attorney in the Orange County case and confirmed that Dr. Roh was actually shown a copy of the letter in question and provided with an opportunity to read it as appears in the record of the trial proceedings. Also

ROH000028

Ms. Agnes Larson, Program Director
Office of Professional Medical Conduct
Page 2
16 March 1998

enclosed are copies of two (2) newspaper articles authored by Paula McMahon, a reporter with the *Middletown Times Herald Record*. Ms. McMahon had discussed the issue of this letter with Dr. Roh on at least one occasion after the November 12, 1997 appearance in Orange County Court.

It should be noted that in both the Orange County case and the Dutchess County case, the Court permitted inquiry and cross-examination regarding the underlying incident referenced in Mr. Phillips' letter. However, given the circumstances, while Dr. Roh's denying knowledge of the letter and his effort to avoid any knowledge of its contents, would not constitute perjury, I believe it does constitute a serious breach of his ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment.

This information is being provided to you for whatever action you deem appropriate under the circumstances.

Very truly yours,

WILLIAM V. GRADY
District Attorney

wmu
Enclosures - 5

ROH000029

## COUNTY OF SUFFOLK



**ROBERT J. GAFFNEY**
SUFFOLK COUNTY EXECUTIVE
DEPARTMENT OF HEALTH SERVICES
**Clare B. Bradley, M.D. M.P.H.**
COMMISSIONER

**CHARLES V. WETLI, M.D.**
CHIEF MEDICAL EXAMINER

DIVISION OF MEDICAL-LEGAL INVESTIGATIONS &
FORENSIC SCIENCES
SIDNEY B. WEINBERG CENTER
FOR FORENSIC SCIENCES

ACCREDITED BY ABFY, ABCLD/LAS & NAME

July 16, 2001

Re:   Dr. Louis Roh

New York State Department of Health/OPMC
Attention: "Intake"
433 River Street
Suite 303
Troy, New York  12180

Dear Sir or Madam:

Earlier this year, Dr. Louis Roh testified for the defense in a homicide trial (People v Charles Bodenburg) held in Suffolk County, New York. The victim, Kayla Zachman, was a three year old girl who had consumed an alcoholic beverage (supposedly, Amaretto). The defendant subsequently caused the death of this child. The autopsy, performed by Dr. Stuart Dawson, revealed head trauma with diffuse axonal injury, typical for the "Whiplash Shaken Infant Syndrome"; other aspects of the investigation lead to the conclusion that smothering was also a factor. Toxicologic analysis revealed a blood alcohol concentration of 0.03% and a brain alcohol concentration of 0.01%.  (Note: A serum alcohol concentration of 0.05% was determined on a blood sample taken in the hospital Emergency Room – serum levels are slightly higher than whole blood).

It would not be unexpected for a defense pathologist to challenge the mechanism of the brain injury, and the conclusion that smothering was a component in the death. However, Dr. Roh testified that alcohol poisoning was the cause of death (despite the fact that diffuse axonal injury, regardless of cause, is a lethal injury). He supported his conclusion by "his experience" and subsequently by an article (attached) where he neglected to mention that the blood alcohol concentration reported in that child was determined more than seven hours after ingestion.

ROH000001

In our opinion, Dr. Roh's testimony went far beyond what would be expected of a defense expert and that his testimony was misleading and had no reasonable basis in fact. In this case, Dr. Dawson provided direct testimony for the state. Dr. Wetli and Dr. Briglia provided rebuttal testimony and cited the medical and toxicologic literature which indicates children may survive extremely high levels of alcohol (two articles enclosed).

Attached for your consideration are the three articles mentioned above, the autopsy report, neuropathology report and toxicology report. Enclosed is the Trial Transcript of Dr. Roh's testimony and the Summation of the Assistant District Attorney.

Should you need additional documents, information or clarification, please contact Dr. Wetli. Thank you for looking into this matter

Sincerely,

Charles V. Wetli, M. D
Chief Medical Examiner

Stuart L. Dawson, M. D.
Deputy Chief Medical Examiner

Edward J. Briglia, Ph. D.
Chief, Toxicology Laboratory

CVW/sig

Cc: (Without enclosures):    Dr. Clare B. Bradley, Suffolk County Health Commissioner
                             Ms Georgia Tschiember, Assistant District Attorney
                             Mr. Robert Cabble, Assistant County Attorney

FORENSIC SCIENCES BLDG. #487
725 VETERAN'S MEMORIAL HIGHWAY
HAUPPAUGE, NY 11787-4311

MAILING ADDRESS
P.O. BOX 6100
HAUPPAUGE, NY 11788-0099

TELECOPIER.  1-(916)-853-5556
             1-(916)-853-4673

ROH000002

**ORIGINAL**

1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF WESTCHESTER

2  -------------------------------------X

   ADMINISTRATION PROCEEDING

3  IN THE MATTER OF
                                    FILE NO.
                                    #074/2003
4

5  ANIELA WALKER a/k/a ANE LA WALKER,
   a/k/a ANIELE WALKER,

6
                    Decedent.

7  -------------------------------------X

8                  Surrogate Court
                   140 Grand Street

9                  White Plains, New York
                   October 31, 2003

10                 9:30 a.m.

11

12

13

14

15          Continued examination before

16  trial of a NON-PARTY WITNESS, LOUIS ROH, M.D.,

17  held pursuant to Subpoena, at the above time

18  and place, before a Notary Public of the

19  State of New York.

20

21

22              SULLIVAN REPORTING
                388 Tarrytown Road

23      White Plains, New York 10607
                (914)949-4545

24

25

```
1    A P P E A R A N C E S :
2                      PISCIONERE & NEMAROW, P.C.
                       Attorneys for Petitioner
3                      363 Boston Post Road
                       Rye, New York 10580
4                      BY: ANTHONY PISCIONERE, ESQ.
5
                       GEORGE LAMBERT,
6                      Public Administrator
                       SCHUMAN, SALL & GEIST, ESQS.
7                      One North Lexington Avenue
                       White Plains, New York 10601
8                      BY: IVAN LAWNER, ESQ.
9
                       RABIN, PANERO & HERRICK, ESQS.
10                     Attorneys for Objectants
                       44 Church Street
11                     White Plains, New York 10601
                       BY: MATTHEW D. SCHWARZ, ESQ.
12
13
14   ALSO PRESENT:
15
                       JAMES McCARTY, ESQ.
16
17
18
19
20
21
22
23
24
25
```

- Louis Rob, M.D. -

1   the nose in the areas where you observed the

2   abrasions, would that be consistent?

3        A.   No, it's not consistent.

4        Q.   Why not?

5        A.   That's my opinion.

6        Q.   Didn't you testify a few minutes ago

7   that those injuries, those abrasions to the nose

8   were consistent with a fingernail scrapping the

9   nose?

10       A.   That's what I said.   It's not consistent

11  with pinching the nose.

12       Q.   Doctor, I am asking you to assume for

13  purposes of our question.   The question I am about

14  to ask you; when Mr. Spruill went to pinch the

15  decedent's nose that he also scratched her nose

16  with his fingernail, are the injuries you observed

17  consistent with him having scratched her, if he

18  did scratch her, when he pinched her nose?

19       A.   If he scratched her five times in the

20  back of the nose, yes.

21       Q.   Doctor, the records of testimony that

22  you say you keep, those are on index cards?

23       A.   No.

24       Q.   Didn't you testify, Doctor, that you

25  keep records of all the cases that you testify on?

- Louis Roh, M.D. -

Page 401

1      A.   No, autopsies I do.

2      Q.   Doctor, do you recall testifying in this

3  case in your deposition testimony that you keep

4  records of every case that you testify on and that

5  you have those records for more than five years of

6  your testimony?

7      A.   I don't recall.

8      Q.   Doctor, let's refer your attention to

9  your deposition --

10     A.   If I did I am wrong.  I don't keep it.

11     Q.   You don't keep it, Doctor?

12     A.   The testimony record, no.

13     Q.   Let's go back to your deposition

14  transcript and see if that refreshes your

15  recollection, Doctor?

16     A.   If I said I did it, that was wrong.

17     Q.   Doctor, let me refresh your recollection

18  first.

19         MR. SCHWARZ:  He didn't say his

20     recollection needed to be refreshed.

21     Q.   Deposition transcript, October 20, 2003,

22  Page 51 -- starting at Page 50, Line 22:

23         "Question:  Doctor, I am talking about

24  the cases that you testified on.  Do you keep some

25  records regarding those cases?

- Louis Roh, M.D. -

Page 402

1           "Answer:  Yes, I do."
2           Continuing on Page 51:
3           "Question:  What type cases or what
4    cases do you keep those records on?
5           "Answer:  I do make a little index card
6    for the case testifying, but it doesn't go back to
7    1970.
8           "Question:  How far back does it go?
9           "Answer: I don't recall.
10          "Question:  Does it go back more than
11   five years?
12          "Answer:  Yes
13          "Question:  Is that for each and every
14   case you testified on for the last five years or
15   more?
16          "Answer:  Yes.
17          "Question:  Whether you testified for
18   the prosecution or the defense?
19          "Answer:  That's correct.
20          "Question:  Does it include information
21   like the name of the case?
22          "Answer:  Yes.
23          "Question:  Name of the attorney?
24          "Answer:  Yes, and the judge."
25          That's it.  Do you recall giving

- Louis Roh, M.D. -

Page 403

1    those --
2         A.   Sometimes I do, yes.
3         Q.   So you do have index cards in the cases
4    you testified for?
5         A.   Yes.
6         Q.   Do you keep those in your office at the
7    medical examiner's office?
8         A.   No.
9         Q.   Where do you keep them?
10        A.   I throw them out.
11        Q.   Wait a second.  We just asked you these
12   questions and answers if you had the records and
13   you said you did?
14        A.   Some I throw out; some I keep.
15        Q.   The ones you keep, where do you keep
16   them?
17        A.   In my office.
18        Q.   Up at the Medical Examiner's office?
19        A.   That's correct.
20        Q.   On index cards?
21        A.   Index cards, yes.
22        Q.   Doctor, I'm going to ask you at your
23   next deposition to produce those cards that you
24   kept on the cases that you testified to.  I'm
25   going to ask you to preserve those from this day

- Louis Roh, M.D. -

Page 404

1    forward and not to throw out any other cases.

2        A.    I don't have it.

3        Q.    What do you mean you don't have it?

4        A.    I don't have index cards.  I only have

5    index cards of the autopsy.

6        Q.    Your deposition transcript is very clear

7    when you testified in this case on October 20,

8    2003, that you kept index cards for each and every

9    case that you testified on for the last five years

10   or more, whether you testified for the

11   prosecution --

12       A.    I said --

13       Q.    Let me finish, Doctor -- whether you

14   testified for the prosecution or the defense and

15   that it included information of the name of the

16   case, name of the attorney and the judge.  In

17   fact, you even added in "Yes, and the judge," in

18   your answer.

19            Is it your testimony today that you

20   don't maintain such cards?

21       A.    Yeah, it's been thrown out.

22       Q.    When?

23       A.    After the testimony.

24       Q.    It is your testimony, Doctor, that

25   between October 20, 2003 and today's date, which

- Louis Roh, M.D. -

Page 405

1    is October 31, 2003, you have thrown out all these

2    cards that you testified you kept?

3         A.   Yes, I did.

4         Q.   Doctor, do you understand the concept of

5    perjury?

6         A.   Yes, I do.

7         Q.   Where did you throw the cards out,

8    Doctor?

9         A.   In the garbage.

10        Q.   Which garbage; at the office or did you

11   take them home to throw them out?

12        A.   No, in the office.

13        Q.   Did you give them to anybody before you

14   threw them out?

15        A.   No, I just put them in the garbage.

16        Q.   How big were these cards; how much space

17   did they take up?

18        A.   A regular garbage bin.

19        Q.   How much space did the cards take up,

20   more than one file draw?

21        A.   No, a few.

22        Q.   How few?

23        A.   I would say maybe 20, 30.

24        Q.   Doctor, you testified that you testified

25   in over 300 cases, didn't you?

- Louis Roh, M.D. -

1      A.    No, I didn't say that I save all the
2   index cards.
3      Q.    That's not my question.  In this case
4   haven't you said in your deposition that you have
5   testified in over 300 cases?
6      A.    My answer is, I do not have index cards,
7   not now.
8      Q.    That's not my question, Doctor.  Did you
9   give deposition testimony in this case that you
10  have testified in over 300 cases?
11     A.    Yes, I did.
12     Q.    How many cases are you telling us now
13  that you have maintained index cards for?
14     A.    Maybe 20, 30.
15     Q.    Is it your testimony that between
16  October 20 and October 31 of 2003 you destroyed
17  those 20 or 30 records of testimony?
18     A.    Yes, I did.
19     Q.    Can you tell us the reason you did that,
20  Doctor?
21     A.    Because I didn't want to get subpoena.
22     Q.    You thought that those records might be
23  subpoenaed by us in connection with this case?
24     A.    That's correct.
25     Q.    And as a result you willfully destroyed

- Louis Roh, M.D. -

1    those records?

2        A.    That's correct.

3        Q.    When did you do it, Doctor, how long

4    after October 20?

5        A.    I don't know the exact date.

6        Q.    Did you do it yesterday?

7        A.    I don't know exact date.

8        Q.    Did you do it this week?

9        A.    I don't recall exact date.

10        Q.    Did you do it last week?

11        A.    I don't recall.

12        Q.    Did you do it within days of October 20?

13        A.    I do not recall.

14        Q.    Did you discuss the destruction of these

15    records with any person --

16        A.    No.

17        Q.    Let my finish the question.  Did you

18    discuss the destruction of these records prior to

19    your destroying these records?

20        A.    No.

21        Q.    Did you shred these records in any way?

22        A.    No.

23        Q.    Did you just toss them in the garbage?

24        A.    That's correct.

25        Q.    And you knew that these records might be

- Louis Roh, M.D. -

Page 408

1    subpoenaed by me in connection with this case,

2    correct?

3        A.    No.

4        Q.    You didn't know that?

5        A.    I didn't know that.

6        Q.    I thought you just said you throw them

7    out because you were worried --

8        A.    Well --

9        Q.    Let me finish the question, Doctor.

10            I thought you said you destroyed these

11   records because you were worried they were going

12   to be subpoenaed by me in connection with this

13   case?

14       A.    Well, that was one of the reasons.

15       Q.    What are the other reasons?

16       A.    I didn't want to keep any unnecessary

17   records, because you have been subpoenaing all

18   kinds of things.  I realize that keeping all these

19   records creates more problems, so I decided to get

20   rid of it.

21            You subpoenaed everything.  So I realize

22   that keeping all these unnecessary records creates

23   a problem.

24       Q.    Let me ask you a question.  Have you

25   ever been challenged in such a way in a case where

- Louis Roh, M.D. -

1   all your records have been subpoenaed like this?

2        A.   No.

3        Q.   So when a challenge such as this comes

4   about, your response was to destroy the evidence;

5   is that correct?

6        A.   That's correct.

7        Q.   Doctor, did you keep any of the records

8   in your computer?

9        A.   No.

10       Q.   Did you keep any of the records at your

11  home?

12       A.   No.

13       Q.   Doctor, is this the first time that you

14  have been involved in a civil case where the

15  person taking your deposition was also charged

16  with murder?

17       A.   I don't recall.

18       Q.   Do you recall any other case such as

19  this, Doctor?

20       A.   I do not recall.

21       Q.   In any event, this is the first time

22  that all these records like this have been

23  subpoenaed, correct?

24       A.   I don't recall, most likely.

25       Q.   This is the first time you have come up

- Louis Roh, M.D. -

1   against this; is that right?

2       A.   That's correct.

3       Q.   And your response to this was to destroy

4   the evidence?

5            MR. LAWNER:   Objection as to form.

6       A.   This are my records.

7       Q.   You thought those records would be

8   subpoenaed as evidence, correct?

9       A.   No, I didn't say that.

10      Q.   You thought those records would be

11  subpoenaed?

12      A.   I felt keeping all those records create

13  frivolous subpoena issues.  So I decided to get

14  rid of it.

15      Q.   You thought they had frivolous subpoena

16  issues associated with them?

17      A.   As far as I am concerned subpoenaing my

18  index card is frivolous.

19      Q.   So you decided to prevent the subpoena

20  of records that you thought might be frivolous, by

21  destroying them?

22      A.   That's correct.

23      Q.   Doctor, did you believe when you

24  destroyed those records you had anything to hide?

25      A.   That's not a record.

- Louis Roh, M.D. -

Page 411

1    Q.   Doctor, let's assume for purposes of my

2    question that the index cards we are talking about

3    are records?

4    A.   That's my file.

5    Q.   That's your file?

6    A.   Yeah, I decided to get rid of it.

7    Q.   When you destroyed your file, was it

8    because you thought you had something to hide?

9    A.   No.

10   Q.   You didn't think you had anything to

11   hide?

12   A.   I decided to get rid of it so I don't

13   have to come here and discuss about this thing one

14   by one.

15   Q.   So you were worried that we were going

16   to start to look into the other cases that you

17   gave testimony?

18   A.   We are talking about three days

19   testimony.  I didn't want to go through that.

20   Q.   Were you worried that we were going to

21   uncover other cases that you had to testify on?

22   A.   No.

23   Q.   Were you worried that we might discover

24   certain testimony of yours that you had given in

25   other cases that it might be contradictory to the

Page 412

1   testimony --

2      A.   No.

3      Q.   Let me finish -- to the testimony you

4   have given in this case?

5      A.   No.

6           MR. PISCIONERE:  I think it's time to

7           take a few minute break.

8           (Recess taken.)

9      Q.   I am going to instruct you, Doctor, that

10  you are not to destroy any evidence that in any

11  way you feel might be associated with your

12  testimony in this case?

13     A.   Such as?

14     Q.   Anything, Doctor.  I am not limiting it

15  to anything in the world.  Anything.

16          MR. McCARTY:  You can't say that.

17          MR. PISCIONERE:  He doesn't want to --

18          MR. SCHWARZ:  You can't subpoena --

19          you issued a subpoena.  He produced the

20          documents.  You can't have an all

21          encompassing subpoena for every single

22          thing he has ever done in his entire life.

23          MR. PISCIONERE:  Maybe what we should

24          do is get the law secretary in here and

25          have the Court issue some direction.  I

- Louis Roh, M.D. -

Page 413

1    think you are right.

2        I will be right back.  If you want to

3    come with me, I am going to get a law

4    secretary.

5        (Recess taken.)

6        MR. PISCIONERE:  Mr. DiBella, before

7    you begin, if I may, towards the end before

8    we broke I gave you direction or attempted

9    to give a direction to Dr. Roh, which upon

10   reflection I believe is inappropriate and

11   poorly advised.

12       I want to, for the record, retract the

13   direction I gave to Dr. Roh, not to destroy

14   some things, because I don't believe I had

15   authority to do so.  I believe we'll

16   request the court to give direction to

17   Dr. Roh.

18       MR. DiBELLA:  Did anybody else want to

19   say anything?

20       My name is Robert DiBella.  I am Judge

21   Scarpino's Principal Court Attorney here in

22   the Surrogates Court.  The attorneys came

23   to my office for a conference with respect

24   to some direction to the witness, Dr. Roh,

25   regarding retention of his records and the

Docutran
1(888)419-4545

Page 414

```
 1      direction not to destroy records, that
 2      Mr. Piscionere feels may be relevant to
 3      issues scheduled to be heard in an
 4      evidentiary hearing before Judge Scarpino.
 5           I had an opportunity to speak to Judge
 6      Scarpino about this briefly and after
 7      hearing the attorneys and speaking to the
 8      Judge, it's the Court's feeling,
 9      Doctor, that you should be careful in what
10      you choose to destroy at this juncture.
11           We don't obviously, as I told you last
12      time, I asked you to preserve everything in
13      your file.  Apparently our definition of
14      what that might mean and your definition of
15      what that might mean, may not be the same.
16           Perhaps those words are susceptible to
17      different interpretations, but what is
18      important is that records, whatever form
19      they may be in, or whatever file or place
20      they are kept in, that may be relevant to
21      issues at our hearing, be preserved.
22           That is our broad objection active.
23      We are not looking to make this any more
24      difficult than we need to with regard to
25      your operations.
```

- Louis Roh, M.D. -

1    We have a substantial obligation, the

2    Court does, to protect evidence in a trial

3    so hopefully the truth can be arrived at,

4    consistent with our laws and rules.

5    Again, I am reiterating our direction

6    to you that we want any documents relating,

7    in any manner, wherever they be and

8    whatever form they are kept in under your

9    custody or potential control, to be

10    preserved.

11    In addition, records that relate to

12    conclusions that you draw as a medical

13    examiner in different situations, should be

14    preserved also.

15    I can't tell you that you need to

16    preserve every scrap of paper that exists

17    that you ever touched.

18    THE WITNESS:  You have to tell me,

19    that's true.

20    MR. DiBELLA:  I am not making

21    something that broad.  These things are not

22    static.  If you know you are being asked at

23    the depositions -- you are being deposed on

24    many separate days now -- about information

25    or findings or testimony that you may have

- Louis Roh, M.D. -

1    given in other cases, about conditions you
2    observed in this case and they are
3    different from those or consistent with
4    those, that could be relevant.  It's
5    possible that could be relevant here.
6         If you said, I think there was an
7    example given by Mr. Piscionere that a
8    blunt instrument would not cause a
9    particular type of condition, but in this
10   case you feel that it did, there maybe good
11   and substantial reasons why they are
12   different and circumstances that may
13   explain any apparent inconsistencies from
14   one testimony to another.
15        But if the whole file or record has
16   been destroyed, then we can never arrive at
17   the information in the first instance, let
18   alone the explanation of it.  This is our
19   problem.
20        I am not here sitting in on the
21   deposition where I have the ability to rule
22   on a question by question basis and know
23   where he is going and where he might be
24   going when you are being questioned.
25   That's impossible.  I don't have the

- Louis Roh, M.D. -

Page 417

1    ability right now to do that.

2        So we are dependent on your

3    professional judgment in a lot of ways, but

4    I want you to know that the Court is

5    considered that any destruction of records

6    could be very problematic.

7        THE WITNESS:  It's not a record.  It's

8    my memo on a piece of paper.

9        MR. DiBELLA:  A memo on a piece of

10   paper is a record.

11       THE WITNESS:  This is something I had

12   let's say ten years ago.  I may have jotted

13   it down on the index card so I can refresh

14   my memory to testify in court.

15       I usually throw them out.  They have

16   nothing to do with this case and he is

17   asking, bring all those, my memo cards to

18   this deposition.

19       If he asked me about a particular,

20   this particular case, certainly I bring it

21   in.  In fact, he asked me to bring the

22   index card on this case, so I brought it in

23   this morning.

24       But he is asking me to bring my memo

25   pad, jot down on the index card, cases

- Louis Rob, M.D. -

Page 418

1    stretching) back 20, 30 years.  These are

2    my scraps of paper.  That's not, of course,

3    on record.  It has nothing to do with this

4    case.

5         You have to draw the line, which is

6    relevant, which is not relevant.  In my

7    opinion those cases are not relevant.

8         MR. DiBELLA:  It's Judge Scarpino's

9    opinion, it's the only important one with

10   regard to what is relevant in this case.

11   Do you understand that?

12        THE WITNESS:  I understand that.

13        MR. DiBELLA:  I am not challenging

14   your medical opinion and I assure you, you

15   will not going to be challenged to change

16   Judge Scarpino's legal opinion.

17        You have an attorney.  You can seek

18   the advice of your attorney.  If you are

19   directed by one of these guys, why you feel

20   there is an inappropriate reason for the

21   objection, you should seek the advice of

22   your counsel.  It's a confidential

23   discussion with your counsel.  And counsel

24   will advise you as to what to do.

25        There are procedures that your counsel

- Louis Roh, M.D. -

1   can utilize to prevent Mr. Piscionere from

2   getting things that he demands.  They can

3   move to quash subpoenas.  They can move for

4   further direction from the Court for an

5   order, limiting, narrowing the discovery,

6   the request of information.  These

7   procedures have worked well for the courts

8   for many hundreds of years in all kinds of

9   cases, but they have to utilized in the

10  right order.

11       You can't be the person who decides

12  what you will give and what you will not.

13  The fact that you don't normally or

14  sometimes don't keep these cards, is not

15  the point.

16       If you have saved them and they do

17  have relevant information, they do exist

18  and they do have relevant information, it

19  may be something that Mr. Piscionere is

20  entitled to, subject to your attorneys

21  bringing the proper objections.

22       These records can sometimes be viewed

23  with what we call incamera, where the court

24  alone looks at them before any disclosure

25  is had, to determine whether they are

- Louis Roh, M.D. -

Page 420

1  relevant and if we make a decision as to

2  relevance or there is a question, it can be

3  appealed.  Other people can see what we

4  have done and determine whether we did the

5  right thing or the wrong thing.  So all

6  these things occur in a civilized process.

7       Again, I am not going to chastise you

8  for doing something wrong.  I don't feel

9  you have.  The order that we gave before

10  was limited.

11       But records include all types of

12  information; computer discs, hard drives,

13  telephone records, tapes, anything that

14  records an event.

15       If you had index cards and wrote on

16  them to refresh your recollection at a

17  later time, it's a record.  It may be a

18  personal record, it might be a business

19  records.  It might be some other type of

20  record to qualify, but the broad term of

21  record will include all types of

22  communication and information.

23       I don't want to have to give you a

24  three-page definition on the laws that make

25  those up.  I am just trying to suggest to

- Louis Roh, M.D. -

Page 421

1      you that you need to consult with your

2      attorney with regard to what Mr. Piscionere

3      asks you to bring and use their best

4      judgment in compliance.

5          My boss is not the kind of kind who

6      likes to punish people, but he insists some

7      people abide by the rules so that the

8      process is protected and we can do the best

9      job we can with the information that we

10     have.  Okay?

11         THE WITNESS:  Okay.

12         MR. DiBELLA:  So please, with regard

13     to any further records that are contained,

14     please make every effort to preserve these

15     and be very careful not to destroy things

16     that may have some import and put us in a

17     worse position later.  I would like to

18     avoid that issue.

19         Does anyone feel that more needs to be

20     done on this area?

21         MR. PISCIONERE:  No.

22         MR. LAWNER:  No.

23         MR. PISCIONERE:  Thank you.

24         MR. DiBELLA:  Okay.  Have a good day.

25     Doctor, I heard you have to leave, have a