court in pretrial conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

202. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment evidence of his fabrications from prosecutor Bolen.

203. This false and fabricated evidence concerning A.C.'s prior sexual history was introduced against Mr. Deskovic at trial and relied upon by Bolen in his opening and closing statements, was a basis for the jury's verdict, and thus deprived him of a fair criminal trial.

204. The truth of the defendants' fabrications and the other material, exculpatory and impeachment evidence that was concealed by them could not have been discovered by the Mr. Deskovic or his attorney through the exercise of due diligence.

205. Had the defendants' fabrications and material, exculpatory and impeachment evidence known to them been documented and/or disclosed they would have tended to prove Mr. Deskovic's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of defendants Levine, McIntyre, Stephens, Roh, and other witnesses. The exculpatory and impeachment evidence withheld by the defendants, considered individually and collectively, undermines confidence in the verdict against Mr. Deskovic, and the concealment of this evidence deprived Mr. Deskovic of a fair criminal trial.

206. The defendants' conduct violated Mr. Deskovic's clearly established constitutional rights to a fair trial and not to be deprived of liberty without due process of law, as guaranteed by the

63

Fourteenth Amendment. No reasonable police officer or medical examiner in 1989 and 1990 would have believed that the actions taken by the defendants in fabricating evidence, failing to document and disclose material, exculpatory evidence, and failing to investigate exculpatory evidence were lawful.

207. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT III

**42 U.S.C. § 1983 Claim for Malicious Prosecution and Unlawful Prolonged Detention
Based on Post-Indictment Failure to Investigate
in Violation of the Fourth and Fourteenth Amendments
Against Defendants Levine, McIntyre, Tumolo, Stephens, Bolen, and Roh**

208. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

209. Defendants Levine, McIntyre, Tumolo, Stephens, Bolen, and Roh, despite knowing that probable cause did not exist to arrest, continually detain, and/or prosecute Mr. Deskovic for the rape and murder of A.C., and despite the fact that the grand jury's probable cause determination was vitiated by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested, continually detained, and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful conviction.

210. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of their deliberate and reckless indifference to the truth should have known of information that probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to January 25, 1990 were not the product of his free will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants, and that those factors as well as additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding against Mr. Deskovic.

211. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's prosecution to continue despite knowing that probable cause had been vitiated. Specifically, after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their pre-indictment misconduct, and committed additional misconduct in the course of post-indictment investigation, including but not limited to concealing from prosecutors additional material, exculpatory evidence that undermined probable cause.

212. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution. The deliberate and reckless investigative failures of the defendants included but

were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

213. Defendants Bolen and Roh caused Mr. Deskovic to be detained and prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history that was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Bolen and Roh knew or in the absence of their deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution to continue. Furthermore, Bolen deliberately and recklessly failed to investigate additional evidence that he knew, or in the absence of his deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution.

214. Specifically, shortly after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., and in furtherance of investigation conducted to obtain evidence to support the continued prosecution of Mr. Deskovic, Bolen and Roh met, discussed, and agreed that Roh would provide a fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by Bolen to the court in a March 21 court hearing more than eight months before trial discussing the DNA testing and the viability of Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

215. In fact Bolen and/or Roh knew, or in the absence of their deliberate and reckless indifference should have known, that Roh had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring of A.C.'s hymen that he described to Bolen.

216. The above-described acts were shocking, and were performed by the defendants deliberately, with reckless disregard for the truth, and with malice.

217. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006, the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on motion of the Westchester County District Attorney, following the vacatur of his conviction and his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

218. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1989 and 1990 would have believed that the defendants' actions were lawful.

219. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT IV

**42 U.S.C. § 1983 Claim for Engaging in Conduct that Shocks the Conscience
in Violation of the Fourteenth Amendment
Against Defendants Levine, McIntyre, Brovarski, and Tumolo**

220. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

221. In their drive to secure Mr. Deskovic's wrongful conviction, defendants Levine, McIntyre,

67

Brovarski, and Tumolo deliberately engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of decency and fairness and violated Jeffrey Deskovic's substantive due process right under the Fourteenth Amendment.

222. Specifically, the defendants deliberately exploited Jeffrey Deskovic's vulnerabilities, tricked, and threatened Jeffrey to coerce his confession; provided investigative facts to Jeffrey that fabricated a false confession and concealed the defendants' coercion and other misconduct; fabricated additional allegedly inculpatory evidence from witnesses and other sources to corroborate Jeffrey's guilt prior to his indictment; deliberately concealed from prosecutors their pre-indictment misconduct, as well as additional exculpatory and impeachment evidence provided to them by witnesses; deliberately concealed, after DNA evidence conclusively exposed the falsity of his confession, additional exculpatory and impeachment evidence that undermined any basis for Jeffrey's guilt and continued prosecution; deliberately and recklessly failed to investigate leads pointing toward other suspects and corroborating Mr. Deskovic's innocence; and engaged in additional, conscience-shocking misconduct that led to the conviction and wrongful imprisonment of an innocent man.

223. The defendants' conduct violated Mr. Deskovic's clearly established constitutional right to substantive due process, as guaranteed by the Fourteenth Amendment. No reasonable police officer in 1989 and 1990 would have believed that the actions taken by the defendants in deliberately failing to conduct a constitutionally adequate investigation were lawful.

224. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT V

**42 U.S.C. § 1983 Claim for Supervisory Liability Against PPD Supervisors**

225. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

226. Defendants Tumolo and John and Jane Doe Supervisors knew or in the absence of their deliberate indifference, recklessness, and gross negligence should have known, that their subordinate officers had deprived Mr. Deskovic of his clearly established constitutional rights through misconduct that included but was not limited to coercing and compelling allegedly inculpatory statements from Mr. Deskovic, providing Mr. Deskovic with non-public details concerning A.C.'s rape and murder and the PPD investigation, fabricating witness statements and other evidence, concealing material, exculpatory and impeachment evidence, and failing to conduct a constitutionally adequate investigation of Mr. Deskovic.  Defendants Tumolo and John and Jane Doe Supervisors, by deliberately, recklessly, and grossly negligently failing to supervise their subordinate police officers, and by their active and direct participation in and facilitation of their subordinates' misconduct, caused their subordinates to deprive Mr. Deskovic of his clearly established constitutional rights, including but not limited to his rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of liberty without due process of law, and to a fair trial.

227. Moreover, defendants Levine, McIntyre, Brovarski, Tumolo, and other PPD detectives acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Tumolo and John and Jane Doe Supervisors, and in which they knew that their violations of Mr. Deskovic's constitutional rights would be facilitated, approved, and/or

69

condoned by the defendant supervisors.

228. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendants Tumolo and John and Jane Doe Supervisors violated their clearly established duty, in 1989 and 1990, to supervise subordinate detectives including defendants Levine, McIntyre, and Brovarski, and no reasonable police supervisor in 1989 and 1990 would have believed that deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

229. Defendants Tumolo and John and Jane Doe Supervisors' actions and omissions proximately and directly caused Mr. Deskovic to be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

## COUNT VI

**42 U.S.C. § 1983 Claim for Supervisory Liability Against Chief Medical Examiner Hyland**

230. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further states as follows.

231. Defendant Hyland acted with deliberate indifference, recklessness, and/or gross negligence to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of his subordinate, Deputy Medical Examiner Roh, and thereby caused Roh to deprive Mr. Deskovic of his rights not to be convicted on the basis of fabricated evidence, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair criminal trial, as guaranteed by the Fourth and Fourteenth Amendments.

232. Specifically, defendant Hyland knew or should have known - based on, among other facts,

70

Roh's reputation for and open and notorious practice of fabricating scientific conclusions and providing perjured testimony, his widely reported and criticized false and baseless scientific testimony high priority and highly publicized cases prior to Mr. Deskovic's conviction, and, upon information and belief, his actual knowledge and/or approval of the reports prepared and testimony given in Jeffrey Deskovic's case - of a high degree of risk that defendant Roh would perform his duties as Deputy Medical Examiner in a manner that violated the constitutional rights of citizens.

233. The deliberately indifferent, reckless, and/or grossly negligent conduct of defendant Hyland violated his clearly established duty, in 1989 and 1990, to supervise subordinate medical examiners, and no reasonable medical examiner in 1989 and 1990 would have believed that deliberately indifferent, reckless, and/or grossly negligent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

234. Defendant Hyland's actions and omissions proximately and directly caused Mr. Deskovic to be wrongly prosecuted, convicted, and imprisoned for sixteen years, and to suffer the other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### 42 U.S.C. § 1983 Claim for Failure to Intercede
### Against Defendants Levine, McIntyre, Brovarski, Tumolo,
### and John and Jane Doe Supervisors

235. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

236. By their conduct and under color of state law, defendants Levine, McIntyre, Brovarski, Tumolo, and John and Jane Doe Supervisors had opportunities to intercede on behalf of Mr.

71

Deskovic to prevent his coerced confession, malicious prosecution, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or deliberate or reckless indifference, declined or refused to do so.

237. The defendants' failures to intercede violated Mr. Deskovic's clearly established constitutional rights not to be compelled to be a witness against himself, to be free from unreasonable search and seizure, not to be deprived of liberty without due process of law, and to a fair trial as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer or police supervisor in 1989 and 1990 would have believed that failing to intercede to prevent the defendants from coercing suspect statements, fabricating evidence, failing to document and disclose material, exculpatory and impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Deskovic to be arrested and prosecuted without probable cause were lawful.

238. As a direct and proximate result of the defendants' failures to intercede Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim
### Against Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens

239. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

240. Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others yet unknown agreed among themselves and with other individuals to act in concert in order to deprive Mr. Deskovic

of his clearly established Fourth, Fifth, and Fourteenth Amendment rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of his liberty without due process of law, and to a fair criminal trial.

241. In furtherance of the conspiracy the defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a) Defendants Levine, McIntyre, Tumolo, Stephens, and others planned to obtain Jeffrey's confession through physical threats, trickery, deceptive promises, and other means deliberately designed to exploit Jeffrey's known age and intellectual, emotional, and psychological vulnerabilities;

b) Defendants Levine, McIntyre, Tumolo, and others provided Jeffrey Deskovic with non-public facts known to the PPD in connection with the A.C. investigation, and through coercion, deception, and trickery compelled Jeffrey to adopt those facts as his own by incorporating them into allegedly inculpatory statements concerning his knowledge of and involvement in the crime;

c) Defendant Levine and others deceived Jeffrey concerning the status and legal significance of his representation by Lou Ecker in relation to the defendants' questioning of him, and defendants Levine, McIntyre, Stephens, and others subsequently caused Jeffrey to waive his Miranda rights under circumstances that were not knowing and voluntary;

d) Defendants Levine, McIntyre, Brovarski, Tumolo, and Stephens deliberately and recklessly created false police reports, reported false facts to prosecutors, and otherwise fabricated evidence that falsely inculpated Mr. Deskovic and concealed the defendants' investigative misconduct, including but not limited to police reports and other documents

73

falsely representing that Mr. Deskovic had independent knowledge of non-public facts concerning A.C.'s rape and murder; <u>Miranda</u> waiver forms falsely representing that Mr. Deskovic's waivers were knowing and voluntary; and allegedly inculpatory witness statements.

e)  Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and others deliberately concealed additional material, exculpatory and impeachment evidence from prosecutors, including but not limited to facts concerning the coercive and intimidating tactics used by them to interview witnesses and interrogate Jeffrey Deskovic; evidence that Freddy Claxton and A.C. had not been in a romantic or sexual relationship; evidence that A.C. had not been sexually active prior to her rape and murder; and other evidence tending to establish Jeffrey Deskovic's innocence, including material, exculpatory and impeachment evidence discovered subsequent to Mr. Deskovic's indictment which vitiated probable cause;

f)  Prior and subsequent to Mr. Deskovic's arrest, charging, and indictment for the crime, defendants Levine, McIntyre, Brovarski, Tumolo, and others deliberately and recklessly failed to investigate leads pointing to other suspects and corroborating Mr. Deskovic's innocence, including but not limited to the following: intentionally failing to interview witnesses whose knowledge tended to disprove Mr. Deskovic's guilt; failing to investigate known exculpatory and potentially exculpatory information provided by witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence; and failing to pursue evidence and leads concerning other suspects after their theory of Mr.

Deskovic's guilt had been fatally undermined by known exculpatory evidence;

g) Defendants Levine, McIntyre, Stephens, and others hid their misconduct and secured Mr. Deskovic's wrongful conviction by deliberately provided perjured testimony in the grand jury and/or in Mr. Deskovic's criminal trial.

242. As a direct and proximate result of the defendants' conspiracy and actions in furtherance of that conspiracy, Mr. Deskovic was wrongly arrested, prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT IX**

**42 U.S.C. § 1983 Claim Against the City of Peekskill**

243. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

244. The City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) disregarding the Fifth Amendment rights of criminal suspects and defendants, in particular juveniles; (b) fabricating evidence; (c) failing to document and disclose material, exculpatory and impeachment evidence to prosecutors; and (d) failing to investigate known exculpatory evidence and otherwise failing to conduct constitutionally adequate investigations.

245. Furthermore, the City of Peekskill and the PPD, by and through their final policymakers, maintained a policy, custom, or pattern and practice of failing to train and supervise PPD investigators in connection with fundamental investigative tasks implicating the constitutional

rights of witnesses and suspects, including but not limited to conducting and documenting criminal investigations, conducting custodial interrogations and witness interviews, and documenting and disclosing exculpatory and impeachment evidence to prosecutors.

246. The PPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing to train and supervise PPD investigators, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple investigators and supervisors in the PPD in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent cases.

247. PPD policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of investigative misconduct and failure to train and supervise PPD investigators created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

248. The misconduct and constitutional violations committed by the PPD defendants in the course of the investigation and prosecution of Jeffrey Deskovic were carried out pursuant to the PPD's policy, custom, or pattern and practice of investigative misconduct, and were directly and proximately caused by the PPD's failure to train and supervise investigators. As a direct and proximate result of the PPD's policies, customs, or patterns and practices, Jeffrey Deskovic was wrongly prosecuted, convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT X

### 42 U.S.C. § 1983 Claim Against Westchester County

76

249. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

250. Prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, and continuing to at least 2006, the Westchester County District Attorney's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring constitutional and ethical duties.

251. This policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys was evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County District Attorney's Office in the course of the investigation and prosecution of Jeffrey Deskovic, and in the course of prior and subsequent investigations and prosecutions, including but not limited to, as described above, the Jean Harris case.

252. As a direct and proximate result of the Westchester County District Attorney's Office policy, custom, or pattern and practice of failing to supervise, train, and discipline assistant district attorneys, prosecutors, including but not limited to assistant district attorney Bolen, committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Assistant district attorney Bolen deliberately or recklessly obtained Mr. Deskovic's conviction by means of fabricated evidence, including but not limited to defendant Roh's deliberately and recklessly false pretrial statements and testimony that (a) there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior

to her rape and murder, and (b) Roh had observed scarring of A.C.'s hymen during his autopsy, which caused Mr. Deskovic to be maliciously prosecuted and subjected to an unfair criminal trial on the basis of material fabrications;

b) Bolen concealed from the defense material, exculpatory and impeachment evidence, including but not limited to, upon information and belief, that Roh's conclusions and findings concerning A.C.'s sexual history were fabricated;

c) Bolen deliberately or recklessly failed to investigate known exculpatory evidence, including but not limited to deliberately and recklessly failing to obtain reference hair samples from Roh, his assistant, and Freddy Claxton, and deliberately or recklessly failing to obtain DNA testing from Freddy Claxton or any other potential consensual sex partner.

d) Bolen deliberately or recklessly suborned perjury and made false arguments that lacked evidentiary foundation in order to obtain Mr. Deskovic's conviction, including but not limited to arguing at trial that hairs found on A.C. had come from Roh, his assistant, and Freddy Claxton, and that the semen found inside A.C. had come from Freddy Claxton.

253. Westchester County District Attorney's Office policymakers were deliberately indifferent to the known and obvious risk that the policy, custom, or pattern and practice of failing supervise, train, and discipline assistant district attorneys in connection with fundamental and recurring ethical and constitutional duties created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

254. Prior to, at, and subsequent to the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of

providing false and scientifically unsupported scientific conclusions to Westchester County prosecutors in order to aid their prosecutions and with deliberate indifference to the risk that such conclusions would violate criminal suspects' right to a fair trial.

255. Additionally, prior to and at the time of the investigation, prosecution, and conviction of Jeffrey Deskovic, the Westchester County Medical Examiner's Office, by and through final policymakers and their delegees, maintained a policy, custom, or pattern and practice of failing to supervise, train and discipline deputy medical examiners. County policymakers maintained this policy, custom, or pattern and practice despite the fact that they knew or, in the absence of their deliberate indifference should have known, that deputy medical examiners, including defendant Roh, openly and notoriously fabricated scientific evidence, gave perjured testimony, and otherwise committed misconduct in connection with their duties as deputy medical examiners.

256. The Westchester County Medical Examiner's Office policy, custom, or pattern and practice of providing false and scientifically unsupported scientific conclusions, and its policy, custom, or pattern and practice of failing to supervise, train, and discipline deputy medical examiners, were evidenced by, among other actions, multiple constitutional violations and related acts of misconduct committed by multiple members of and supervisors in the Westchester County Medical Examiner's Office in the course of the investigation and prosecution of Jeffrey Deskovic, misconduct committed by Roh in the Jean Harris case, reported and/or admitted misconduct by Roh in the Vassello, Maragh, Kilmer, Bodenburgh, and Walker/Spruill cases, and in the course of other prior and subsequent cases.

257. As a direct and proximate result of the Westchester County Medical Examiner's Office's policy, custom, or pattern and practice of providing false and scientifically unsupported

conclusions to Westchester County prosecutors, and of failing to supervise, train, and discipline deputy medical examiners, Deputy Medical Examiner Louis Roh committed multiple constitutional violations and related misconduct in the course of prosecuting Jeffrey Deskovic, including but not limited to the following:

a) Roh deliberately and recklessly fabricated the false fact that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and murder, in order to support the prosecution's theory that the semen found in A.C. had come from a consensual donor;

b) Roh deliberately and recklessly fabricated the false fact that he had observed scarring of A.C.'s hymen;

c) Roh concealed material, exculpatory and impeachment evidence from assistant district attorney Bolen, including, upon information and belief, the fact that his conclusions and findings concerning A.C.'s sexual history were false;

d) Roh perjured himself on multiple occasions during Mr. Deskovic's trial, including by deliberately and recklessly misstating and overstating his scientific conclusions.

258. Westchester County Medical Examiner's Office policymakers were deliberately indifferent to the known and obvious risk that the Office's policy, custom, or pattern and practice of providing false and scientifically unsupported evidence to prosecutors, and of failing supervise, train, and discipline deputy medical examiners created a risk that the constitutional rights of criminal suspects like Mr. Deskovic would be violated.

259. As a direct result of the policies, customs, or patterns and practices of Westchester County, Jeffrey Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and

suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XI

### 42 U.S.C. § 1983 Claim for Unreasonable Search and Unnecessary and Wanton Infliction of Pain in Violation of the Fourth, Eight, and Fourteenth Amendments Against Defendant Tweed

260. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

261. Defendant Tweed, acting under color of law, conducted searches of Mr. Deskovic's person that were unreasonable violations of Mr. Deskovic's legitimate expectation of privacy, lacked any legitimate penalogical objective, and therefore violated Mr. Deskovic's Fourth and Fourteenth Amendment right to bodily integrity.

262. Furthermore, defendant Tweed repeatedly, maliciously, sadistically, and without any legitimate penalogical objective subjected Mr. Deskovic to invasive, assaultive, and violative physical and sexual conduct, and otherwise unnecessarily and wantonly inflicted pain upon Mr. Deskovic. Tweed acted with deliberate disregard for Mr. Deskovic's health and safety, in violation of Mr. Deskovic's right under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment.

263. Defendant Tweed's actions to deprive Mr. Deskovic of his Fourth, Eighth, and Fourteenth Amendment rights violated clearly established constitutional law, and no reasonable corrections officer in 2004 would have believed that defendant's actions were lawful.

264. Defendant Tweed's conduct directly and proximately caused Mr. Deskovic to suffer the grievous injuries enumerated above at the time of the constitutional violations and continuing to this day and into the future.

## Count XII

### State Law Claim for Malicious Prosecution
### Against Defendants Levine, McIntyre, Tumolo, Stephens, and Roh

265. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

266. Defendants Levine, McIntyre, Tumolo, Stephens, and Roh, despite knowing that probable cause did not exist to arrest and prosecute Mr. Deskovic for the rape and murder of A.C., and despite the fact that the grand jury's probable cause determination was vitiated by the defendants' undisclosed misconduct and by other concealed, material, exculpatory and impeachment evidence, acted individually and in concert to cause Mr. Deskovic to be arrested and prosecuted for those crimes. The defendants' conduct violated Mr. Deskovic's right pursuant to the Fourth and Fourteenth Amendments of the United States Constitution to be free of unreasonable searches and seizures, and proximately caused his wrongful conviction.

267. Specifically, defendants Levine, McIntyre, Tumolo, and Stephens knew or in the absence of their deliberate and reckless indifference to the truth should have known of information that probable cause did not exist to arrest and prosecute Mr. Deskovic, including but not limited to the facts that Mr. Deskovic's waiver of his right to counsel prior to January 10, 1990 was not knowing and voluntary, that Mr. Deskovic's allegedly inculpatory statements on and prior to January 25, 1990 were not the product of his free will and rational intellect, that allegedly inculpatory evidence had been fabricated by the defendants, and that those factors as well as additional material, exculpatory and impeachment evidence which was not disclosed to the grand jury or prosecutors undermined the evidence presented in support of a probable cause finding

82

against Mr. Deskovic.

268. Following Mr. Deskovic's indictment, defendants Levine, McIntyre, and Tumolo intentionally and with deliberate and reckless disregard for the truth, caused Mr. Deskovic's prosecution to continue despite knowing that probable cause had been vitiated. Specifically, after DNA testing results exonerated Mr. Deskovic, the defendants continued to conceal their pre-indictment misconduct, and committed additional misconduct in the course of post-indictment investigation, including but not limited to concealing from prosecutors additional material, exculpatory evidence that undermined probable cause.

269. Additionally, prior and subsequent to Mr. Deskovic's indictment and being notified of exonerative DNA testing results, defendants Levine, McIntyre, and Tumolo deliberately and recklessly failed to investigate evidence that they knew, or in the absence of their deliberate and reckless indifference should have known, vitiated probable cause for Mr. Deskovic's prosecution. The deliberate and reckless investigative failures of the defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by witnesses, failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to serology, hair, fingerprint, and DNA evidence, and failing to pursue evidence and leads concerning other suspects.

270. Defendant Roh caused Mr. Deskovic to be maliciously prosecuted in violation of the Fourth Amendment by deliberately and recklessly fabricating allegedly inculpatory evidence concerning A.C.'s prior sexual history, which was critical to the continued prosecution of Mr. Deskovic following the exculpatory DNA test results, and which Roh knew or in the absence of his deliberate and reckless indifference should have known would cause Mr. Deskovic's prosecution

83

to continue.

271. Specifically, just weeks after learning that DNA testing proved Mr. Deskovic not to be the source of the semen found inside A.C., Roh provided assistant district attorney Bolen with a fabricated explanation for the source of the semen by falsely stating (a) that there was a scientific basis for concluding that A.C. had been sexually active on multiple occasions prior to her rape and death, and (b) that he had observed scarring of A.C.'s hymen during his autopsy. These false and fabricated pre-trial statements were repeated by Bolen to the court in pretrial conferences discussing the DNA testing and Mr. Deskovic's continued prosecution, and were elicited from Roh at trial.

272. In fact Roh knew, or in the absence of his deliberate and reckless indifference should have known, that he had no scientific basis for concluding that A.C. had been sexually active on multiple occasions, and that he had not seen the scarring that he described to Bolen. Upon information and belief, Roh concealed the material, exculpatory and impeachment evidence of his fabrications from Bolen.

273. The defendants performed the above-described acts deliberately, with reckless disregard for the truth, and with malice.

274. In fact, Mr. Deskovic was innocent of the rape and murder of A.C. On November 2, 2006, the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on motion of the Westchester County District Attorney, following the vacatur of his conviction and his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

275. Defendants' actions to deprive Mr. Deskovic of his liberty without probable cause were in violation of clearly established constitutional law, and no reasonable police officer in 1989 and

84

1990 would have believed that the defendants' actions were lawful.

276. As a direct and proximate result of the defendants' actions Mr. Deskovic was wrongly prosecuted, convicted, and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

## COUNT XIII

### State Law Claim for Intentional or Reckless Infliction of Emotional Distress Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh

277. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

278. The conduct of defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh in deliberately causing, or recklessly disregarding the risk of causing, the wrongful arrest, prosecution, and incarceration of Jeffrey Deskovic was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

279. The conduct of defendant Tweed in deliberately subjecting Mr. Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, was extreme and outrageous, and directly and proximately caused the grievous and continuing injuries and damages set forth above.

280. Defendants' actions intentionally to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XIV

85

**State Law Claim for Negligent Infliction of Emotional Distress
Against Defendants Levine, McIntyre, Brovarski, Tumolo, Stephens, and Roh**

281. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

282. Defendants Levine, McIntyre, Tumolo, Brovarski, Stephens, and Roh negligently and grossly negligently, and in breach of their duties owed to Mr. Deskovic to refrain from (a) compelling him to be a witness against himself, (b) fabricating evidence, (c) withholding material, exculpatory and impeachment evidence, (d) failing to conduct a constitutionally adequate investigation, and (e) maliciously prosecuting and causing Mr. Deskovic's false arrest and imprisonment, directly and proximately caused Mr. Deskovic, an innocent man, to be falsely arrested, malicious prosecuted, and wrongly imprisoned for sixteen years. The defendants' actions caused Mr. Deskovic to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his pretrial and postconviction incarceration.

283. Defendant Tweed negligently and grossly negligently breached his duty to refrain from subjecting Jeffrey Deskovic to unnecessary, invasive, assaultive, and violative physical contact, including contact of a sexual nature, and thereby caused Mr. Deskovic to suffer physical harm and to fear for his physical safety throughout his incarceration.

284. Defendants' actions negligently to inflict emotion distress upon Mr. Deskovic were in violation of clearly established law, and no reasonable police officer in 1989 and 1990, or corrections officer in and subsequent to 1994, would have believed that the defendants' actions were lawful.

## COUNT XV

### Respondeat Superior Claim Against the City of Peekskill

285. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

286. At all times relevant to this complaint defendants Levine, McIntyre, Brovarski, and Tumolo acted as agents of, and in the scope of their employment with, defendant City of Peekskill. The conduct by which the defendants committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while the defendants were carrying out their routine investigative functions as PPD detectives, and engaging in such conduct as would have been reasonably expected, and was in fact foreseen by, by their employer.

287. The City of Peekskill is liable for its agents' state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVI

### Respondeat Superior Claim Against Putnam County

288. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

289. At all times relevant to this complaint defendant Stephens acted as an agent of, and in the scope of his employment with, defendant Putnam County. The conduct by which defendant Stephens committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Stephens

87

was carrying out his routine investigative function as a Putnam County police officer, and was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen by, his employer.

290. Putnam County is liable for Stephens's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVII

### Respondeat Superior Claim Against Westchester County

291. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

292. At all times relevant to this complaint defendant Roh acted as an agent of, and in the scope of his employment with, defendant Westchester County. The conduct by which defendant Roh committed the torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress was undertaken while Roh was carrying out his routine function as a Deputy Medical Examiner, and while Roh was engaged in such conduct as would have been reasonably expected by, and was in fact foreseen by, their employer. Westchester County is liable for Roh's state law torts of malicious prosecution, intentional or reckless infliction of emotional distress, and negligent infliction of emotional distress under the doctrine of respondeat superior.

## COUNT XVIII

### State Law Claim for Legal Malpractice against Peter Insero

293. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further

88

alleges as follows.

294. In the course of providing legal representation to Mr. Deskovic, Peter Insero negligently failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community. Mr. Insero's acts of negligence included but were not limited to the following: failing to conduct a minimally adequate investigation into the circumstances of the PPD's interrogations of Jeffrey; failing to conduct a minimally adequate investigation into the causes and circumstances of Jeffrey's false confession, including but not limited to an investigating and interviewing witnesses concerning Jeffrey's allegations of police coercion and the public and non-public sources of the details included in Jeffrey's false confession; failing, even after DNA evidence proved the falsity of Jeffrey's confession, to retain experts to conduct psychological evaluations of Jeffrey in connection with the police interrogations and his false confession, and/or assessments of the effects of the police interrogation tactics on Jeffrey, either for purposes of arguing that Jeffrey's statements were not knowing and voluntary or in order to explain to a jury why Jeffrey had falsely confessed; failing to retain experts to obtain independent evaluations of false and/or baseless scientific arguments advanced by the State, including experts to evaluate the conclusions of Deputy Medical Examiner Roh and to conduct hair analysis; failing to conduct a minimally adequate investigation into exculpatory DNA and other scientific evidence; failing adequately to cross-examine State witnesses or otherwise to present known and/or readily available evidence at trial; failing adequately to inform his client concerning the nature and implications of a known conflict of interest, and/or failing to take reasonable steps to eliminate the conflict; and negligently consuming alcohol in a manner that affected his representation of his client.

89

295. Mr. Deskovic was in fact innocent of the rape and murder of A.C.  On November 2, 2006, the prosecution terminated in Mr. Deskovic's favor when charges against him were dismissed on motion of the Westchester County District Attorney, following the vacatur of his conviction and his release from prison on September 20, 2006, after sixteen years of wrongful incarceration.

296. As a direct and proximate result of Mr. Insero's actions, Mr. Deskovic was wrongly convicted and imprisoned for sixteen years, and suffered the other grievous and continuing injuries and damages as set forth above.

**COUNT XIX**

**Respondeat Superior Claim Against Legal Aid Society of Westchester County**

297. Mr. Deskovic hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

298. At all times relevant to this complaint Peter Insero acted as and agent of, and in the scope of his employment with, defendant Legal Aid Society of Westchester County.  The conduct by which Insero committed the tort of legal malpractice was undertaken while he was carrying out his routine and assigned function as an attorney for LAS, and was engaging in such conduct as would have been reasonably expected  by his employer.

299. The Legal Aid Society of Westchester County is liable of its agent's state law tort of legal malpractice under the doctrine of respondeat superior.

**WHEREFORE**, Jeffrey Deskovic prays as follows:

A.   That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

B.   That the Court award punitive damages to him, and against all non-municipal

90

defendants, in an amount, to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief to which he may be entitled.

Respectfully submitted,

May 13, 2009

_____
Barry Scheck
Nick Brustin
Debi Cornwall
Jennifer Laurin
Sarah Crowley
Cochran, Neufeld & Scheck LLP
99 Hudson Street, 8th Floor
New York, New York 10013
Tel:  (212) 965-9081
Fax: (212) 965-9084
Attorneys for Plaintiff Jeffrey Deskovic

91

# Exhibit 1

# ORANGE COUNTY DISTRICT ATTORNEY

ORANGE COUNTY GOVERNMENT CENTER, GOSHEN, NEW YORK 10924-1627
FAX: 914-294-6958    TEL: 914-294-5471



**FRANCIS D. PHILLIPS II**
*District Attorney*

August 17, 1995

Hon. Anthony Ingrassia
Orange County Coroner
59 Eisenhower Drive
Middletown, New York 10940

RE:   DR. LOUIS ROH

Dear Anthony:

We have had substantial problems with quality of the work of Dr. Louis Roh. In various criminal cases his findings have been either incomplete, inadequate, or erroneous. I cannot in good conscience rely upon his findings in cases where the cause of death is more than a simple gunshot wound or stab wound. All of the Coroners must understand that we need to find a suitable replacement for him who will perform forensic work on behalf of the County of Orange.

There have also been problems with regard to Dr. Roh's fees which, if I thought we would be able to retain him in the future, would be a problem in and of itself. In the meantime it is critical that the Coroners, District Attorney, and members of law enforcement work together to find and retain another forensic pathologist.

I must candidly advise you that if Dr. Roh continues to do forensic work I will be forced to retain an independent forensic pathologist to review all of his autopsy findings. I want to present input from police agencies who are in a better position to articulate the problems we have had. I would like to set up a meeting in early September. Please advise me of a convenient date on which all or most of the Coroners will be able to attend.

Very truly yours,

FRANCIS D. PHILLIPS II
DISTRICT ATTORNEY

PEOPLE'S EXHIBIT
66
i30/05  88D

ROH000051

Exhibit
2



STATE OF NEW YORK

COUNTY COURT OF THE COUNTY OF DUTCHESS

COUNTY COURT HOUSE

POUGHKEEPSIE, NY 12601

431-1810

THOMAS J. DOLAN
COUNTY JUDGE

February 11, 1998

William V. Grady
Dutchess County District Attorney
236 Main Street
Poughkeepsie, New York 12601

RE:   People v. Kilmer/Testimony of Dr. Roh

Dear Bill:

During the Kilmer trial, Dr. Louis Roh, who is the Deputy Medical Examiner for Westchester County, testified for the defendant.

I have enclosed a copy of the appropriate part of the record of trial containing Dr. Roh's testimony in the Kilmer case. Also provided to you is a copy of the appropriate section of the minutes of an Orange County trial, People v. Maragh, dated November 12, 1997.

Obviously, the inconsistent nature of Dr. Roh's testimony under oath in both of these cases is very disturbing and I feel constrained to formally advise you of the situation for whatever action you feel is appropriate under the circumstances.

Very truly yours,

Thomas J. Dolan
County Court Judge

TJD/ds

encl.

PRINTED ON RECYCLED PAPER

ROH000027

Exhibit
3



March 16, 1998

Ms. Agnes Larson, Program Director
New York State Department of Health
Office of Professional Medical Conduct
145 Huguenot Street, 6th Floor
New Rochelle, New York 10801

    RE:   DR. LOUIS ROH

Dear Ms. Larson:

During a recent homicide trial conducted in the Dutchess County Court, Dr. Louis Roh, a Board Certified Forensic Pathologist, appeared as an expert witness for the defense. In this case, Dr. Roh, testified as a private physician but professionally holds employment as the Deputy Chief Medical Examiner in Westchester County.

As part of his testimony, Dr. Roh made certain remarks which the presiding County Court Judge, Thomas Dolan, found very disturbing; I concur with his assessment. Certainly ethical and professional responsibility require of a public servant the highest degree of candor, whether testifying in that capacity or not, and it is for that reason that I am bringing this matter to your attention.

As enclosures to this correspondence, I have provided you with certain portions of Dr. Roh's testimony in the Dutchess County case. That testimony occurred in January of 1998. Within that testimony, reference is made to a letter written by Orange County District Attorney Francis Phillips; I have enclosed a copy of that correspondence as well. I have also provided you with relevant portions of Dr. Roh's testimony as transcribed from a trial that took place on November 12, 1997 in Orange County Court before the Hon. Jeffrey G. Berry. A member of my staff has spoken personally with the presiding Judge, the Judge's Law Clerk, the prosecutor and the defense attorney in the Orange County case and confirmed that Dr. Roh was actually shown a copy of the letter in question and provided with an opportunity to read it as appears in the record of the trial proceedings.   Also

ROH000028

Ms. Agnes Larson, Program Director
Office of Professional Medical Conduct
Page 2
16 March 1998

enclosed are copies of two (2) newspaper articles authored by Paula McMahon, a reporter with the *Middletown Times Herald Record*. Ms. McMahon had discussed the issue of this letter with Dr. Roh on at least one occasion after the November 12, 1997 appearance in Orange County Court.

It should be noted that in both the Orange County case and the Dutchess County case, the Court permitted inquiry and cross-examination regarding the underlying incident referenced in Mr. Phillips' letter. However, given the circumstances, while Dr. Roh's denying knowledge of the letter and his effort to avoid any knowledge of its contents, would not constitute perjury, I believe it does constitute a serious breach of his ethical and professional responsibility to truthfully answer the questions posed to him while under oath without regard for the potential professional embarrassment.

This information is being provided to you for whatever action you deem appropriate under the circumstances.

Very truly yours,

WILLIAM V. GRADY
District Attorney

wmu
Enclosures - 5

ROH000029

# Exhibit
# 4

ROH000001

Nov 09 07 03:33p    Charles V. Wetli, M.D.    201-750-8221    p.2

# `COUNTY OF SUFFOLK



**ROBERT J. GAFFNEY**
SUFFOLK COUNTY EXECUTIVE
DEPARTMENT OF HEALTH SERVICES
**Clare B. Bradley, M.D. M.P.H.**
COMMISSIONER

DIVISION OF MEDICAL-LEGAL INVESTIGATIONS &
FORENSIC SCIENCES
SIDNEY B. WEINBERG CENTER
FOR FORENSIC SCIENCES

ACCREDITED BY ABFT, ASCLD/LAB & NAME

**CHARLES V. WETLI, M.D.**
CHIEF MEDICAL EXAMINER

July 16, 2001

Re:    Dr. Louis Roh

New York State Department of Health/OPMC
Attention: "Intake"
433 River Street
Suite 303
Troy, New York  12180

Dear Sir or Madam:

Earlier this year, Dr. Louis Roh testified for the defense in a homicide trial (People v Charles Bodenburg) held in Suffolk County, New York. The victim, Kayla Zachman, was a three year old girl who had consumed an alcoholic beverage (supposedly, Amaretto). The defendant subsequently caused the death of this child. The autopsy, performed by Dr. Stuart Dawson, revealed head trauma with diffuse axonal injury, typical for the "Whiplash Shaken Infant Syndrome"; other aspects of the investigation lead to the conclusion that smothering was also a factor. Toxicologic analysis revealed a blood alcohol concentration of 0.03% and a brain alcohol concentration of 0.01%. (Note: A serum alcohol concentration of 0.05% was determined on a blood sample taken in the hospital Emergency Room – serum levels are slightly higher than whole blood).

It would not be unexpected for a defense pathologist to challenge the mechanism of the brain injury, and the conclusion that smothering was a component in the death. However, Dr. Roh testified that alcohol poisoning was the cause of death (despite the fact that diffuse axonal injury, regardless of cause, is a lethal injury). He supported his conclusion by "his experience" and subsequently by an article (attached) where he neglected to mention that the blood alcohol concentration reported in that child was determined more than seven hours after ingestion.

ROH000001

In our opinion, Dr. Roh's testimony went far beyond what would be expected of a defense expert and that his testimony was misleading and had no reasonable basis in fact. In this case, Dr. Dawson provided direct testimony for the state. Dr. Wetli and Dr. Briglia provided rebuttal testimony and cited the medical and toxicologic literature which indicates children may survive extremely high levels of alcohol (two articles enclosed).

Attached for your consideration are the three articles mentioned above, the autopsy report, neuropathology report and toxicology report. Enclosed is the Trial Transcript of Dr. Roh's testimony and the Summation of the Assistant District Attorney.

Should you need additional documents, information or clarification, please contact Dr. Wetli. Thank you for looking into this matter

Sincerely,

Charles V. Wetli, M. D
Chief Medical Examiner

Stuart L. Dawson, M. D.
Deputy Chief Medical Examiner

Edward J. Briglia, Ph. D.
Chief, Toxicology Laboratory

CVW/slg

Cc: (Without enclosures):    Dr. Clare B. Bradley, Suffolk County Health Commissioner
Ms Georgia Tschiember, Assistant District Attorney
Mr. Robert Cabble, Assistant County Attorney

FORENSIC SCIENCES BLDG. #487
725 VETERAN'S MEMORIAL HIGHWAY
HAUPPAUGE, NY 11787-4311

MAILING ADDRESS
P.O. BOX 6100
HAUPPAUGE, NY 11788-0099

TELECOPIER.    1-(516)-853-5555
1-(516)-853-4673

Exhibit
5

**ORIGINAL**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------X
ADMINISTRATION PROCEEDING
IN THE MATTER OF

                                      FILE NO.
                                      #074/2003

ANIELA WALKER a/k/a ANE LA WALKER,
a/k/a ANIELE WALKER,

                    Decedent.
------------------------------------------X
                    Surrogate Court
                    140 Grand Street
                    White Plains, New York
                    October 31, 2003
                    9:30 a.m.

          Continued examination before
trial of a NON-PARTY WITNESS, LOUIS ROH, M.D.,
held pursuant to Subpoena, at the above time
and place, before a Notary Public of the
State of New York.

                    SULLIVAN REPORTING
                    388 Tarrytown Road
                    White Plains, New York 10607
                    (914)949-4545

Page 330

APPEARANCES:

PISCIONERE & NEMAROW, P.C.
Attorneys for Petitioner
363 Boston Post Road
Rye, New York 10580
BY: ANTHONY PISCIONERE, ESQ.

GEORGE LAMBERT,
Public Administrator
SCHUMAN, SALL & GEIST, ESQS.
One North Lexington Avenue
White Plains, New York 10601
BY: IVAN LAWNER, ESQ.

RABIN, PANERO & HERRICK, ESQS.
Attorneys for Objectants
44 Church Street
White Plains, New York 10601
BY: MATTHEW D. SCHWARZ, ESQ.

ALSO PRESENT:

JAMES McCARTY, ESQ.

- Louis Roh, M.D. -

Page 400

the nose in the areas where you observed the
abrasions, would that be consistent?

A.   No, it's not consistent.

Q.   Why not?

A.   That's my opinion.

Q.   Didn't you testify a few minutes ago
that those injuries, those abrasions to the nose
were consistent with a fingernail scrapping the
nose?

A.   That's what I said.   It's not consistent
with pinching the nose.

Q.   Doctor, I am asking you to assume for
purposes of our question.  The question I am about
to ask you; when Mr. Spruill went to pinch the
decedent's nose that he also scratched her nose
with his fingernail, are the injuries you observed
consistent with him having scratched her, if he
did scratch her, when he pinched her nose?

A.   If he scratched her five times in the
back of the nose, yes.

Q.   Doctor, the records of testimony that
you say you keep, those are on index cards?

A.   No.

Q.   Didn't you testify, Doctor, that you
keep records of all the cases that you testify on?

- Louis Roh, M.D. -

Page 401

A.    No, autopsies I do.

Q.    Doctor, do you recall testifying in this case in your deposition testimony that you keep records of every case that you testify on and that you have those records for more than five years of your testimony?

A.    I don't recall.

Q.    Doctor, let's refer your attention to your deposition --

A.    If I did I am wrong.  I don't keep it.

Q.    You don't keep it, Doctor?

A.    The testimony record, no.

Q.    Let's go back to your deposition transcript and see if that refreshes your recollection, Doctor?

A.    If I said I did it, that was wrong.

Q.    Doctor, let me refresh your recollection first.

MR. SCHWARZ:  He didn't say his recollection needed to be refreshed.

Q.    Deposition transcript, October 20, 2003, Page 51 -- starting at Page 50, Line 22:

"Question:  Doctor, I am talking about the cases that you testified on.  Do you keep some records regarding those cases?

- Louis Roh, M.D. -

"Answer: Yes, I do."

Continuing on Page 51:

"Question: What type cases or what cases do you keep those records on?

"Answer: I do make a little index card for the case testifying, but it doesn't go back to 1970.

"Question: How far back does it go?

"Answer: I don't recall.

"Question: Does it go back more than five years?

"Answer: Yes

"Question: Is that for each and every case you testified on for the last five years or more?

"Answer: Yes.

"Question: Whether you testified for the prosecution or the defense?

"Answer: That's correct.

"Question: Does it include information like the name of the case?

"Answer: Yes.

"Question: Name of the attorney?

"Answer: Yes, and the judge."

That's it. Do you recall giving

- Louis Roh, M.D. -

Page 403

those --

A.    Sometimes I do, yes.

Q.    So you do have index cards in the cases you testified for?

A.    Yes.

Q.    Do you keep those in your office at the medical examiner's office?

A.    No.

Q.    Where do you keep them?

A.    I throw them out.

Q.    Wait a second.  We just asked you these questions and answers if you had the records and you said you did?

A.    Some I throw out; some I keep.

Q.    The ones you keep, where do you keep them?

A.    In my office.

Q.    Up at the Medical Examiner's office?

A.    That's correct.

Q.    On index cards?

A.    Index cards, yes.

Q.    Doctor, I'm going to ask you at your next deposition to produce those cards that you kept on the cases that you testified to.  I'm going to ask you to preserve those from this day

- Louis Roh, M.D. -

Page 404

forward and not to throw out any other cases.

A.   I don't have it.

Q.   What do you mean you don't have it?

A.   I don't have index cards.  I only have index cards of the autopsy.

Q.   Your deposition transcript is very clear when you testified in this case on October 20, 2003, that you kept index cards for each and every case that you testified on for the last five years or more, whether you testified for the prosecution --

A.   I said --

Q.   Let me finish, Doctor -- whether you testified for the prosecution or the defense and that it included information of the name of the case, name of the attorney and the judge.  In fact, you even added in "Yes, and the judge," in your answer.

Is it your testimony today that you don't maintain such cards?

A.   Yeah, it's been thrown out.

Q.   When?

A.   After the testimony.

Q.   It is your testimony, Doctor, that between October 20, 2003 and today's date, which

- Louis Roh, M.D. -

is October 31, 2003, you have thrown out all these cards that you testified you kept?

A.    Yes, I did.

Q.    Doctor, do you understand the concept of perjury?

A.    Yes, I do.

Q.    Where did you throw the cards out, Doctor?

A.    In the garbage.

Q.    Which garbage; at the office or did you take them home to throw them out?

A.    No, in the office.

Q.    Did you give them to anybody before you threw them out?

A.    No, I just put them in the garbage.

Q.    How big were these cards; how much space did they take up?

A.    A regular garbage bin.

Q.    How much space did the cards take up, more than one file draw?

A.    No, a few.

Q.    How few?

A.    I would say maybe 20, 30.

Q.    Doctor, you testified that you testified in over 300 cases, didn't you?

- Louis Roh, M.D. -

Page 406

A.   No, I didn't say that I save all the index cards.

Q.   That's not my question.  In this case haven't you said in your deposition that you have testified in over 300 cases?

A.   My answer is, I do not have index cards, not now.

Q.   That's not my question, Doctor.  Did you give deposition testimony in this case that you have testified in over 300 cases?

A.   Yes, I did.

Q.   How many cases are you telling us now that you have maintained index cards for?

A.   Maybe 20, 30.

Q.   Is it your testimony that between October 20 and October 31 of 2003 you destroyed those 20 or 30 records of testimony?

A.   Yes, I did.

Q.   Can you tell us the reason you did that, Doctor?

A.   Because I didn't want to get subpoena.

Q.   You thought that those records might be subpoenaed by us in connection with this case?

A.   That's correct.

Q.   And as a result you willfully destroyed

- Louis Roh, M.D. -

those records?

A.    That's correct.

Q.    When did you do it, Doctor, how long after October 20?

A.    I don't know the exact date.

Q.    Did you do it yesterday?

A.    I don't know exact date.

Q.    Did you do it this week?

A.    I don't recall exact date.

Q.    Did you do it last week?

A.    I don't recall.

Q.    Did you do it within days of October 20?

A.    I do not recall.

Q.    Did you discuss the destruction of these records with any person --

A.    No.

Q.    Let my finish the question.  Did you discuss the destruction of these records prior to your destroying these records?

A.    No.

Q.    Did you shred these records in any way?

A.    No.

Q.    Did you just toss them in the garbage?

A.    That's correct.

Q.    And you knew that these records might be

- Louis Roh, M.D. -

Page 408

subpoenaed by me in connection with this case, correct?

A.    No.

Q.    You didn't know that?

A.    I didn't know that.

Q.    I thought you just said you throw them out because you were worried --

A.    Well --

Q.    Let me finish the question, Doctor.

I thought you said you destroyed these records because you were worried they were going to be subpoenaed by me in connection with this case?

A.    Well, that was one of the reasons.

Q.    What are the other reasons?

A.    I didn't want to keep any unnecessary records, because you have been subpoenaing all kinds of things. I realize that keeping all these records creates more problems, so I decided to get rid of it.

You subpoenaed everything. So I realize that keeping all these unnecessary records creates a problem.

Q.    Let me ask you a question. Have you ever been challenged in such a way in a case where

- Louis Roh, M.D. -

Page 409

all your records have been subpoenaed like this?

A.    No.

Q.    So when a challenge such as this comes about, your response was to destroy the evidence; is that correct?

A.    That's correct.

Q.    Doctor, did you keep any of the records in your computer?

A.    No.

Q.    Did you keep any of the records at your home?

A.    No.

Q.    Doctor, is this the first time that you have been involved in a civil case where the person taking your deposition was also charged with murder?

A.    I don't recall.

Q.    Do you recall any other case such as this, Doctor?

A.    I do not recall.

Q.    In any event, this is the first time that all these records like this have been subpoenaed, correct?

A.    I don't recall, most likely.

Q.    This is the first time you have come up

- Louis Roh, M.D. -

Page 410

against this; is that right?

A.    That's correct.

Q.    And your response to this was to destroy the evidence?

MR. LAWNER:  Objection as to form.

A.    This are my records.

Q.    You thought those records would be subpoenaed as evidence, correct?

A.    No, I didn't say that.

Q.    You thought those records would be subpoenaed?

A.    I felt keeping all those records create frivolous subpoena issues.  So I decided to get rid of it.

Q.    You thought they had frivolous subpoena issues associated with them?

A.    As far as I am concerned subpoenaing my index card is frivolous.

Q.    So you decided to prevent the subpoena of records that you thought might be frivolous, by destroying them?

A.    That's correct.

Q.    Doctor, did you believe when you destroyed those records you had anything to hide?

A.    That's not a record.

- Louis Roh, M.D. -

Page 411

Q. Doctor, let's assume for purposes of my question that the index cards we are talking about are records?

A. That's my file.

Q. That's your file?

A. Yeah, I decided to get rid of it.

Q. When you destroyed your file, was it because you thought you had something to hide?

A. No.

Q. You didn't think you had anything to hide?

A. I decided to get rid of it so I don't have to come here and discuss about this thing one by one.

Q. So you were worried that we were going to start to look into the other cases that you gave testimony?

A. We are talking about three days testimony. I didn't want to go through that.

Q. Were you worried that we were going to uncover other cases that you had to testify on?

A. No.

Q. Were you worried that we might discover certain testimony of yours that you had given in other cases that it might be contradictory to the

- Louis Roh, M.D. -

Page 412

testimony --

A. No.

Q. Let me finish -- to the testimony you have given in this case?

A. No.

MR. PISCIONERE: I think it's time to take a few minute break.

(Recess taken.)

Q. I am going to instruct you, Doctor, that you are not to destroy any evidence that in any way you feel might be associated with your testimony in this case?

A. Such as?

Q. Anything, Doctor. I am not limiting it to anything in the world. Anything.

MR. McCARTY: You can't say that.

MR. PISCIONERE: He doesn't want to --

MR. SCHWARZ: You can't subpoena --
you issued a subpoena. He produced the documents. You can't have an all encompassing subpoena for every single thing he has ever done in his entire life.

MR. PISCIONERE: Maybe what we should do is get the law secretary in here and have the Court issue some direction. I

- Louis Roh, M.D. -

think you are right.

I will be right back. If you want to come with me, I am going to get a law secretary.

(Recess taken.)

MR. PISCIONERE: Mr. DiBella, before you begin, if I may, towards the end before we broke I gave you direction or attempted to give a direction to Dr. Roh, which upon reflection I believe is inappropriate and poorly advised.

I want to, for the record, retract the direction I gave to Dr. Roh, not to destroy some things, because I don't believe I had authority to do so. I believe we'll request the court to give direction to Dr. Roh.

MR. DiBELLA: Did anybody else want to say anything?

My name is Robert DiBella. I am Judge Scarpino's Principal Court Attorney here in the Surrogates Court. The attorneys came to my office for a conference with respect to some direction to the witness, Dr. Roh, regarding retention of his records and the

- Louis Roh, M.D. -

direction not to destroy records, that Mr. Piscionere feels may be relevant to issues scheduled to be heard in an evidentiary hearing before Judge Scarpino.

I had an opportunity to speak to Judge Scarpino about this briefly and after hearing the attorneys and speaking to the Judge, it's the Court's feeling, Doctor, that you should be careful in what you choose to destroy at this juncture.

We don't obviously, as I told you last time, I asked you to preserve everything in your file. Apparently our definition of what that might mean and your definition of what that might mean, may not be the same.

Perhaps those words are susceptible to different interpretations, but what is important is that records, whatever form they may be in, or whatever file or place they are kept in, that may be relevant to issues at our hearing, be preserved.

That is our broad objection active. We are not looking to make this any more difficult than we need to with regard to your operations.

- Louis Roh, M.D. -

We have a substantial obligation, the Court does, to protect evidence in a trial so hopefully the truth can be arrived at, consistent with our laws and rules.

Again, I am reiterating our direction to you that we want any documents relating, in any manner, wherever they be and whatever form they are kept in under your custody or potential control, to be preserved.

In addition, records that relate to conclusions that you draw as a medical examiner in different situations, should be preserved also.

I can't tell you that you need to preserve every scrap of paper that exists that you ever touched.

THE WITNESS:  You have to tell me, that's true.

MR. DiBELLA:  I am not making something that broad.  These things are not static.  If you know you are being asked at the depositions -- you are being deposed on many separate days now -- about information or findings or testimony that you may have

- Louis Roh, M.D. -

given in other cases, about conditions you observed in this case and they are different from those or consistent with those, that could be relevant.  It's possible that could be relevant here.

If you said, I think there was an example given by Mr. Piscionere that a blunt instrument would not cause a particular type of condition, but in this case you feel that it did, there maybe good and substantial reasons why they are different and circumstances that may explain any apparent inconsistencies from one testimony to another.

But if the whole file or record has been destroyed, then we can never arrive at the information in the first instance, let alone the explanation of it.  This is our problem.

I am not here sitting in on the deposition where I have the ability to rule on a question by question basis and know where he is going and where he might be going when you are being questioned.  That's impossible.  I don't have the

- Louis Roh, M.D. -

Page 417

ability right now to do that.

So we are dependent on your professional judgment in a lot of ways, but I want you to know that the Court is considered that any destruction of records could be very problematic.

THE WITNESS: It's not a record. It's my memo on a piece of paper.

MR. DiBELLA: A memo on a piece of paper is a record.

THE WITNESS: This is something I had let's say ten years ago. I may have jotted it down on the index card so I can refresh my memory to testify in court.

I usually throw them out. They have nothing to do with this case and he is asking, bring all those, my memo cards to this deposition.

If he asked me about a particular, this particular case, certainly I bring it in. In fact, he asked me to bring the index card on this case, so I brought it in this morning.

But he is asking me to bring my memo pad, jot down on the index card, cases

- Louis Roh, M.D. -

stretching) back 20, 30 years. These are my scraps of paper. That's not, of course, on record. It has nothing to do with this case.

You have to draw the line, which is relevant, which is not relevant. In my opinion those cases are not relevant.

MR. DiBELLA: It's Judge Scarpino's opinion, it's the only important one with regard to what is relevant in this case. Do you understand that?

THE WITNESS: I understand that.

MR. DiBELLA: I am not challenging your medical opinion and I assure you, you will not going to be challenged to change Judge Scarpino's legal opinion.

You have an attorney. You can seek the advice of your attorney. If you are directed by one of these guys, why you feel there is an inappropriate reason for the objection, you should seek the advice of your counsel. It's a confidential discussion with your counsel. And counsel will advise you as to what to do.

There are procedures that your counsel

- Louis Roh, M.D. -

can utilize to prevent Mr. Piscionere from getting things that he demands.  They can move to quash subpoenas.  They can move for further direction from the Court for an order, limiting, narrowing the discovery, the request of information.  These procedures have worked well for the courts for many hundreds of years in all kinds of cases, but they have to utilized in the right order.

You can't be the person who decides what you will give and what you will not. The fact that you don't normally or sometimes don't keep these cards, is not the point.

If you have saved them and they do have relevant information, they do exist and they do have relevant information, it may be something that Mr. Piscionere is entitled to, subject to your attorneys bringing the proper objections.

These records can sometimes be viewed with what we call incamera, where the court alone looks at them before any disclosure is had, to determine whether they are

- Louis Roh, M.D. -

Page 420

relevant and if we make a decision as to relevance or there is a question, it can be appealed.  Other people can see what we have done and determine whether we did the right thing or the wrong thing.  So all these things occur in a civilized process.

Again, I am not going to chastise you for doing something wrong.  I don't feel you have.  The order that we gave before was limited.

But records include all types of information; computer discs, hard drives, telephone records, tapes, anything that records an event.

If you had index cards and wrote on them to refresh your recollection at a later time, it's a record.  It may be a personal record, it might be a business records.  It might be some other type of record to qualify, but the broad term of record will include all types of communication and information.

I don't want to have to give you a three-page definition on the laws that make those up.  I am just trying to suggest to

- Louis Roh, M.D. -

you that you need to consult with your attorney with regard to what Mr. Piscionere asks you to bring and use their best judgment in compliance.

My boss is not the kind of kind who likes to punish people, but he insists some people abide by the rules so that the process is protected and we can do the best job we can with the information that we have.  Okay?

THE WITNESS:  Okay.

MR. DiBELLA:  So please, with regard to any further records that are contained, please make every effort to preserve these and be very careful not to destroy things that may have some import and put us in a worse position later.  I would like to avoid that issue.

Does anyone feel that more needs to be done on this area?

MR. PISCIONERE:  No.

MR. LAWNER:  No.

MR. PISCIONERE:  Thank you.

MR. DiBELLA:  Okay.  Have a good day. Doctor, I heard you have to leave, have a