UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFREY DESKOVIC,

                         Plaintiff,

        v.

CITY OF PEEKSKILL, PUTNAM COUNTY,
WESTCHESTER COUNTY, DAVID LEVINE,
THOMAS McINTYRE, WALTER BROVARSKI,
EUGENE TUMOLO, JOHN AND JANE DOE
SUPERVISORS, DANIEL STEPHENS, LOUIS
ROH, MILLARD HYLAND, GEORGE BOLEN,
PETER INSERO, LEGAL AID SOCIETY OF
WESTCHESTER COUNTY, and ALAN TWEED,

                         Defendants.

Related Cases:

Case Nos.  07-CV-8150 (KMK)
                  07-CV-9488 (KMK)

OPINION AND ORDER

---

CITY OF PEEKSKILL, DAVID LEVINE, THOMAS
McINTYRE, WALTER BROVARSKI,

                         Third-Party Plaintiffs,

        v.

STEVEN ORLIKOFF, MARCIA G. SHEIN, P.C.,
MARCIA G. SHEIN, PETER INSERO, LEGAL AID
SOCIETY OF WESTCHESTER COUNTY,

                         Third-Party Defendants.

---

LINDA McGARR,

                         Plaintiff,

        v.

CITY OF PEEKSKILL, WESTCHESTER COUNTY,
DAVID LEVINE, THOMAS McINTYRE, WALTER
BROVARSKI, EUGENE TUMOLO, JOHN AND
JANE DOE SUPERVISORS, DANIEL STEPHENS,
GEORGE BOLEN, LOUIS ROH, and MILLARD
HYLAND,

                         Defendants.

<u>Appearances</u>:

Barry C. Scheck, Esq.
Deborah L. Cornwall, Esq.
Nick J. Brustin, Esq.
Sarah A. Crowley, Esq.
Neufeld Scheck & Brustin LLP
New York, New York
*Counsel for Jeffrey Deskovic*

Eric Hecker, Esq.
Elora Mukherjee, Esq.
Emery Celli Brinckerhoff & Abady, LLP
New York, New York
*Counsel for Linda McGarr*

Stuart E. Kahan, Esq.
Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP
White Plains, New York
*Counsel for Westchester County, Louis Roh, Millard Hyland, and George Bolen*

Brian S. Sokoloff, Esq.
Sokoloff Stern LLP
Westbury, New York
*Counsel for City of Peekskill, David Levine, Thomas McIntyre, Walter Brovarski, and Eugene Tumolo*

James A. Mitchell, Esq.
Stillman, Friedman & Shechtman, P.C.
New York, New York
*Counsel for Eugene Tumolo*

James A. Randazzo, Esq.
Gelardi & Randazzo LLP
Rye Brook, New York
*Counsel for Daniel Stephens and Putnam County*

Peter I. Livingston, Esq.
Rose & Livingston & Cholst LLP
New York, New York
*Counsel for Peter Insero and The Legal Aid Society of Westchester County*

John Eric Knudsen, Esq.
New York State Department of Law
Albany, New York
*Counsel for Alan Tweed*

Michele E. Kahn, Esq.
Michele Kahn P.C.
New York, New York
*Counsel for Stephen Orlikoff*

Jonathan B. Bruno, Esq.
Kaufman, Borgeest & Ryan, LLP
New York, New York
*Counsel for Marcia G. Shein and Marcia G. Shein, P.C.*

KENNETH M. KARAS, District Judge:

In these two civil rights actions, Plaintiffs Jeffrey Deskovic ("Deskovic") and his mother,

Linda McGarr ("McGarr") (together, "Plaintiffs"), bring claims against, *inter alia*, Defendants

City of Peekskill, County of Westchester, and a number of police officers and other officials, in

connection with the arrest, conviction, and incarceration of Deskovic for a rape and murder that

he did not commit.[1]  Deskovic filed his Amended Complaint on June 13, 2008 and his Second

Amended Complaint on May 13, 2009, alleging claims under 42 U.S.C. § 1983 ("Section 1983")

for numerous violations of his constitutional rights and under state law for malicious prosecution

and intentional infliction of emotional distress.  McGarr filed her Amended Complaint on July 7,

2008, alleging Section 1983 claims for violation of her constitutional right to familial

---

[1] The action captioned as *Deskovic v. City of Peekskill et al.* is filed as Case No. 07-CV-8150, and the action captioned as *McGarr v. City of Peekskill et al.* is filed as Case No. 07-CV-9488.  The cases were filed as related, and they have been consolidated by this Court for all pre-trial purposes.  Both suits name as defendants City of Peekskill, Westchester County, David Levine, Thomas McIntyre, Walter Brovarski, Eugene Tumolo, John and Jane Doe Supervisors, Daniel Stephens, George Bolen, Louis Roh, and Millard Hyland.  Deskovic has additionally named as defendants Putnam County, the Legal Aid Society of Westchester County, Peter Insero, and Alan Tweed.

association.[2]  Of particular relevance to the instant matter before the Court, Deskovic alleges

Section 1983 claims against Defendant George Bolen ("Bolen"), a former assistant district

attorney for the County of Westchester, in his individual capacity, for malicious prosecution and

unlawful prolonged detention; McGarr alleges Section 1983 claims against Bolen for violation of

her constitutional right to familial association.

Bolen moves to dismiss Plaintiffs' claims as to him pursuant to Federal Rule of Civil

Procedure 12(b)(6), claiming that his alleged conduct is protected by absolute immunity.[3]

Because Bolen has submitted virtually identical memoranda in support of his motions to dismiss

both Plaintiffs' claims, and because Plaintiffs rely on identical legal arguments in opposing

Bolen's motions, the Court considers both motions together.[4]

For the reasons discussed below, Bolen's motions to dismiss the claims against him in

both actions are granted.[5]

---

[2] The Court refers to Deskovic's Second Amended Complaint and McGarr's Amended
Complaint together as "Complaints in these actions" or "Plaintiffs' Complaints."

[3] Bolen's motion to dismiss Deskovic's claims as to him was filed prior to Deskovic's
submission of his Second Amended Complaint.  However, because the allegations as to Bolen in
Deskovic's Second Amended Complaint are identical to those allegations contained in the
Amended Complaint, the Court considers Bolen's motion to dismiss as addressing the Second
Amended Complaint.  *See Jones v. Astrue*, 526 F. Supp. 2d 455, 458 n.1 (S.D.N.Y. 2007)
(considering motion to dismiss as addressing amended complaint where it was materially
identical to the original complaint).

[4] McGarr "joins and . . . incorporates by reference[] all of the arguments made by . . .
Deskovic in opposition to . . . Bolen's motion," without putting forth additional arguments.  (Pl.
McGarr's Mem. in Opp'n to Def. George Bolen's Mot. to Dismiss 1.)  The Court therefore cites
to Deskovic's Memorandum in Opposition to Bolen's Motion to Dismiss ("Pls.' Opp'n") in
referencing arguments put forward by both Deskovic and McGarr.

[5] The Court notes that it does not address herein Plaintiffs' claims against any Defendant
other than Bolen.  At issue here are only the claims against Bolen, who moved to dismiss based

I.  Background

The Court assumes the allegations in Plaintiffs' Complaints to be true for the purposes of deciding these motions and construes them in the light most favorable to Plaintiffs.

On November 17, 1989, the body of a fifteen-year-old girl (hereinafter "A.C." or the "victim"), was found in a heavily wooded area of Hillcrest Park, a park located in Peekskill, New York.  (Second Am. Compl. of Jeffrey Deskovic ("Deskovic SAC") ¶ 37; Am. Compl. of Linda McGarr ("McGarr AC") ¶ 27.)  A.C. had been missing since November 15, 1989.  (Deskovic SAC ¶ 35; McGarr AC ¶ 25.)  When A.C.'s body was found by members of the Peekskill Police Department ("PPD"), she was covered with leaves, and she was naked from the waist down.  (Deskovic SAC ¶ 37; McGarr AC ¶ 27.)  A.C. had been raped, and had died from asphyxiation and blunt trauma to the head.  (Deskovic SAC ¶ 37; McGarr AC ¶ 27.)

PPD personnel canvassed the area where A.C.'s body was found, collecting and vouchering the following evidence:  a torn note found underneath A.C.'s body, a white bra left along a dirt path leading to A.C.'s body, and a 35-millimeter camera left on a paved path in the park.  (Deskovic SAC ¶ 40; McGarr AC ¶ 30.)  The note found underneath A.C.'s body was written in her handwriting, and included the name "Freddy."  (Deskovic SAC ¶ 42; McGarr AC ¶ 32.)  After the evidence at the crime scene was collected, A.C.'s body was taken from the crime scene and examined by Westchester County Deputy Medical Examiner Dr. Louis Roh ("Roh"), a Defendant in this case, and his assistant.  (Deskovic SAC ¶ 47; McGarr AC ¶ 37.)  During Roh's examination of A.C.'s body, he found loose hairs on A.C.'s right breast, right leg, left arm, and in A.C.'s pubic region, which he submitted to the Westchester County Department of Laboratories

_____

on his defense of absolute immunity.

5

and Research ("Westchester County Lab") for analysis.  (Deskovic SAC ¶ 48; McGarr AC ¶ 38.)

Roh also prepared oral, rectal, and vaginal swabs and submitted them along with A.C.'s bra,

jeans, and underwear for serological analysis by the Westchester County Lab.  (Deskovic SAC

¶ 48; McGarr AC ¶ 38.)

Based upon the note found under A.C.'s body, PPD officers developed a theory that

"A.C. had been in a romantic relationship with . . . Peekskill High School student . . . Freddy

Claxton [('Claxton')], and that her rape and murder was connected to that relationship."

(Deskovic SAC ¶ 42; McGarr AC ¶ 32.)  PPD officers pursued this theory by questioning

Claxton in the days after A.C.'s body was found, but Claxton repeatedly stated that "he knew

A.C. but never spoke with her."  (Deskovic SAC ¶ 53; McGarr AC ¶ 43.)  Other Peekskill High

School students also confirmed to PPD officers that "[Claxton] and A.C. had not had any

romantic relationship," and that "A.C. had never been involved in any relationship – let alone a

sexual relationship – prior to her death."  (Deskovic SAC ¶¶ 57-58; McGarr AC ¶¶ 46-47.)  It is

unclear from Plaintiffs' allegations whether Bolen was aware of the PPD officers' theory

regarding Claxton's relationship with A.C. during this stage in the investigation.  Plaintiffs do

allege, however, that Bolen was never made aware that Claxton or other Peekskill High School

students denied the existence of a relationship between A.C. and Claxton.  (Deskovic SAC ¶ 58;

McGarr AC ¶ 47.)

At the time of A.C.'s death, Deskovic was a sixteen-year-old Peekskill High School

sophomore who struggled socially, academically, and emotionally.  (Deskovic SAC ¶¶ 60-61;

McGarr AC ¶¶ 49-50.)  From a young age, Deskovic "received emotional and psychological

counseling and treatment . . . . for a variety of psychological symptoms, including anxiety,

6

depression, and, for a time, complaints of hearing voices." (Deskovic SAC ¶ 62; McGarr AC ¶ 51.) Deskovic had been acquainted with A.C. as a classmate at Peekskill High School, and he was "deeply affected by A.C.'s death." (Deskovic SAC ¶¶ 60, 64; McGarr AC ¶¶ 49, 53.) He "visited the crime scene shortly after A.C.'s body was found – following a map that had been published in the local newspaper, as well as other public descriptions of the area, which he was generally familiar with from prior visits to Hillcrest Park." (Deskovic SAC ¶ 64; McGarr AC ¶ 53.) PPD officers first questioned Deskovic after they received reports that "he had been extremely emotional at A.C.'s wakes and funeral, and appeared to be taking an unusual interest in A.C.'s death." (Deskovic SAC ¶ 65; McGarr AC ¶ 54.) Once PPD officers began investigating Deskovic, they immediately learned of his emotional, academic, social, and psychological difficulties, as well as the fact that he had a troubled family life. (Deskovic SAC ¶ 66; McGarr AC ¶ 55.) In fact, Deskovic's "known difficulties in these regards were . . . significant factors in causing the PPD [officers] to view [him] as a suspect, and to initiate questioning of [him] in connection with the crime." (Deskovic SAC ¶ 66; McGarr AC ¶ 55.)

On December 12, 1989, PPD officers approached Deskovic as he walked to school and asked him "to accompany them to the PPD stationhouse to speak with them about A.C." (Deskovic SAC ¶¶ 68, 71; McGarr AC ¶¶ 59, 62.) Bolen was notified that Deskovic was being questioned. (Deskovic SAC ¶ 71; McGarr AC ¶ 62.) Deskovic was alone during the December 12, 1989 interrogation; his mother, McGarr, was not present, and he did not yet have counsel. (Deskovic SAC ¶ 72; McGarr AC ¶¶ 56, 63.) In the interrogation, Deskovic revealed to the officers that "he had visited the crime scene within twenty-four hours of A.C.'s body being found, and that he had learned certain facts about the crime from the newspaper and other public

sources." (Deskovic SAC ¶ 72; McGarr AC ¶ 63.) PPD officers responded by accusing

Deskovic of the rape and murder of A.C., showing Deskovic "one or more photographs of the

deceased A.C. and of the crime scenes," and "shar[ing] with [him] details of the crime and the

investigation that had not been made public," including their theory that Claxton and A.C. had

been romantically involved. (Deskovic SAC ¶¶ 73-74; McGarr AC ¶¶ 64-65.) Deskovic denied

involvement in A.C.'s rape and murder. (Deskovic SAC ¶ 73; McGarr AC ¶ 64.)

Following the interrogation, Deskovic informed one of his teachers at Peekskill High

School that he had been questioned by PPD officers. (Deskovic SAC ¶ 79; McGarr AC ¶ 70.)

The school convened a meeting that included McGarr, Deskovic, one of Deskovic's teachers,

several school administrators, and the high school principal. (Deskovic SAC ¶ 79; McGarr AC

¶ 70.) McGarr expressed to those at the meeting that she would retain counsel for Deskovic, and

she explained that she did not want Deskovic to speak with PPD officers again. (Deskovic SAC

¶ 81; McGarr AC ¶ 72.) One or more of the Peekskill High School officials present at the

meeting subsequently informed PPD officers that McGarr did not want PPD officers

interrogating Deskovic and that she would be retaining counsel. (Deskovic SAC ¶ 82; McGarr

AC ¶ 73.) On or shortly after December 13, 1989, Deskovic retained attorney Lou Ecker

("Ecker") as counsel. (Deskovic SAC ¶ 83; McGarr AC ¶ 74.) Within days of December 13,

1989, Ecker contacted the PPD to inform them that he would be representing Deskovic, and that

Deskovic should not be questioned again outside of the presence of counsel. (Deskovic SAC

¶ 84; McGarr AC ¶ 75.) Subsequently, Ecker ceased representing Deskovic, referring him to the

Legal Aid Society of Westchester County ("Legal Aid"). (Deskovic SAC ¶ 85; McGarr AC

¶ 76.)  Deskovic was not assigned counsel by Legal Aid, however, until January 25, 1990, the date of his arrest.  (Deskovic SAC ¶ 116.)

When PPD officers next contacted Deskovic, he recited Ecker's instructions that he should not speak to PPD officers without counsel present.  (Deskovic SAC ¶ 85; McGarr AC ¶ 76.)  By this time, Ecker had ceased representing Deskovic, but Deskovic was apparently confused about the status of his representation.  (Deskovic SAC ¶ 85; McGarr AC ¶ 76.)  Despite PPD officers' awareness of Deskovic's confusion regarding the status of his representation, PPD Officer David Levine, a Defendant in these actions, coerced Deskovic into waiving his right to counsel, and thereafter PPD officers interrogated Deskovic on numerous other occasions, also outside the presence of McGarr or counsel.  (Deskovic SAC ¶¶ 84-87; McGarr AC ¶¶ 75-78.)  During these interrogations, PPD officers provided Deskovic with "numerous non-public details and investigative theories concerning A.C.'s death," and they "encouraged and coerced [Deskovic] to incorporate those details into his own statements concerning the crime." (Deskovic SAC ¶ 75; McGarr AC ¶ 66.)  Later, "[t]he PPD [officers] . . . falsely represented, in police reports, [in] conversations with prosecutors before trial, [at] pretrial hearings, and at trial that these public facts were actually the product of [Deskovic's] independent knowledge about the crime."  (Deskovic SAC ¶ 76; McGarr AC ¶ 67.)  Details that PPD officers falsely represented that Deskovic learned through independent knowledge of the crime included the following:

(1) that a note referring to "Freddy" was discovered under A.C.'s body;

(2) that a ripped bra was found away from A.C.'s body;

(3) that A.C.'s body was covered in leaves;

(4) that the perpetrator had asphyxiated A.C. by covering his hand over her mouth;

(5) that A.C. had been struck on the back of the head;

(6) the location where A.C.'s camera was discovered;

(7) that A.C. had lost her keys;

(8) the possibility that the rapist had not ejaculated; and

(9) that the attack on A.C. took place in three different crime scene locations.

(Deskovic SAC ¶¶ 77, 117; McGarr AC ¶¶ 68, 107.)

On January 25, 1990, PPD officers interrogated Deskovic for approximately eight hours, during which time he was denied food, threatened with physical injury, and told that he could go home if he confessed. (Deskovic SAC ¶¶ 100-14; McGarr AC ¶¶ 91-105.) As with the other interrogations, Deskovic was alone during the interrogation. (Deskovic SAC ¶ 101; McGarr AC ¶ 92.) In the course of the eight-hour interrogation, Deskovic "provided information that drew upon details concerning the crime that had been provided to him by PPD [officers] – many of which were inaccurate. By the end of his statement [Deskovic] was sobbing uncontrollably." (Deskovic SAC ¶ 113; McGarr AC ¶ 104.) Deskovic was then placed under arrest. (Deskovic SAC ¶ 115; McGarr AC ¶ 106.) After his arrest, PPD officers encouraged Deskovic to give a more detailed account of the crime, but he refused to do so. (Deskovic SAC ¶ 114; McGarr AC ¶ 106.) After the arrest, Peter Insero was assigned by Legal Aid to act as Deskovic's counsel. (Deskovic SAC ¶ 116.)

Later, when PPD officer Thomas McIntyre ("McIntyre"), a Defendant in these actions, prepared the police report that purported to describe the events that led to Deskovic's alleged

confession, he "falsely represented that critical details originated with [Deskovic], when in fact

they had been provided and/or suggested to [him] by various PPD [officers] over the course of

their multiple interviews and interrogations."  (Deskovic SAC ¶ 117; McGarr AC ¶ 107.)

McIntyre also excluded from the police report "material, exculpatory and impeachment evidence

concerning the coercive circumstances of [the] . . . January 25[, 1990] interrogation, including

but not limited to the threats of violence against [Deskovic] by the PPD [officers] and [a]

promise to [Deskovic] that if he confessed he could go home and would receive mental health

treatment."  (Deskovic SAC ¶ 118; McGarr AC ¶ 108.)  Polygraph technician Daniel Stephens,

also a Defendant in these actions, likewise prepared documentation falsely representing that

"facts relayed by [Deskovic] originated with him, rather than with [the PPD officers]."

(Deskovic SAC ¶ 119; McGarr AC ¶ 109.)

On February 27, 1990, Deskovic was indicted on charges of murder in the second degree,

rape in the first degree, and possession of a weapon in the fourth degree.  (Deskovic SAC ¶ 125;

McGarr AC ¶ 115.)  While Plaintiffs allege that prosecutors, including Bolen, were "notified [of]

. . . the December 12[, 1989] questioning of . . . Deskovic[,] and [were] told of all subsequent

important investigative events and decisions of which the District Attorney's Office was aware

concerning . . . Deskovic" (Deskovic SAC ¶¶ 71, 84 (alleging that the District Attorney's Office

was aware of Ecker's statement that Deskovic should not be questioned outside the presence of

counsel); McGarr AC ¶¶ 62, 75), Plaintiffs also specifically allege that prosecutors were unaware

of the bulk of PPD officers' misconduct and of other potentially exculpatory information.

Indeed, Plaintiffs allege that "Deskovic was charged and indicted based upon evidence that was

fabricated by [various] defendants and by means of th[ose] defendants' *concealment from*

*prosecutors* and the grand jury of material, exculpatory, and impeachment evidence that undermined a probable cause determination." (Deskovic SAC ¶ 126 (emphasis added); McGarr AC ¶ 116.) The concealed evidence included the following:

> (1) the false police reports and false statements representing that Deskovic had independent knowledge of non-public facts concerning A.C.'s death;
>
> (2) that evidence was fabricated to make Deskovic's statements and confession appear knowing and voluntary;
>
> (3) the material facts regarding the circumstances surrounding his confession;
>
> (4) statements by Peekskill High School students that A.C. had not had consensual sex prior to her rape and murder; and
>
> (5) statements by Claxton and other Peekskill High School students that A.C. had not engaged in a sexual relationship with Freddy Claxton.

(Deskovic SAC ¶ 126; McGarr AC ¶ 116.)

Prior to Deskovic's January 25, 1990 confession, vaginal swabs from A.C.'s body were sent to an FBI laboratory to definitively determine whether Deskovic was the perpetrator. (Deskovic SAC ¶ 123; McGarr AC ¶ 113.) The DNA test results were returned days after Deskovic's indictment. (Deskovic SAC ¶ 127; McGarr AC ¶ 117.) The tests definitively excluded Deskovic as the source of semen found in A.C.'s body. (Deskovic SAC ¶ 127; McGarr AC ¶ 117.) In addition, microscopic hair analysis of the hairs found on A.C.'s body excluded Deskovic as the source of those hairs. (Deskovic SAC ¶ 128; McGarr AC ¶ 118.) The hair analysis showed that at least one of the hairs found on A.C.'s body "was consistent with a 'negroid-type' hair, typically shed by an African American individual." (Deskovic SAC ¶ 128; McGarr AC ¶ 118.)

Bolen was informed of the results of the DNA and hair analysis in the days following

Deskovic's indictment.  (Deskovic SAC ¶¶ 128-29; McGarr AC ¶¶ 118-19.)  Thereafter, "Bolen

directed that additional investigation be done by the PPD, and personally conducted and

personally directed further investigation . . . to provide an explanation for the presence of another

man's semen inside A.C. following her rape and murder."  (Deskovic SAC ¶ 129; McGarr AC

¶ 119.)  Specifically, Plaintiffs allege that Bolen and Roh discussed and agreed that "Roh would

provide evidence that in his scientific opinion[,] A.C. had been sexually active on multiple

occasions prior to her rape and death, and that during his autopsy he had observed scarring on

A.C.'s hymen that proved this fact."  (Deskovic SAC ¶ 130; McGarr AC ¶ 120.)  Bolen knew, or

should have known, that Roh had no scientific basis for this conclusion and that he had not

observed the scarring that he reported to Bolen.  (Deskovic SAC ¶ 131; McGarr AC ¶ 121.)

Nevertheless, "Roh and/or Bolen concealed that Roh's conclusions and findings concerning

A.C.'s sexual history were fabricated . . . and [Bolen] affirmatively misrepresented the basis for

Roh's conclusions and findings to the defense and the court."  (Deskovic SAC ¶ 131; McGarr

AC ¶ 121.)   Plaintiffs allege that this conduct by Bolen began days after Deskovic was indicted,

and eight months before the start of Deskovic's trial.  (Deskovic SAC ¶ 129; McGarr AC ¶ 119.)

Plaintiffs do not allege, however, when the trial date was set.

At trial, "[a] critical challenge facing the prosecution . . . was to explain how [Deskovic]

could have raped [the victim] despite scientific proof that the semen found inside of her [body],

and hairs found on her body, were not his."  (Deskovic SAC ¶ 137; McGarr AC ¶ 127.)

Although Bolen had never tested the semen found in the victim to determine whether it was

Claxton's, Bolen argued to the jury that Claxton was the source of the semen, and that A.C. and

13

Claxton had engaged in consensual sex prior to her rape and murder.  (Deskovic SAC ¶ 137;

McGarr AC ¶ 127.)  Bolen supported his argument by eliciting from Roh the false and fabricated

testimony regarding A.C.'s autopsy, and he relied on Roh's testimony in his opening statement

and his closing argument.  (Deskovic SAC ¶¶ 138-41; McGarr AC ¶¶ 128-31.)  Bolen also

argued that the "negroid-type" hairs found on A.C.'s body belonged to Roh, Roh's African

American assistant, and Claxton despite never having tested the hairs to determine if they did

belong to those individuals.  (Deskovic SAC ¶ 140; McGarr AC ¶ 130.)

On December 7, 1990, Deskovic was convicted by a Westchester County jury of murder,

rape, and possession of a weapon.  (Deskovic SAC ¶ 157; McGarr AC ¶ 135.)  He was sentenced

to fifteen years to life imprisonment.  (Deskovic SAC ¶ 157; McGarr AC ¶ 135.)  For the next

sixteen years, Deskovic fought to vindicate his innocence through the state and federal habeas

processes, to no avail.  (Deskovic SAC ¶¶ 157-60; McGarr AC ¶¶ 136-38.)  In 2006, the

Westchester County District Attorney consented to conduct DNA tests on the semen found in

A.C.'s body and to compare the results of those tests against the available DNA databases of

convicted offenders.  (Deskovic SAC ¶ 164; McGarr AC ¶ 139.)  In September 2006, the DNA

obtained from the semen was matched to Steven Cunningham ("Cunningham"), who was then

incarcerated in New York for the 1993 murder of a Peekskill school teacher.  (Deskovic SAC

¶ 164; McGarr AC ¶ 140.)  In March 2007, Cunningham pled guilty to the rape and murder of

A.C., and on May 2, 2007, he was sentenced to an additional twenty years in prison for the crime.

(Deskovic SAC ¶ 164; McGarr AC ¶ 140.)

On September 20, 2006, Deskovic's conviction was vacated, and he was released from

prison based upon a motion pursuant to New York Criminal Procedure Law § 440.10, submitted

jointly by the Westchester County District Attorney's Office and Deskovic's counsel.  (Deskovic SAC ¶ 167; McGarr AC ¶ 142.)  On November 2, 2006, on motion by the Westchester County District Attorney, the indictment against Deskovic was dismissed on the ground of actual innocence.  (Deskovic SAC ¶ 168; McGarr AC ¶ 143.)

II.  Discussion

### A.  Standard of Review

"On a Rule 12(b)(6) motion to dismiss a complaint, the court must accept a plaintiff's factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."  *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)).  The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted) (second alteration in *Twombly*).  "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, and "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  Simply put, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.  If Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint[s] must be dismissed."  *Id.*; *see also*

15

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (internal citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original)).

Finally, in adjudicating a Rule 12(b)(6) motion, a court must confine its consideration to "facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference" or facts of which the Court may take judicial notice.  *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999).

### B.  Absolute Immunity

#### 1.  Guiding Principles

Bolen claims he should be dismissed from Plaintiffs' actions because he is absolutely immune from Section 1983 liability for his alleged conduct.  Courts recognize absolute immunity for official conduct to the same extent it was recognized at common law.  *See Burns v. Reed*, 500 U.S. 478, 485 (1991) (explaining that the applicability of absolute immunity is "'predicated upon a considered inquiry into the immunity historically accorded the relevant official at common law and interests behind it'" (quoting *Imbler v. Pachtman*, 424 U.S. 409, 421 (1976))).  "Since [Section 1983] on its face does not provide for *any* immunities, [courts would be] going far to read into it an absolute immunity for conduct which was only accorded qualified immunity in 1871, [when the statute was enacted]."  *Malley v. Briggs*, 475 U.S. 335, 342 (1986) (emphasis in

16

original); *see also Tower v. Glover*, 467 U.S. 914, 922-23 (1984) ("We do not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."); *Imbler*, 424 U.S. at 418 ("[Section] 1983 is to be read in harmony with general principles of tort immunities and defenses . . . ."). Therefore, "[t]he absence of [historical or common law] support [for absolute immunity] is generally determinative" of whether absolute immunity applies to shield officials from Section 1983 liability. *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 357 (2d Cir. 2004).

"It is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.'" *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler*, 424 U.S. at 410, 431) (internal citations omitted); *see also Kalina v. Fletcher*, 522 U.S. 118, 124 (1997) (noting that a prosecutor covered by absolute immunity is "not amenable to suit under § 1983"). Extending absolute immunity to such prosecutorial conduct ensures that "public prosecutor[s] can[] zealously perform the prosecutorial duties of the office [without being] compelled to work under the constant threat of legal reprisals." *Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995); *see also Burns*, 500 U.S. at 485-86 (noting that in the absence of such immunity "lawsuits would divert prosecutors' attention and energy away from their important duty of enforcing the criminal law; prosecutors would have more difficulty than other officials in meeting the standards for qualified immunity; and potential liability would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." (internal citations and quotation marks omitted)); *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) ("[I]t has been thought in the end

better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.").

However, not every action performed by a prosecutor is "absolutely immune merely because [it was] performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Rather, a prosecutor's entitlement to absolute immunity turns on "the capacity in which the prosecutor acts at the time of the alleged misconduct." *Zahrey v. Coffey*, 221 F.3d 342, 346 (2d Cir. 2000). Thus, to determine whether a prosecutor's conduct is entitled to absolute immunity, courts must apply "a functional approach, which looks to the nature of the function performed [by the prosecutor]." *Buckley*, 509 U.S. at 269 (internal quotation marks and citation omitted); *see also Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009) ("To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of . . . 'functional' considerations . . . ."); *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (noting that in determining whether to apply immunity, courts must "look[] . . . to the nature of the function performed").

Generally, whether a prosecutor "may be sheltered by absolute immunity from liability for [his conduct] turns on whether or not [his conduct] occurred in the course of his role as an advocate." *Hill*, 45 F.3d at 662; *see also Burns*, 500 U.S. at 491 (holding that prosecutor was entitled to absolute immunity while acting "as [an] advocate for the State" (internal quotation marks omitted)). In other words, "a prosecutor is absolutely immune from civil suit for any activities that are intimately associated with the judicial phase of the criminal process." *Hickey v. City of New York*, No. 01-CV-6506, 2002 WL 1974058, at *2 (S.D.N.Y. Aug. 26, 2002) (citing *Imbler*, 424 U.S. at 431); *see also Burns*, 500 U.S. at 494 (noting that absolute immunity is

justified only "for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct"); *Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001) (explaining that immunity applies when "the actions are part of a prosecutor's traditional functions" (internal quotation marks omitted)).  For example, "a [prosecutor] is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial."  *Hill*, 45 F.3d at 661; *see also Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) ("A prosecutor enjoys absolute immunity for acts taken in initiating a prosecution and in presenting the State's case, whether at a trial, a preliminary hearing, or a bail hearing." (internal citations and quotation marks omitted)).  Likewise, the Supreme Court has emphasized that

> acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity.  Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley*, 509 U.S. at 273; *see also Hill*, 45 F.3d at 661 (explaining that prosecutors are "immune for conduct in preparing for those functions; [such as] evaluating and organizing evidence for presentation at trial or to a grand jury, or determining which offenses are to be charged").

In contrast, "[w]hen a [prosecutor] functions outside his . . . role as an advocate for the People, the shield of [absolute] immunity is absent."  *Id.*  Specifically, "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."  *Buckley*, 509 U.S. at 273 (internal quotation marks omitted); *see also Smith*, 147 F.3d at 94 ("[W]hen a prosecutor functions as an administrator . . . [or] performs the investigative

19

functions normally performed by a detective or police officer, he is eligible only for qualified immunity." (internal quotation marks omitted) (second alteration in original)); *Hickey*, 2002 WL 1974058, at *3 ("[W]hen prosecutors involve themselves in functions that have typically been performed by police officers or investigative agents, they are as much (or as little) subject to suit as such officers.").  For example, absolute immunity is not available when a prosecutor advises the police whether probable cause exists during their pretrial investigation, *see Burns*, 500 U.S. at 492-96, releases information to the media, *see Buckley*, 509 U.S. at 276-78; *Powers v. Coe*, 728 F.2d 97, 103 (2d Cir. 1984), authorizes or directs the use of wiretaps, *see Powers*, 728 F.2d at 103, or orchestrates a sting operation, *see Smith*, 147 F.3d at 94.

The line between a prosecutor's acts as an advocate and as an investigator can sometimes be blurry.  *See Zahrey*, 221 F.3d at 347 ("The line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw."); *accord Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005) ("The analysis of whether prosecutorial acts constitute advocacy or police-type investigative work is complicated by the fact that [courts] ha[ve] [not] . . . draw[n] a bright-line between the two [functions]."); *Crews v. County of Nassau*, No. 06-CV-2610, 2007 WL 4591325, at *14 (E.D.N.Y. Dec. 27, 2007) (noting that the line between advocate and investigator might be difficult to draw).  Indeed, as the Supreme Court has noted, although "[a]lmost any action by a prosecutor, including his . . . participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, . . . [the courts] have never indicated that absolute immunity is that expansive."  *Burns*, 500 U.S. at 495.  In the end, "[t]he key to whether a prosecutor should be afforded absolute immunity is the degree to which the specific conduct at issue is 'intimately associated with the judicial phase

of the criminal process.'" *DiBlasio v. Novello*, 344 F.3d 292, 300 (2d Cir. 2003) (quoting *Imbler*, 424 U.S. at 430)).

In assessing how closely connected a prosecutor's conduct is to the judicial phase of the criminal process, the timing of the conduct is relevant, but not dispositive. *See id.* at 300-01 ("In assessing whether absolute immunity should attach to a prosecutor, or an agency official claiming prosecutorial immunity, we have focused on the timing of the conduct at issue . . . ."); *Genzler*, 410 F.3d at 639 ("The timing of evidence gathering is a relevant fact in determining how closely connected that conduct is to the official's core advocacy function in the judicial process . . . ."); *KRL v. Moore*, 384 F.3d 1105, 1111 (9th Cir. 2004) ("[T]he timing of the prosecutor's conduct informs our determination of the function performed, but it is not determinative."); *Cousin v. Small*, 325 F.3d 627, 636 (5th Cir. 2003) ("[T]he timing of events, while not determinative, can be highly relevant to the inquiry into function."). For example, the Supreme Court has observed that absolute immunity is unavailable for investigative conduct that takes place before probable cause has been established: "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274; *see also Zahrey*, 221 F.3d at 347 n.2 (explaining that *Buckley* "suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative"); *Hill*, 45 F.3d at 661 ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts."). The converse is not necessarily true, however. "[A] determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Buckley*, 509 U.S. at 274 n.5; *see also Zahrey*, 221 F.3d at 347 n.2 (noting that "a

21

prosecutor's conduct even after probable cause exists might be investigative").  For example, even after probable cause is established "'a prosecutor may engage in "police investigative work" that is entitled to only qualified immunity.'"  *Crews*, 2007 WL 4591325, at *14 (quoting *Buckley*, 509 U.S. at 274 n.5).

### 2.  Application

Plaintiffs argue that Bolen's conduct was more akin to that of an investigator than that of an advocate, and therefore he is not entitled to absolute immunity.  As Plaintiffs put it, the conduct that constitutes "[t]he heart of [Plaintiffs'] Section 1983 claim against Bolen in his individual capacity . . . is that days after [Deskovic's] indictment for the rape and murder of A.C.[,] . . . Bolen acted in an investigative capacity to deliberately procure false scientific evidence in order to proceed with the case against [Deskovic]."  (Pls.' Opp'n 1.)[6]  Specifically, according to Plaintiffs, soon after the indictment of Deskovic was returned, DNA testing excluded Deskovic as the source of the semen found on the swab from the victim, while microscopic hair analysis excluded Deskovic as the source of hairs found on the victim.  (*Id*. 1.)  These forensic results, according to Plaintiffs, meant that there was no basis to conclude that Deskovic was the sole perpetrator of the rape and, in Plaintiffs' view, "eviscerated probable cause" to believe Deskovic was guilty.  (Deskovic SAC ¶ 129; McGarr AC ¶ 119.)

Plaintiffs allege that in response to these exculpatory test results, Bolen "directed that additional investigation be done by the PPD," and Bolen himself "conducted and personally

---

[6] Although Plaintiffs also allege a number of other improper acts by Bolen, Plaintiffs have represented to the Court that those allegations are "the constitutional predicates to [P]laintiff[s'] *Monell* claims against the County[,] . . . [and] are not the bas[e]s for individual claims against [Bolen]."  (Pls.' Opp'n 1 n.1.)

directed further investigation."  (Deskovic SAC ¶ 129; McGarr AC ¶ 119.)  Plaintiffs'

Complaints are silent as to the investigation that PPD officials conducted at Bolen's direction.

For example, there is no allegation that PPD officials, acting at Bolen's specific direction,

falsified any evidence, coerced any witnesses, or suppressed any exculpatory material.[7]  Indeed,

although Plaintiffs do allege that PPD officials engaged in investigative misconduct, they

consistently allege that PPD officials concealed that misconduct from the prosecutors.  (Deskovic

SAC ¶¶ 6, 56-58, 75-76, 90, 93-94, 134; McGarr AC ¶¶ 6, 45-47, 66-67, 81, 84-85, 124.)[8]

  Moreover, Plaintiffs' Complaints offer no specifics about what precise "investigation"

Bolen allegedly carried out himself, other than to speak with "[D]efendant Deputy Medical

Examiner . . . [Roh], *to provide evidence to support the continued prosecution of* . . . Deskovic in

the face of exonerative DNA evidence."  (Deskovic SAC ¶ 130 (emphasis added); McGarr AC

¶ 120.)  According to Plaintiffs, Bolen and Roh allegedly "discussed and agreed that Roh would

provide evidence that[,] in his scientific opinion," the victim "had been sexually active on

---

[7] The Court recognizes that Plaintiffs' Complaints include an allegation that "PPD [officers] conducted . . . post-DNA, pretrial investigation on their own initiative and at the direction of prosecutors including Bolen. . . . [and that] in the course of that investigation the PPD [officers] uncovered additional exculpatory and impeachment evidence, including but not limited to evidence that was material to the prosecution's efforts to account for the fact that [Deskovic] was not the source of semen found inside [the victim]."  (Deskovic SAC ¶ 135; McGarr AC ¶ 125.)  While this investigation was generally alleged to be at Bolen's direction, Plaintiffs fail to point to any improper acts specifically undertaken at Bolen's direction.  Nor is it inferrable that Bolen was aware of PPD officers' alleged improper acts, as Plaintiffs allege that "PPD [officers] failed to document and disclose th[e] evidence" uncovered in their post-indictment investigation.  (Deskovic SAC ¶ 135; McGarr AC ¶ 125.)

[8] While Deskovic's counsel, at oral argument, explained some of the investigative steps PPD officials allegedly undertook at Bolen's direction, there is nothing in Plaintiffs' Complaints describing this conduct, and there is nothing about counsel's description of this additional investigation suggesting any constitutional foul attributable to Bolen.

multiple occasions prior to her rape and death, and that during his autopsy [Roh] had observed

scarring on [the victim's] hymen that proved this fact."  (Deskovic SAC ¶ 130; McGarr AC

¶ 120.)[9]  Plaintiffs allege that this "evidence" from Roh was false and that Bolen knew or should

have known it to be false.  (Deskovic SAC ¶ 131; McGarr AC ¶ 121.)  This alleged scheme,

according to Plaintiffs, played out as planned at trial, as Plaintiffs assert that Bolen relied on

"Roh's fabrications" to explain to the jury how it was that Deskovic could have raped the victim

even though the "scientific proof" was inconsistent with his involvement.  (Deskovic SAC

¶¶ 137-39; McGarr AC ¶¶ 127-29.)  Specifically, Plaintiffs allege that, at trial, "Bolen elicited

from Roh the false and fabricated testimony *that they had discussed prior to trial*:  (a) that Roh

had a scientific basis for concluding that [the victim] had been sexually active on multiple

occasions prior to her death; and (b) that during [the] autopsy[,] Roh had observed scarring on

[the victim's] hymen."  (Deskovic SAC ¶ 138 (emphasis added); McGarr AC ¶ 128.)  According

to Plaintiffs, "Bolen relied upon Roh's fabrications in his opening [statement] and closing

argument[] to the jury as the sole evidence supporting the prosecution theory that the semen

found in [the victim] had come from a consensual sex partner."  (Deskovic SAC ¶ 138; McGarr

AC ¶ 128.)

　　　　To determine whether Bolen is entitled to absolute immunity, the Court must determine

the capacity in which he was functioning when engaging in the alleged misconduct.  *See Tellier

v. Petrillo*, No. 95-CV-211, 1996 WL 734885, at *3 (S.D.N.Y. Dec. 23, 1996) ("To determine

whether defendants in the instant action are entitled to absolute immunity, I must first determine

---

[9] Plaintiffs also allege that Bolen "failed to investigate known exculpatory evidence" (Deskovic SAC ¶ 132; McGarr AC ¶ 122), but as Deskovic's counsel explained at oral argument, Plaintiffs do not base their Section 1983 claims against Bolen on this allegation.

in what capacity defendants were functioning when they allegedly manufactured evidence.").  As a threshold matter, the Court notes that Plaintiffs' labeling of Bolen's alleged conduct as "investigation" in their Complaints is not by itself determinative of the absolute immunity analysis.  *See Crews*, 2007 WL 4591325, at *15 n.15 ("[P]laintiffs' labeling various actions 'investigative' or 'administrative' in the complaint is of no moment."); *Belot v. Wieshaupt*, No. 96-CV-3005, 1997 WL 218449, at *7 (S.D.N.Y. Apr. 29, 1997) ("[I]t is not enough for plaintiff to allege simply that defendants performed investigative functions or that they were involved in the criminal investigation; plaintiff must also identify wrongdoing by defendants in their investigative capacity." (internal quotation marks omitted)).  The key inquiry remains whether the conduct described in the complaints is sufficiently related to the "judicial phase of the criminal process."  *DiBlasio*, 344 F.3d at 300 (internal quotation marks omitted); *see also Genzler*, 410 F.3d at 640 ("We . . . focus on whether the character of the [prosecutor's activities] was more in the nature of quasi-judicial advocacy or police-type investigative work.").

The Court finds that, even taking Plaintiffs' allegations to be true, Bolen's allegedly improper actions took place in the judicial phase of the criminal process.  To begin, it is important to note that the alleged conduct that forms the basis for Plaintiffs' claims against Bolen occurred after Deskovic's indictment.  And, from the allegations in Plaintiffs' Complaints, it is evident not only that Bolen had no reason to doubt the bona fides of the indictment, but also that he had strong reason to believe that Deskovic was guilty based on his supposed confession.  *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (noting that a confession is "probably the most probative and damaging evidence that can be admitted against [a defendant]" (internal quotation marks omitted)).  While Plaintiffs allege that Deskovic's confession was not, in fact, a true

25

confession and that it was made only after improperly coercive conduct by PPD officials,

Plaintiffs also allege that the pre-indictment misconduct of PPD officials in securing the

confession (and other evidence) was concealed from the prosecutors, including Bolen.  (Deskovic

SAC ¶ 6 ("Peekskill detectives and supervisors . . . . built their case by systematically coercing

and fabricating . . . Deskovic's false confession, by similarly coercing and fabricating allegedly

corroborating evidence from witnesses, and by hiding evidence of . . . Deskovic's innocence and

their improper investigation from prosecutors and the defense – even after learning that DNA

evidence proved . . . Deskovic's innocence."); McGarr AC ¶ 6 (same); Deskovic SAC ¶ 126

("Deskovic was charged and indicted based upon evidence that was fabricated by [PPD officers]

and by means of [PPD officers'] concealment from prosecutors and the grand jury of material,

exculpatory and impeachment evidence that undermined a probable cause determination.");

McGarr AC ¶ 116 (same); Deskovic SAC ¶ 134 (alleging that "[e]ven after learning of the DNA

test results, . . . the PPD [officers] continued to conceal from prosecutors their previously

undisclosed misconduct," including, *inter alia*, "their coercion of allegedly inculpatory

statements from [Deskovic]; their providing to [Deskovic] one or more of the non-public facts

contained in his allegedly inculpatory statements; [and] their fabrications of allegedly inculpatory

witness statements," and that they also "failed to disclose exculpatory impeachment evidence"

"that [Claxton] and [the victim] had not had a romantic relationship" and that the victim "was not

sexually active"); McGarr AC ¶ 124 (same).)

Thus, Plaintiffs' own version of events is that Bolen believed, based on Deskovic's

confession (and not on any scientific tests), that the grand jury's indictment meant that there was

probable cause to believe that Deskovic had committed the crimes against the victim.  Indeed, the

law entitled Bolen to that belief.  *See Green v. Montgomery*, 219 F.3d 52, 60 (2d Cir. 2000)

("Under New York law, the fact that a grand jury indicts a person of a crime creates a

presumption of probable cause . . . ."); *Blair v. City of New York*, No. 03-CV-1485, 2009 WL

959547, at *8 (E.D.N.Y. Mar. 31, 2009) ("It is an established rule that a Grand Jury indictment

creates a presumption of probable cause.").  At that point, "after probable cause ha[d] been

established," Bolen's primary role was to "act[] as an advocate" for the prosecution of Deskovic.

*Cousin*, 325 F.3d at 633.

    Plaintiffs nonetheless argue that the DNA and hair analysis results received by Bolen in

the days after the indictment "eviscerated" probable cause to prosecute Deskovic.  (Deskovic

SAC ¶ 129; McGarr AC ¶ 119.)   Plaintiffs accordingly claim that Bolen's alleged conduct was

investigative activity aimed at "obtain[ing] evidence supporting probable cause to prosecute

[Deskovic]" (Deskovic SAC ¶ 129; McGarr AC ¶ 119), thus bringing this case into the ambit of

cases holding that absolute prosecutorial immunity is not available for investigative conduct that

occurs prior to the establishment of probable cause, *see, e.g.*, *Buckley*, 509 U.S. at 275 (holding

that fabricating evidence before probable cause has been established is not covered by absolute

immunity); *Burns*, 500 U.S. at 492-96 (holding that advising police officers before probable

cause exists is not protected by absolute immunity); *Hill*, 45 F.3d at 662 (holding that if evidence

is "made to collect or corroborate [other] evidence against [a person] in order to get probable

cause to arrest her, the act of making the [evidence] receives only qualified immunity").

    As is clear from the broad allegations in Plaintiffs' Complaints, and counsel's comments

at oral argument, the allegation that probable cause was "eviscerated" is not one describing

Bolen's belief that the indictment was invalid at the time he learned about the test results, but

rather Plaintiffs' after-the-fact belief that probable cause had been gutted by the test results and that Bolen must have realized that.  However, Plaintiffs' after-the-fact assessment of the strength of the case against Deskovic, and their conclusory allegation to that effect, is not an allegation that changes the functional analysis of Bolen's conduct after the indictment was returned.  *See Iqbal*, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Moreover, the fact that Bolen either should have believed, or did believe, that his case might have had substantial proof problems, and that he allegedly reacted by falsifying evidence for use at trial, at the same time suppressing the fact that he did so, does not change the fact that his conduct was in the judicial phase of the case, i.e., after the indictment was returned and in the pretrial stage.  While the Supreme Court has noted that a prosecutor is not absolutely immune for every action taken after probable cause has been established, *see Buckley*, 509 U.S. at 274 n.5, "the Court's treatment of the issue demonstrates that the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating the advocatory nature of prosecutorial conduct," *Cousin*, 325 F.3d at 633.  Thus, "[p]rosecutors are absolutely immune from liability for gathering additional evidence after probable cause is established or criminal proceedings have begun when they are performing a quasi-judicial function."  *Broam v. Bogan*, 320 F.3d 1023, 1030 (9th Cir. 2003).  Indeed, for example, a prosecutor is absolutely immune even when he or she falsifies evidence for use at a trial, or otherwise fails to honor his or her *Brady* obligation to disclose exculpatory evidence in the judicial phase of a case.  *See Hill*, 45 F.3d at 662 (noting that absolute immunity covers prosecutors who fail to disclose *Brady*

28

materials in the prosecutorial phase, and who conspire to present false evidence at trial); *Green v.*
*City of New York*, No. 06-CV-3942, 2008 WL 4394679, at *2 (E.D.N.Y. Sept. 23, 2008)
(prosecutor accused of failing to disclose *Brady* material and conspiring to present false trial
testimony covered by absolutely immunity).  As the Ninth Circuit has explained, "[w]here a
prosecutor has secured an indictment and begins to marshal evidence for trial, *i.e.*, undertakes the
second or third step in the process of obtaining a conviction," then imposing liability in that
situation "has a greater likelihood of interfering with the prosecutor's independent judgment,"
and therefore the prosecutor's acts are covered by absolute immunity.  *KRL*, 384 F.3d at 1112.

     As noted, the Court recognizes that prosecutors are not absolutely immune for all post-
indictment investigation.  For example, if searching for evidence of crimes not charged in an
indictment, the prosecutor only can claim qualified immunity.  *See id*. at 1113 (holding that
prosecutor's collateral investigation into different crime did not merit absolute immunity, as it
"went beyond any legitimate preparation to prosecute [the defendant] for . . . the . . . crimes
charged in the indictment").  Here, however, it is significant that Bolen is not accused of
conducting an investigation to determine if he could bring other charges against Deskovic.
Indeed, he is not accused of doing any specific investigation in the wake of the DNA and hair
analysis results other than speaking to Roh, the Deputy Medical Examiner, who already had
conducted an autopsy of the victim and who presumably would have been a trial witness in any
event.  (Deskovic SAC ¶¶ 130-31; McGarr AC ¶¶ 120-21.)  According to Plaintiffs, the purpose
of this conversation with Roh was "to provide *evidence* to support *the continued prosecution of*
. . . Deskovic in the face of the exonerative DNA evidence."  (Deskovic SAC ¶ 130 (emphasis
added); McGarr AC ¶ 120.)  Specifically, as Plaintiffs describe it, "[a] critical challenge facing

the prosecution at [Deskovic's] criminal trial was to explain how [Deskovic] could have raped [the victim] despite scientific proof that the semen found inside of her [body], and hairs found on her body, were not his."  (Deskovic SAC ¶ 137; McGarr AC ¶ 127.)  Bolen responded to this "critical [evidentiary] challenge" (Deskovic SAC ¶ 137; McGarr AC ¶ 127) by allegedly developing a false theory of the case with Roh that accounted "for the presence of another man's semen inside [the victim's body] following her rape and murder" (Deskovic SAC ¶ 129; McGarr AC ¶ 129).

As described by Plaintiffs, it is clear that Bolen was acting as an advocate in the judicial phase of the case, even if his case was substantially weakened by the scientific test results.  *See Cousin*, 325 F.3d at 633 ("Although *Buckley* did not explicitly hold that all witness interviews conducted after indictment are advocatory in nature, the Court's reasoning strongly indicates that many, perhaps most, such interviews are likely to be advocatory rather than investigative."); *cf. Buckley*, 509 U.S. at 285 (Kennedy, J., concurring in part, and dissenting in part) ("The premise of *Burns* was that, in providing advice to the police, the prosecutor acted to guide police, not to prepare his own case."); *KRL*, 384 F.3d at 1113 ("Investigative activities carried out in preparation for a prosecutor's case may enjoy absolute immunity.").  This is so even if Bolen's conduct took place soon after the indictment was returned, and months before trial began.  *See KRL*, 384 F.3d at 1113 ("[A]n investigator gathering evidence, a month after an indictment was filed, to prepare the prosecutor for trial is engaged in an advocacy function intimately associated with the judicial process, and is entitled to the same immunity that would be afforded a prosecutor."); *cf. Buckley*, 509 U.S. at 273 (explaining that acts entitled to absolute immunity "must include the professional evaluation of the evidence assembled by the police and

appropriate preparation for its presentation at trial"); *Imbler*, 424 U.S. at 431 n.33 ("Preparation . . . for a trial[] may require the obtaining, reviewing, and evaluating of evidence.").  In fact, the point is driven home by Plaintiffs' additional allegation that Bolen carried out his plan to "support the continued prosecution of Deskovic" by calling Roh as a trial witness and having him testify about the very same false theories that the two of them allegedly concocted in light of the post-indictment DNA and hair analysis.  (Deskovic SAC ¶¶ 130, 137-39; McGarr AC ¶¶ 120, 127-29.)  Indeed, it is readily apparent that the only purpose of this alleged discussion between Bolen and Roh was to create evidence for use at trial.  Yet, it is precisely such alleged pre-trial conduct that is protected by absolute immunity.  *See Cousin*, 325 F.3d at 635 ("The record . . . demonstrates that, at the time of [the prosecutor's] conversations with [a witness], in which [the prosecutor] allegedly told [the witness] to implicate [the defendant] falsely . . . and coached him on how to testify, [the prosecutor] was acting as an advocate rather than as an investigator.  The interview was intended to secure evidence that would be used in the presentation of the state's case at the pending trial of an already identified suspect, not to identify a suspect or establish probable cause."); *Hill*, 45 F.3d at 662 ("[A]bsolute prosecutorial immunity extends even to conspiracies to present false evidence at trial . . . ."); *Dory*, 25 F.3d at 83 (same).

Because absolute immunity protects a prosecutor for actions in his "role as advocate for the state," *Burns*, 500 U.S. at 491 (internal quotation marks omitted), Bolen is absolutely immune for allegedly procuring false scientific evidence from Roh and then presenting it at trial. *See Peay v. Ajello*, 470 F.3d 65, 68 (2d Cir. 2006) (conferring absolute immunity for conspiring to present false evidence at trial); *Dory*, 25 F.3d at 83 (same); *Zahrey v. City of New York*, No. 98-4546, 2009 WL 54495, at *30-31 (S.D.N.Y. Jan. 7, 2009) (holding that post-indictment

efforts to manufacture false evidence are covered by absolute immunity). Therefore, Deskovic's

malicious prosecution and prolonged detention claims and McGarr's related claims, all brought

under Section 1983, against Bolen in his individual capacity are dismissed. *See, e.g.*, *Shmueli*,

424 F.3d at 236-37 (dismissing malicious prosecution claim based on absolute immunity);

*Green*, 2008 WL 4394679, at *2 (dismissing prolonged detention claim based on absolute

immunity).[10]

## III. Conclusion

For the reasons discussed above, the motions of Defendant Bolen to dismiss Plaintiffs'

claims against him are granted. The Clerk of Court is respectfully directed to terminate the

motion pending in Case No. 07-CV-8150 (Dkt. No. 150) and the motion pending in Case No. 07-

CV-9488 (Dkt. No. 87), and to dismiss Bolen from both cases as a defendant.


SO ORDERED.

Dated:       August  12 , 2009
             White Plains, New York


                                        _____
                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

---

[10] While the governing caselaw gives Bolen absolute immunity for his alleged conduct in
this case, the Court notes that other remedies may be pursued to address any prosecutorial
misconduct. *See Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004)
("[P]rosecutorial misconduct may be subject to professional or even criminal sanctions at the
same time that it fits within the scope of advocative functions entitled to absolute immunity from
suit for money damages.").

*ECF Service List*:

Barry C. Scheck, Esq.
Deborah L. Cornwall, Esq.
Nick J. Brustin, Esq.
Sarah A. Crowley, Esq.
Neufeld Scheck & Brustin LLP
99 Hudson Street
New York, NY 10013
Ph. (917) 237-0338
Fax (212) 965-9084
Email: debi@cnscivilrights.com
        nick@cnscivilrights.com
        sarah@nsbcivilrights.com

Eric Hecker, Esq.
Elora Mukherjee, Esq.
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Ph. 212-763-5000
Fax 212-763-5001
Email: ehecker@ecbalaw.com
        emukherjee@ecbalaw.com

Stuart E. Kahan, Esq.
Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP
120 Bloomingdale Road
White Plains, NY 10605
Ph. (914) 422-3900
Fax (914) 422-3636
Email: skahan@oxmanlaw.com

Brian S. Sokoloff, Esq.
Sokoloff Stern LLP
355 Post Avenue, Suite 201
Westbury, NY 11590
Ph. (516) 334-4500
Fax (516) 334-4501
Email: bsokoloff@sokoloffstern.com

James A. Mitchell, Esq.
Stillman, Friedman & Shechtman, P.C.
425 Park Avenue
New York, NY 10022
Ph. 212-223-0200
Fax 212-223-1942
Email: jmitchell@stillmanfriedman.com

James A. Randazzo, Esq.
Gelardi & Randazzo LLP
800 Westchester Ave., Suite S-608
Rye Brooke, NY 10573
Ph. (914) 251-0603
Fax (914) 251-0603
Email: jrandazzo@gandrlaw.com

Peter I. Livingston, Esq.
Rose & Livingston & Cholst LLP
275 Madison Ave., Suite 500
New York, NY 10016
Ph. (212) 687-7770
Fax: (212) 687-8030
Email: pil@rosenlivingston.com

John Eric Knudsen
New York State Department of Law
The Capitol
Albany, NY 12224
Ph. (212) 416-8625
Fax (212) 416-6075
Email: John.Knudsen@oag.state.ny.us

Michele E. Kahn, Esq.
Michele Kahn P.C.
708 Third Ave, 19th Floor
New York, NY 10017
Ph. (212) 687-5066
Fax (212) 687-5066
Email: mk@kahngoldberg.com

Jonathan B. Bruno, Esq.
Kaufman, Borgeest & Ryan, LLP
120 Broadway, 14th Floor
New York, NY 10271
Ph. (212) 980-9600
Fax (212) 980-9291
Email: jbruno@kbrlaw.com