Robert Delicate (RD-7363)
Stephen Wellinghorst (SW-2998)
HARWOOD LLOYD, LLC
*Attorneys for Defendants Daniel Stephens and Putnam County*
350 5th Avenue, 59th Floor, Empire State Building
New York, New York 10118
(201)-359-3530

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY DESKOVIC<br><br>Plaintiff,<br><br>-against-<br><br>CITY OF PEEKSKILL, PUTNAM COUNTY, WESTCHESTER COUNTY, DAVID LEVINE, THOMAS MCINTYRE, WALTER BROVARSKI, EUGENE TUMOLO, JOHN AND JANE DOE SUPERVISORS, DANIEL STEPHENS, LOUIS ROH, MILLARD HYLAND, PETER INSERO, and LEGAL AID SOCIETY OF WESTCHESTER COUNTY<br><br>Defendants. | **DEFENDANT DANIEL STEPHENS RULE 56.1 STATEMENT**<br><br>No. 7:07-cv-8150 (KMK) (GAY)<br><br>**ECF Case** |
| LINDA MCGARR<br><br>Plaintiff,<br><br>-against-<br><br>CITY OF PEEKSKILL, PUTNAM COUNTY, WESTCHESTER COUNTY, DAVID LEVINE, THOMAS MCINTYRE, WALTER BROVARSKI, EUGENE TUMOLO, JOHN AND JANE DOE SUPERVISORS, DANIEL STEPHENS, LOUIS ROH, MILLARD HYLAND<br><br>Defendants. | No. 7:07-cv-09488 (KMK) (GAY)<br><br>**ECF Case** |

Defendant Daniel Stephens and Putnam Count, as and for a statement of material facts pursuant to Local Rule 56.1 as to which it is contended that there does not exist a genuine issue to be tried, respectfully provides the following statement of undisputed material facts.

1. On November 15, 1989, a fifteen year old Peekskill High School sophomore, A.C., left her home after school. (City 00293, (Cmplt ¶1).

2. When A.C. did not return home on November 15, 1989, her family contacted the Peekskill Police Department ("PPD") and reported her missing. (City 00293).

3. On the morning of November 17, 1989, PPD officers and members of the State Police found A.C.'s body in a heavily wooded area of Hillcrest Park. (City 00154).

4. The PPD formulated a theory that A.C. had known her attacker, that the perpetrator was a white or Hispanic man younger than nineteen years old and approximately five feet, ten inches tall, and that he was a loner with physical or mental handicaps. (Cmplt ¶41)

5. Jeffrey Deskovic was a sixteen year old classmate of the victim that fit this description. (Cmplt ¶3).

6. The police first began to notice Deskovic when he attended multiple wakes as well as the victim's funeral. (City 00172, 00174).

7. Deskovic was upset at these events (JD: 32, 33).

8. On December 12, 1989, Detectives David Levine ("Levine") and Thomas McIntyre ("McIntyre") members of the PPD approached Deskovic for the first time. (City 00174, JD: 114, 115).

9. They asked Deskovic to accompany them to the PPD to speak with them about the murder. (City 00174, JD: 116).

10. Deskovic agreed to accompany them, but did not ask the detectives to contact his mother. (JD: 117,118).

11. Deskovic was questioned by McIntyre and Levine told the police that he had visited the crime scene within twenty-four hours of the body being found. (JD: 129, City 00174).

12. Deskovic claimed to know the location of the body from the newspaper. (JD:130).

13. During this first encounter, McIntyre asked Deskovic if he would be willing to submit to a polygraph examination. (City 00175, JD:141).

14. Deskovic stated he would think it over. (JD: 141).

15. Deskovic appeared at the PPD on January 9, 1990. (JD: 196).

16. On January 10, 1990 Deskovic met with Levine, McIntyre and Lieutenant Eugene Tumolo ("Tumolo"). (JD: 216).

17. Deskovic came to the PPD with typewritten notes that he had prepared of his own investigation and gave them to Levine. (JD: 218)

18. He spoke with Levine but does not remember the substance of this conversation. (JD: 218).

19. Deskovic independently drew a crime scene map. (JD: 219).

20. The map indicated the three crime scene locations identified by the police. (City 00189, JD: 222).

21. As far as the PPD knew, these crime scene locations were only known to the medical examiner, district attorney and police. (TM: 167).

22. Later that day Deskovic accompanied Levine, Tumolo and McIntyre to the crime scene. (JD: 231).

23. Deskovic had previously spoken with Levine about his theory of the three crime scene locations. (JD: 229).

24. Following the crime scene trip, Deskovic returned to the PPD where he answered more questions about the crime scene. (City 00193, JD: 234).

25. At some point Levine asked Deskovic if he wanted to submit to a polygraph exam. (JD: 315, 316).

26. Deskovic agreed to take the polygraph exam. (JD: 317).

27. On January 24, 1990, Deskovic appeared at the PPD, and inquired what time he would be taking the polygraph exam. (JD: 321, 319, 320).

28. Levine responded that if Deskovic wanted to take the polygraph exam he should appear at the PPD on January 25, 1990 at 9:30 A.M. (City 00196, JD: 321, 322).

29. Deskovic arrived at the PPD at 9:30 A.M. on January 25, 1990. (JD: 327, 328, 331).

30. Deskovic was transported by the police to Brewster, New York where he would take the polygraph exam. (JD: 382).

31. On his way to Brewster, Deskovic never had any second thoughts about taking the polygraph examination. (JD: 382).

32. In addition, Deskovic never communicated to any of the police on his way to Brewster that he wanted assistance from anyone, including family and friends. (JD: 382).

33. At approximately 11:00 a.m., Deskovic arrived in Brewster at Stephens' office with Levine, McIntyre and Tumolo. (City 00346).

34. Prior to January 25, 1990, Deskovic had never heard the name "Daniel Stephens" and had never heard any of the Peekskill police mention Stephens. (JD: 420).

35. When he arrived, Deskovic told Stephens that he had come to take a polygraph examination in order to be permitted to assist the PPD with their investigation into A.C.'s death. (JD: 383).

36. Shortly after his arrival, Deskovic entered the room where he would be taking the polygraph exam. (JD: 385).

37. Stephens gave Deskovic a document regarding the polygraph test, which Deskovic read. (JD: 385).

38. Deskovic did not ask any questions of Stephens after he finished reading the document. (JD: 392).

39. Deskovic remembers he responded yes to the following questions asked by Stephens: "Can you stop the polygraph anytime you want to", "do you realize that if I am called into court to testify about what both you and I said here today I will be placed under oath to tell the complete truth", "would you want me to tell the truth", "I will tell the complete truth regardless if it helps or hurts the prosecutor, or helps or hurts your side" and "now that you know all these rights that you do have, do you wish me to continue." (JD: 395).

40. Deskovic then signed a document acknowledging his affirmative responses to each of these questions. (JD: 396).

41. Deskovic's handwriting appears at the bottom of a statement that reads "I understand all the above questions asked to me. I've read everything on the page including my truthful answers. I've been allowed to make any changes I wish to make. I wish to continue with the procedure without an attorney. I am here of my own free will. I know I can leave the room by merely telling Dan Stephens that I wish to leave." (JD: 396, 397; City 00114).

42. Deskovic was asked at least once by Stephens if he wanted to proceed with the polygraph exam and responded affirmatively. (JD: 402, 414, 415).

43. Before the polygraph examination began at approximately 2:00 P.M., Stephens handwrote a narrative given by Deskovic regarding the A.C. murder. (JD: 423-427, DS Trial: 1072). The narrative, as Stephens recalls, consisted of:

> "She went up there to Griffin's Pond to kill two birds with one stone, take some pictures, and to meet somebody. She's gone up there once or twice before. The person she wanted to meet didn't show up there. Somebody else found out she was going to meet someone there. There was a conversation and argument. She was knocked unconscious by a blow with a blunt object. He was trying to get her to be his girlfriend again. All right she was raped, he probably had intercourse with her I don't know if he ejaculated. Somewhere along the line she wakes up during the raping. She was probably knocked out again. I think she was strangled. He got up and she was still lying down. He walked to the top of her head, picked her up by the hair and strangled her. But I'm not sure if he used a weapon to strangle but he probably did. He dragged her to where the body was found. There was a 50/50 chance that she was covered with leaves. The guy just left and probably went to his house. She dropped her keys somewhere in the woods. It's not up more towards the school, it's the other way. She didn't do it on purpose, they probably fell out of her pocket. The camera was dropped when she was taking pictures when the argument took place and probably was dropped just a short distance into the woods."

(DS Trial: 1006, 1007).

44. Although Deskovic denies making the statement "I don't know if he ejaculated", during this narrative, he admits having made the remaining statements. (JD: 424).

45. At no time while Stephens questioned him did Deskovic ask to leave, or to call his mother or any of his friends. (JD: 412).

46. At the end of the polygraph examination Stephens told Deskovic the polygraph examination indicated Deskovic had committed the crime. (JD: 418).

47. After the polygraph exam, Deskovic spoke with McIntyre. (DS Trial: 428).

48. Stephens then left and McIntyre entered the room. (JD: 429).

49. Deskovic told McIntyre that he did not do well on the test and McIntyre indicated to Deskovic that it had become apparent to him several weeks ago that Deskovic was the person who committed the crime. (JD: 429, 436)

50. Deskovic claims McIntyre then told him that the other police officers wanted to harm him, and that McIntyre was trying to protect him. (JD: 437).

51. Deskovic then confessed to McIntyre. (JD: 438).

52. Deskovic explained during the confession that: "I lost my temper. I tackled her and she landed on her stomach. I then rolled her over, and she tried to scratch me. I began slapping her around, backhanding her, and then put my hand over her mouth. I may have done it too long. (JD: 441-443).

53. Deskovic then said "please don't make me say anymore, I don't want to think about what else I did." (JD: 444).

54. Plaintiff repeated the confession to Tumolo and Levine, who had entered the room after the initial confession to McIntyre. (JD: 450).

55. The PPD officers placed Deskovic under arrest and transported him back to the PPD where he was charged by them with the rape and murder of A.C. (JD: 453).

56. After his arrest, Deskovic was assigned counsel from Legal Aid. (JD: 641).

58. Jeffrey Deskovic was tried and convicted for the rape and murder of A.C., and sentenced on January 18, 1991. (JD 50-H: 301; JD Trial: 1-10).

59. In 2006 new DNA testing established that the semen found in A.C.'s body came from Steven Cunningham. (Cmplt ¶4).

60. Cunningham subsequently confessed and pled guilty to the crime. (Cmplt ¶4).

61. On September 20, 2006, Deskovic's conviction was vacated and he was released from prison. (JD 50-H: 331).

62. On November 2, 2006, the indictment against Deskovic was dismissed. (Cmplt ¶167)


Dated: New York, New York
       August 5, 2011

                                      YOURS, etc.,
                                      HARWOOD LLOYD, LLC

                                      By: _____

                                      Robert Delicate (RD-7363)
                                      Stephen Wellinghorst (SW-2998)
                                      *Attorneys for Defendant Daniel Stephens*
                                      *and Putnam County*
                                      350 Fifth Avenue, 59th Floor
                                      Empire State Building
                                      New York, New York 10118
                                      (201) 359-3530

TO:

Nick Brustin
nick@nsbcivilrights.com
Chloe Cockburn
chloe@nsbcivilrights.com
Neufeld, Scheck and Brustin LLP
99 Hudson St.
New York, New York 10013

Vincent Gelardi
vg@vincentgelardi.com
Gelardi & Randazzo, LLP
800 Westchester Ave., Suite S-608
Rye Brook, NY 10573

James Mitchell
jmitchell@stillmanfriedman.com
Stillman Friedman and Shechtman, P.C. 425 Park Ave.
New York, NY 10022

Peter Meisels
Peter.meisels@wilsonelser.com
John Flannery
john.flanney@wilsonelser.com
Lalit Loomba
lalit.loomba@wilsonelser.com
Wilson Elser Moskowitz Edelman& Dicker, LLP
3 Gannett Drive
White Plains, NY 10604-3407

William Harrington wpharrington@bpslaw.com
Pete Harrington pharrington@bpslaw.com
Bleakley Platt & Schmidt,
LLP One North Lexington Avenue
White Plains, NY 10601

Stuart Kahan
skahan@oxmanlaw.com
Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP
120 Bloomingdale Rd. White Plains, NY 10605

Diane Houk dhouk@ecbalaw.com
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019