

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFREY DESKOVIC,

                    Plaintiff,

          v.

CITY OF PEEKSKILL, PUTNAM COUNTY,
DAVID LEVINE, THOMAS McINTYRE, EUGENE
TUMOLO, JOHN AND JANE DOE SUPERVISORS,
and DANIEL STEPHENS,

                    Defendants.

---

LINDA McGARR,

                    Plaintiff,

          v.

CITY OF PEEKSKILL, DAVID LEVINE, THOMAS
McINTYRE, EUGENE TUMOLO, JOHN AND
JANE DOE SUPERVISORS, and DANIEL
STEPHENS,

                    Defendants.

---

Case Nos.  07-CV-8150 (KMK)
           07-CV-9488 (KMK)

OPINION AND ORDER

Appearances:

Nick J. Brustin, Esq.
Chloe Francis Cockburn, Esq.
Deborah L. Cornwall, Esq.
Jennifer Elizabeth Laurin, Esq.
Sarah A. Crowley, Esq.
Anna Benvenutti Hoffmann, Esq.
Neufeld Scheck & Brustin LLP
New York, New York
*Counsel for Plaintiff Jeffrey Deskovic*

Eric Hecker, Esq.
Elora Mukherjee, Esq.
Emery Celli Brinckerhoff & Abady, LLP
New York, New York
*Counsel for Plaintiff Linda McGarr*

James A. Randazzo, Esq.
Gaines, Gruner, Ponzini & Novick, LLP
White Plains, New York
*Counsel for Defendants Daniel Stephens and Putnam County*

Stephen Wellinghorst, Esq.
Robert Louis Delicate, Esq.
Harwood, Lloyd, LLC
Hackensack, NJ
*Counsel for Defendants Daniel Stephens and Putnam County*

KENNETH M. KARAS, District Judge:

In these two civil rights actions, Plaintiffs Jeffrey Deskovic ("Deskovic") and his mother,

Linda McGarr ("McGarr") (together, "Plaintiffs"), bring claims against the City of Peekskill and

a number of police officers and other officials, in connection with the wrongful arrest,

conviction, and incarceration of Deskovic.[1]  Deskovic brings claims under 42 U.S.C. § 1983

("Section 1983") for numerous violations of his constitutional rights and under state law for

malicious prosecution as well as negligent and intentional infliction of emotional distress.  (Dkt.

No. 268.)  McGarr alleges a Section 1983 claim for violation of her constitutional right to

familial association.

Defendants Stephens and Putnam County move for summary judgment on the claims

against them.  For the reasons discussed below, Defendants' motions for summary judgment are

denied as to Deskovic's claims, and granted as to McGarr's claim.[2]

---

[1] The action captioned as *Deskovic v. City of Peekskill, et al.* is filed as Case No. 07-CV-8150, and the action captioned as *McGarr v. City of Peekskill, et al.* is filed as Case No. 07-CV-9488.  The cases were filed as related, and they have been consolidated by this Court for all pretrial purposes.  Both suits name as defendants City of Peekskill, David Levine, Thomas McIntyre, Eugene Tumolo, John and Jane Doe Supervisors, and Daniel Stephens.  Deskovic has additionally named Putnam County as a defendant.  Plaintiffs originally named other defendants, but some defendants settled, and others were dismissed by the Court.

[2] The Court notes that it does not address herein Plaintiffs' claims against any Defendant other than Stephens and Putnam County, as they are the only claims at issue in these motions.

## I. Background

### A. Factual Background

The facts of the case have been summarized in this Court's prior opinions in this case, notably *Deskovic v. City of Peekskill*, No. 07-CV-8150, 2009 WL 2475001 (S.D.N.Y. Aug. 13, 2009). The Court presumes familiarity with its prior opinions, and will briefly summarize the underlying facts, then focus on the facts relevant to the instant motions. A fifteen-year-old classmate of Deskovic, A.C., was raped and murdered on November 15, 1989. (Deskovic 56.1 ¶ 1.) At the time of A.C.'s death, Deskovic was a sixteen-year-old Peekskill High School sophomore who struggled socially, academically, and emotionally. *Deskovic*, 2009 WL 2475001, at *2. Two weeks later, the Peekskill police began focusing their investigation on Deskovic, as he seemed "extremely distraught" at A.C.'s wake and funeral, and "appeared to have become infatuated" with A.C. (Pls.' Opp'n Ex. 1, at 57.)[3] Peekskill officers had several meetings with Deskovic, and in mid-January 1990 twice sought permission from the District Attorney's office to make an arrest, but were told their evidence was insufficient to support an arrest. (Deskovic 56.1 ¶¶ 9-11.) Peekskill officers then met with Deskovic and asked him to take a polygraph exam, to which request Deskovic agreed. (*Id.* ¶ 12.)

Stephens was an investigator with the Putnam County Sheriff's Department at all times relevant to the Complaints. (Deskovic Third Am. Compl. ¶ 28.) Defendants David Levine ("Levine"), Thomas McIntyre ("McIntyre"), and Eugene Tumolo ("Tumolo") were Peekskill police officers (collectively, "Peekskill officers"). (*Id.* ¶¶ 23, 24, 26.) In December 1989 or January 1990, Stephens first met Tumolo at a narcotics task force Christmas party, where

---

[3] Exhibit 1 is a compilation of the criminal investigation reports in the murder of A.C. from the Peekskill Police Department.

Stephens offered Tumolo his services as a polygraph operator. (Deskovic 56.1 ¶ 14.) Stephens was known in his department as being skilled at getting confessions, and he described himself as having a "knack" for it. (*Id.* ¶ 13; Pls.' Opp'n Ex. 19, at 192-93.)[4] Tumolo stated in a letter to the Putnam County Sheriff, written after the polygraph, that he asked Stephens to polygraph Deskovic after "[s]everal interviews with [Deskovic] failed to produce a confession vital to this case as a lack of physical evidence, witnesses or investigative leads had critically hampered its progress." (Deskovic 56.1 ¶ 16; Pls.' Opp'n Ex. 53, at 2.)[5] By the time of Deskovic's polygraph exam, Stephens had performed more than 100 polygraphs and had worked with seven or eight police departments. (Deskovic 56.1 ¶ 27.)

Deskovic arrived at the police station on January 25, 1990, a Thursday and a school day, at the Peekskill officers' request. (*Id.* ¶ 29.) Deskovic's mother was not informed that he would be with the Peekskill officers that day, or that he would be taking a polygraph. (*Id.*) Deskovic was accompanied by his friend Martin Burrett, who planned to go with him to the polygraph. (*Id.* ¶ 30.) Tumolo "said in a loud voice" that Martin could not accompany Deskovic to the polygraph, "which appeared to frighten [Martin], and he left." (*Id.*) Deskovic then drove with the Peekskill officers to Stephens' private polygraph office in Brewster, New York. (*Id.* ¶ 31.) Stephens did not tell Deskovic at any point that he was a police officer. (*Id.*) Deskovic told Stephens at the beginning of the day that he was taking the polygraph exam so that he could have a more active role in the investigation into A.C.'s murder, echoing what the Peekskill officers allegedly had told Deskovic to encourage his participation. (*Id.* ¶¶ 17-18.) Stephens later

---

[4] Exhibit 19 is the August 11, 2010 deposition of Stephens.

[5] Exhibit 53 contains excerpts from Stephens' personnel file, produced by Putnam County.

testified at a suppression hearing prior to Deskovic's criminal trial that he did not believe that the Peekskill Police Department would allow Deskovic to investigate the homicide, but Stephens did not ask any follow-up questions or correct Deskovic's impression. (*Id.* ¶ 18; Pl.'s Opp'n Ex. 35, at 309-10.)

The polygraph examination was roughly eight hours long, by Deskovic's estimate, and six hours long, by Stephens' estimate. (Deskovic 56.1 ¶ 33; Pls.' Opp'n Ex. 19, at 131, 198.) Deskovic was hooked up to the polygraph machine during the entire examination.[6] (Deskovic 56.1 ¶ 40.) Stephens and Deskovic were alone in the polygraph room during the examination, and the Peekskill officers were in a second room, where a speaker allowed them to monitor the audio of what was taking place in the polygraph room. (Pls.' Opp'n Ex. 1, at 107-08.) Stephens conducted the exam using the "Arther method," an allegedly unreliable way to conduct a polygraph examination, due to its high error rate. (Deskovic 56.1 ¶ 23; Pls.' Opp'n Ex. 36, at 5.)[7] Deskovic did not eat any food during the polygraph examination, but did drink several cups of coffee. (Deskovic 56.1 ¶¶ 37-38.) Deskovic alleges that Stephens was "very aggressive in his questioning," and that Stephens invaded Deskovic's personal space, yelled at him, repeatedly asked the same questions, accused Deskovic of murder several times, and did not accept Deskovic's protestations of innocence. (*Id.* ¶ 41.) There was no tape recording made of the polygraph examination. (*Id.* ¶ 46.)

---

[6] Being "hooked up" to a polygraph machine means that two rubber bellows are secured around the subject's chest and abdomen by a chain and attached to the polygraph instrument by rubber tubing. (Deskovic 56.1 ¶ 39.) A blood pressure cuff is placed on the upper part of one arm, and two electrodes are attached to the polygraph instrument by wires. (*Id.*) The end result is that the subject is "effectively tied in a chair and is unable to stand or move about freely without damaging the instrument." (*Id.*)

[7] Exhibit 36 is the July 7, 2011 report of Dr. Charles Honts, Plaintiffs' polygraph expert.

4

After concluding the polygraph examination, which allegedly indicated Deskovic's deception, Stephens told Deskovic that he had failed the test, and stated, "You just told me within yourself, through the polygraph results, that you committed it. All we want you to do is verbalize it." (*Id.* ¶ 53; Pls.' Opp'n Ex. 30, at 219.)[8] Stephens then left the room, and McIntyre entered and interrogated Deskovic for two more hours. (Deskovic 56.1 ¶ 54.) Plaintiffs allege that Stephens listened to McIntyre's interrogation from the second room, (*id.* ¶ 64), while Stephens denies that he heard the interrogation, (Defs.' Resp. to Deskovic 56.1 ¶ 64). McIntyre allegedly threatened Deskovic and promised him leniency if he confessed, and Deskovic then falsely confessed. (Deskovic 56.1 ¶¶ 58-63.) Stephens and Tumolo entered the room and asked Deskovic, who was sobbing on the floor in a fetal position, to repeat the confession. (*Id.* ¶ 66.) Deskovic was then arrested for A.C.'s murder and brought back to the Peekskill police department. (*Id.* ¶ 67.)

Deskovic was tried before a jury and on December 7, 1990. He was convicted of A.C.'s rape and murder, and, on January 18, 1991, he was sentenced to fifteen years to life. (*Id.* ¶ 2) In 2006, a new DNA analysis of evidence from A.C.'s murder was performed, and the results were run through an FBI database; the DNA matched the DNA of Steven Cunningham, who was serving a life sentence for sexually assaulting and murdering another Peekskill woman three years after A.C.'s murder. (*Id.* ¶ 4.) On September 18, 2006, Cunningham confessed to raping and murdering A.C., and swore under oath that he had acted alone and that he had never met Deskovic. (*Id.* ¶ 5.) Deskovic's conviction was vacated, and he was released from prison on

---

[8] Exhibit 30 is Deskovic's June 28, 2007 50-H examination.

5

September 20, 2006. (*Id.* ¶ 7.) Cunningham later pleaded guilty to A.C.'s rape and murder on March 14, 2007. (*Id.* ¶ 5.)

### B. Procedural History

Deskovic initiated his action on September 18, 2007, and McGarr initiated her action on October 24, 2007. Deskovic filed his Amended Complaint on June 13, 2008, his Second Amended Complaint on May 13, 2009, and his Third Amended Complaint on March 17, 2010. (Dkt. Nos. 49, 200, 268.)[9] McGarr filed her Amended Complaint on July 7, 2008, and her Second Amended Complaint on April 9, 2010. (Dkt. Nos. 33, 119 (07-CV-9488 docket).)

Stephens and Putnam County filed summary judgment motions in both cases on December 19, 2011. (Dkt. No. 428 (07-CV-8150 docket); Dkt. No. 223 (07-CV-9488 docket).)

Defendants argue that summary judgment should be granted on Deskovic's claims against Stephens, because "discovery has revealed no evidence giving rise to the allegations," and, in the alternative, that Stephens is entitled to qualified immunity.[10] (Defs.' Mem. 1.) Defendants further argue that summary judgment should be granted as to Putnam County, because "[t]o the extent that [Deskovic] fails to establish a state law claim against Stephens, he likewise fails to establish a claim against Putnam County." (*Id.* at 24.) Defendants argue that

---

[9] Docket numbers refer to the 07-CV-8150 docket, unless otherwise indicated.

[10] Deskovic stated in an April 27, 2011 letter to the Court that he intended to pursue only Counts II (fabricating evidence), IV (Section 1983 malicious prosecution), VIII (failure to intercede), IX (conspiracy), and XII (state law malicious prosecution) against Stephens. (Defs.' Mem. Ex. L, at 2 n.1.) Deskovic also brings a respondeat superior claim against Putnam County, alleging that Stephens acted as an agent of, and in the scope of his employment with, Putnam County, and that therefore Putnam County is liable for Stephens' state law tort of malicious prosecution. (Deskovic Third Am. Compl. ¶¶ 294-296.) McGarr alleges that Stephens violated her right to familial association, under the First and Fourteenth Amendments. (McGarr Second Am. Compl. ¶ 172.)

6

omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). "A fact is material when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Electric Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

### B. Doctrine of Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted); *see also Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) ("[Q]ualified immunity shields police officers acting in their official capacity from suits for damages . . . unless their actions violate clearly-established rights of which an objectively reasonable official would have known."). "[Qualified] immunity protect[s] government's ability to perform its traditional functions . . . by helping to avoid unwarranted timidity in performance of public duties, ensuring that talented candidates are not deterred from public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 132 S. Ct. 1657, 1665 (2012) (second alteration in original) (internal quotation marks omitted); *see also Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (noting that qualified immunity allows public officials "to perform their duties unflinchingly and without constant dread of retaliation").

8

Qualified immunity shields a defendant from standing trial or facing other burdens of litigation, "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("[R]easonableness is judged against the backdrop of the law at the time of the conduct. . . . [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks omitted)). Summary judgment may be granted on the "basis of a qualified immunity defense premised on an assertion of objective reasonableness [if] the defendant show[s] that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (second alteration in original) (internal quotation marks omitted).

### C. Fabrication of Evidence Claim (Count II)

Deskovic alleges that Stephens and other defendants deprived Deskovic of his liberty without due process and of his right to a fair trial when they "fabricated evidence, concealed material, exculpatory and impeachment evidence, and deliberately and recklessly failed to conduct a constitutionally adequate criminal investigation." (Deskovic Third Am. Compl. ¶ 203.) Specifically, Deskovic alleges that Stephens fabricated and falsely ascribed to Deskovic the statement "I don't know if he[, the murderer,] ejaculated." Stephens counters that he included this statement in notes from the January 25, 1990 polygraph examination that apparently document statements made by Deskovic during the examination. (Deskovic 56.1 ¶

9

71; Pls.' Opp'n 8.) Stephens later submitted these notes to George Bolen ("Bolen"), the assistant district attorney in Deskovic's criminal case. (Deskovic 56.1 ¶ 71.)

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under [Section] 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *see also Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) (same). Unlike a malicious prosecution claim, a fabrication of evidence claim cannot be defeated by the defendant's demonstration of probable cause. *See Ricciuti*, 124 F.3d at 129-130; *Jocks*, 316 F.3d at 138. Defendants do not dispute that Stephens forwarded his notes to Bolen, or that the ejaculation statement was likely to influence a jury's decision; instead, Defendants argue that there is not sufficient evidence for a jury to find that Stephens fabricated this statement. (Defs.' Mem. 11-12.)

### 1. Merits

Stephens alleges that Deskovic made the ejaculation statement while narrating his theory as to A.C.'s murder during the January 25, 1990 polygraph examination. (Deskovic 56.1 ¶ 71.) Deskovic has consistently denied that he made the statement, (Pls.' Opp'n Ex. 29, at 424; Pls.' Opp'n Ex. 30, at 217),[11] insisting that at that time the word "ejaculate" was not part of his vocabulary, and contending that he was a virgin who "did not know that it was possible for a man to have intercourse without leaving semen behind," (Deskovic 56.1 ¶ 72; Pls.' Opp'n Ex.

---

[11] Exhibit 29 contains excerpts from the 2010 deposition of Deskovic, taken May 10, May 11, and August 5, 2010.

50, ¶ 3).[12] Stephens argues that Plaintiffs' allegation that Deskovic did not make this statement, and that Stephens falsely inserted it into his report, is "completely unfounded" and speculative. (Defs.' Mem. 11.)

McIntyre testified in his deposition that he remembered "vividly" Deskovic making this statement, (Pls.' Opp'n Ex. 22, at 50-51),[13] and that it was one of two statements that he specifically remembered Deskovic making that day, (Pls.' Opp'n Ex. 25, at 315-17).[14] McIntyre claimed that he was "shocked" that a sixteen-year-old would use the word "ejaculate," and that he understood the significance of the statement at the time. (Pls.' Opp'n Ex. 24, at 235; Pls.' Opp'n Ex. 25, at 314.)[15] Despite his supposed surprise, McIntyre did not include the statement in his two-page report of the events of January 25, 1990, which included quotations of numerous other statements that Deskovic allegedly made. (Pls.' Opp'n Ex. 1, at 107-08.) McIntyre has claimed, however, that he did not take notes as events were unfolding on January 25, 1990, but that he did his best to include "all relevant information" in his report, and to "put in as accurately and as in much [sic] detail as [he] could every important thing that [] Deskovic said that day." (Pls.' Opp'n Ex. 25, at 342.) McIntyre stated that he had not put the ejaculation comment in his

---

[12] Exhibit 50 contains Deskovic's October 25, 2011 declaration.

[13] Exhibit 22 contains excerpts from the first day of McIntyre's deposition, taken on September 11, 2009.

[14] Exhibit 25 contains excerpts from the fourth day of McIntyre's deposition, taken on June 17, 2011.

[15] Exhibit 24 contains excerpts from the third day of McIntyre's deposition, taken on June 15, 2011.

11

report because he believed that Stephens was taking notes on Deskovic's statements made during Stephens' part of the questioning. (*Id.* at 343-34.)[16]

The only written record of the ejaculation statement is in two pages of typewritten notes that Stephens turned over to Bolen. (Deskovic 56.1 ¶ 71; Pls.' Opp'n Ex. 19, at 157-58.) The typewritten notes were prepared by Stephens' secretary, and were allegedly based on five pages of handwritten notes in which Stephens recorded statements made by Deskovic during different stages of questioning on January 25, 1990. (Pls.' Opp'n Ex. 1, at 118-20 (three pages of handwritten notes); Pls.' Opp'n Ex. 54 (two pages of handwritten notes); Pls.' Opp'n Ex. 19, at 390-92 (statements made during different stages of questioning).) These notes were separate from the seven-page polygraph form that Stephens filled out during the polygraph. (Pls.' Opp'n Ex. 1, at 110-16.) Stephens at first testified that all five pages of the handwritten notes were written the day of the questioning, (Pls.' Opp'n Ex. 19, at 137), but later stated that the second page of the two pages of notes could have been written either later in the evening of January 25, 1990, or the next day, (*id.* at 385-86).[17] Stephens stated, however, that the three pages of notes which include the ejaculation statement were taken contemporaneously as Deskovic was speaking.[18] (*Id.* at 162.) There are other credibility questions about the notes: The typed notes provided to Bolen contain paragraphs that are out of order; fail to indicate the timing of different statements; and do not provide accurate information about the timing of the examination. (*Id.* at

---

[16] This explanation is not entirely implausible, as McIntyre's report is very detailed where he is speaking to Deskovic, but very brief where detailing other events of that day. (Pls.' Opp'n Ex. 1, at 107-08.)

[17] These notes are contained in Exhibit 54.

[18] These notes are contained in Exhibit 1, at pages 118-20.

12

138, 156-62.) Furthermore, the typed notes are not on letterhead and have no seal; are not addressed to anyone; do not indicate their author; and contain no details of the circumstances of the polygraph or the methods used. (Pls.' Opp'n Ex. 1, at 121-22.) These notes stand in sharp contrast to a report that Stephens created after conducting a polygraph of a murder suspect (in a different investigation) on August 12, 1991: That report appears on Putnam County Sheriff letterhead; is properly addressed; indicates that it was prepared by Stephens; and details the events leading up to the polygraph, the circumstances of the polygraph, release forms which were completed, the polygraph equipment and methods used, and the beginning and ending time of the polygraph. (Pls.' Opp'n Ex. 53, at 68-69.)

The record also reveals that the typed notes were not in the police file when Bolen first received it, and Bolen has indicated that he received the typed notes at some point between March 15 and March 22, seven to eight weeks after the polygraph. (Pls.' Opp'n Ex. 46, at 458-59.)[19] McIntyre testified that he did not remember seeing the notes during the course of the investigation in the Peekskill police file, with which file he was familiar as the lead detective on the case. (Pls.' Opp'n Ex. 27, at 551-52.)[20] Stephens testified at his deposition that after the DNA results came back on March 2, 1990, but before the trial, he talked to Tumolo, and maybe also McIntyre and Levine, about the fact that the DNA of the semen found at the crime scene did not match Deskovic's DNA. (Pls.' Opp'n Ex. 19, at 283-85.) The timing of the DNA results and the disclosure of the notes is relevant, because it suggests a motive for fabricating the

---

[19] Exhibit 46 contains excerpts from the deposition of Bolen, taken July 30, 2010, January 18, 2011, and March 3, 2011.

[20] Exhibit 27 contains excerpts from the sixth day of McIntyre's deposition, taken on June 22, 2011.

ejaculation statement, as the statement was later used to explain how Deskovic could have raped A.C. without leaving any DNA traces. (Deskovic 56.1 ¶ 87; Pls.' Opp'n Ex. 57, at 47-49; Pls.' Opp'n Ex. 32, at 1491-93, 1538.)[21] The inconsistencies as to when the handwritten notes upon which the typed notes were based were prepared, the circumstances in which the typed notes were produced, and, most notably, the state of the typed notes all raise questions about the credibility of the typed notes.

At the summary judgment stage, "it is undoubtedly the duty of district courts not to weigh the credibility of the parties." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 345 (S.D.N.Y. 2011) (denying summary judgment where defendant's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Bennett v. Vaccaro*, No. 08-CV-4028, 2011 WL 1900185, at *7-8 (S.D.N.Y. Apr. 11, 2011) (denying summary judgment where defendants did not establish that plaintiff's "testimony is, either on its face or in light of any other statements he has made, so self-contradictory or implausible as to rule out crediting it," and there was no evidence that plaintiff "ever contradicted his current version of his arrest").

Here, Deskovic's testimony that he did not make the ejaculation statement has been consistent throughout the proceedings, and although he has no supporting evidence, this is not

_____

[21] Exhibit 57 contains excerpts from Bolen's trial opening in Deskovic's criminal trial. Exhibit 32 contains excerpts from Bolen's trial summation in Deskovic's criminal trial.

14

particularly surprising, as one would not expect a sixteen-year-old to be taking contemporaneous notes in such a situation. While Stephens and McIntyre both testified that Deskovic made the ejaculation statement, Defendants do not have "substantial evidence" contradicting Deskovic's version of the events: Stephens' notes of the statement suffer from credibility issues, as detailed above, and McIntyre's testimony is cast into doubt by the absence of the key statement in his police report from that day. The Court does not determine whether McIntyre's testimony or Stephens' notes are credible; instead, it merely finds that they are not overwhelming and incontrovertible evidence that Deskovic made the ejaculation statement.

Thus, the Court concludes that a genuine issue of material fact exists, and summary judgment is therefore inappropriate. *See Ricciuti*, 124 F.3d at 130 ("Here, a reasonable jury could find, based on the evidence, that [defendants] violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict."); *see also Jocks*, 316 F.3d at 138 (holding that summary judgment was inappropriate where plaintiff testified that statement written by defendant was false, and defendant testified that statement was verbatim and accurate, because, "[a]lthough there was certainly not overwhelming evidence of falsification, a reasonable jury would be entitled to credit [plaintiff's] testimony and reject [defendant's]").

### 2. Qualified Immunity

Stephens also argues that summary judgment should be granted because he is entitled to qualified immunity. (Defs.' Mem. 20.) In *Ricciuti*, the Second Circuit denied qualified immunity at the summary judgment stage to a police officer who in 1989 submitted to a prosecutor a confession that the officer had allegedly fabricated. 124 F.3d at 126-27, 129-30. The Second Circuit held that the "action violate[d] [the] accused's clearly established

15

constitutional rights, and no reasonably competent police officer could believe otherwise." *Id.* at 130; *see also Blake v. Race*, 487 F. Supp. 2d 187, 213-14 (E.D.N.Y. 2007) (denying qualified immunity because plaintiff "created a material issue of fact as to whether the defendants participated in the fabrication of evidence to establish probable cause to arrest and prosecute" plaintiff). As the circumstances here are similar to those in *Ricciuti*, and material facts are in dispute, the Court denies Stephens' summary judgment motion based on qualified immunity.

### D. Malicious Prosecution Claims – Federal and State (Counts IV and XII)

Deskovic alleges that Stephens and other defendants violated his Fourth and Fourteenth Amendment right to be free of unreasonable searches and seizures when they acted to cause Deskovic to be arrested, detained, and prosecuted without probable cause. (Deskovic Third Am. Compl. ¶ 220.) Specifically, Deskovic alleges that Stephens knew or should have known that probable cause did not exist to arrest and prosecute Deskovic, because Stephens knew that the ejaculation statement had been fabricated and that Deskovic's confession had been coerced. (*Id.* ¶ 221.)

"A [Section] 1983 claim for malicious prosecution requires the plaintiff to 'demonstrate conduct by the defendant that is tortious under state law and that results in a constitutionally cognizable deprivation of liberty.'" *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 226 (E.D.N.Y. 2010) (quoting *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)). The standard is the same for Plaintiffs' federal and state law malicious prosecution claims, as Section 1983, "in recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." *Cornejo v. Bell*, 592 F.3d 121, 129 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or

16

continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (internal quotation marks omitted); *see also Cornejo*, 592 F.3d at 129 (same).[22] Defendants argue that summary judgment should be granted because: (1) the record is clear that Stephens did not initiate or continue the prosecution; (2) probable cause existed; and (3) "the facts presented to Stephens during and after the polygraph prevented him from having actual malice." (Defs.' Mem. 12-14.) Defendants do not dispute that the proceeding terminated in Deskovic's favor.

### 1. Merits

"A defendant may be said to commence or continue a prosecution if that defendant knowingly provides false information or fabricated evidence that is likely to influence the prosecutors or the grand jury." *Watson v. Grady*, No. 09-CV-3055, 2010 WL 3835047, at *5 (S.D.N.Y. Sept. 30, 2010); *see also Rivers v. Towers, Perrin, Forster & Crosby Inc.*, No. 07-CV-5441, 2009 WL 817852, at *3 (E.D.N.Y. Mar. 27, 2009) ("Giving information to the police that is known to be false qualifies as the commencement of a prosecution."); *Mejia v. City of New York*, 119 F. Supp. 2d 232, 272 (E.D.N.Y. 2000) (noting that civilian witnesses may be liable for malicious prosecution "if the information they falsely gave the prosecutor induced the prosecutor

---

[22] The minor distinctions between New York and federal malicious prosecution causes of action do not change the outcome in this case. *See Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 229 (E.D.N.Y. 2010) ("New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence. Instead, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence." (citing *Cantalino v. Danner*, 754 N.E.2d 164, 168 (2001))).

to act," or if they "conspire[d] with a complaining witness to manufacture evidence that is likely to influence the prosecutor's decision to commence proceedings"); *Babi-Ali v. City of New York*, 979 F. Supp. 268, 276 (S.D.N.Y. 1997) (noting that a person may be held liable for commencing or continuing a prosecution if he or she provides "information which he [or she] knew to be false and so unduly influenced the authorities" (internal quotation marks omitted)).

Plaintiffs allege that Stephens initiated or commenced the criminal proceeding against Deskovic by fabricating the ejaculation statement and misrepresenting the true circumstances of the interrogation. (Pls.' Opp'n 21.) As noted above, a reasonable jury could find that Stephens fabricated the ejaculation statement and passed it along to Bolen. A reasonable jury could further find that the ejaculation statement was likely to have influenced Bolen. Indeed, Bolen relied on the ejaculation statement in both his opening and closing statements at Deskovic's criminal trial to explain why DNA from the semen in the victim's body did not match Deskovic. (Deskovic 56.1 ¶ 87; Pls.' Opp'n Ex. 57, at 47-49; Pls.' Opp'n Ex. 32, at 1491-93, 1538.) Confirming the significance of this statement is an internal memo from the District Attorney's office which noted that Deskovic was convicted despite the negative DNA results, in part based on Deskovic's ejaculation statement. (Deskovic 56.1 ¶ 88; Pls.' Opp'n Ex. 58.)[23] A jury could therefore find that Stephens initiated or commenced the prosecution of Deskovic, for the purposes of a malicious prosecution claim. *See Jovanovic v. City of New York*, No. 04-CV-8437, 2006 WL 2411541, at *9 (S.D.N.Y. Aug. 17, 2006) (finding that the plaintiff sufficiently alleged that defendant police officer commenced or continued the prosecution by claiming that the

---

[23] Exhibit 58 is an August 3, 1994 memorandum from Richard Weill, Second Deputy District Attorney to Jeanine Pirro, District Attorney of Westchester County, regarding the use of DNA in criminal cases.

18

officer had created and forwarded false information to the prosecutors and supplied false testimony to the grand jury), *reconsidered on other grounds*, 2008 WL 355515 (S.D.N.Y. Feb. 7, 2008).

Defendants argue that there was probable cause for commencing the proceeding. "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York, and indictment by a grand jury creates a presumption of probable cause." *Manganiello*, 612 F.3d at 161-62 (alteration in original) (citation and internal quotation marks omitted). "That presumption may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* at 162 (internal quotation marks omitted). "Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury, the presumption of probable cause created by the indictment may be overcome." *Id.* (internal quotation marks omitted); *see also Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior."). "Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" *Ricciuti*, 124 F.3d at 130 (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)).

Plaintiffs argue that without the ejaculation statement or the coerced confession, probable cause did not exist. (Pls.' Opp'n 21-22.) The Court has already noted that a reasonable jury

19

could find that Stephens fabricated the ejaculation statement. The Court must next examine whether there is evidence that Deskovic's confession was coerced.

"No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *United States v. Orlandez-Gamboa*, 320 F.3d 328, 332 (2d Cir. 2003) (internal quotation marks omitted). In this analysis, the Court considers: (1) "the characteristics of the accused," including the accused's experience, background, youth, and lack of education or intelligence; (2) "the conditions of interrogation," including the place where the interrogation was held, the length of the detention, and the presence or absence of counsel; and (3) "the conduct of law enforcement officials," including "the repeated and prolonged nature of the questioning[,] failure to inform the accused of his constitutional rights," physical deprivations of food, water, or sleep, and "psychologically coercive techniques such as brainwashing or promises of leniency or other benefits." *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988); *see also Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (same); *Villafane v. Artus*, No. 09-CV-5545, 2011 WL 6835029, at *40 (E.D.N.Y. Nov. 17, 2011) (same).

Here, taking the following disputed facts in a light favorable to Plaintiffs, a reasonable jury could find that Deskovic's confession was coerced: (1) Deskovic was young, inexperienced with the law, and emotionally troubled; (2) Deskovic was interrogated in an isolated situation without counsel for an entire day; (3) Deskovic was interrogated for seven to nine hours (five to seven hours of Stephens' interrogation, and two hours of McIntyre's interrogation), was repeatedly asked the same question, did not have anything to eat, was promised leniency, and was told that he had inculpated himself with what the officers arguably knew was an inaccurate polygraph test; and (4) McIntyre threatened Deskovic that the other officers would harm

20

Deskovic if he did not confess. *See Arizona v. Fulminante*, 499 U.S. 279, 286-88 (1991)
(holding that confession was coerced because it was prompted by a "credible threat of physical
violence," where official told defendant that defendant was in danger of physical harm at hands
of other inmates, and offered to protect defendant in exchange for a confession); *United States ex
rel. Lewis v. Henderson*, 520 F.2d 896, 898, 902 (2d Cir. 1975) (reversing decision that
confession was voluntary and remanding for a hearing where defendant was a twenty-two-year-
old man with a ninth grade education, who was "arrested in questionable circumstances,
questioned all night, denied sleep and food, deceived by false promises of help and completely
deprived of the support of counsel or friends until he confessed"); *Quartararo v. Mantello*, 715
F. Supp. 449, 452, 459-60 (E.D.N.Y. 1989) (holding that confession was involuntary, where
suspect was a few days short of his sixteenth birthday, was questioned for at least four hours
prior to his first confession, and was not accompanied by counsel, friends, or family; where
defendants made no "showing that petitioner acted coolly or callously during questioning or that
he had past experiences with the police"; and where police made promises of leniency). In
reaching this conclusion, the Court also is mindful of the Supreme Court's recent caution that
"the pressure of custodial interrogation is so immense that it can induce a frighteningly high
percentage of people to confess to crimes they never committed. That risk is all the more
troubling — and recent studies suggest, all the more acute — when the subject of custodial
interrogation is a juvenile." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (citations
and internal quotation marks omitted).

Without the ejaculation statement or the confession, a reasonable jury could find that
public officials lacked probable cause to arrest or prosecute Deskovic — given the negative
DNA results and lack of other evidence. (Pls.' Opp'n Ex. 46, at 169-71 (noting that other than

21

the confession, the principal pieces of evidence were Deskovic's statements and notes that Deskovic had written to the police).) Indeed, evidence in the record shows that officers and prosecutors in this case believed that the ejaculation statement and the confession were crucial to the case against Deskovic. Tumolo wrote a letter to the Putnam County Sheriff twelve days after the polygraph and five days after Deskovic's indictment, stating that without Stephens' assistance in obtaining the statements and confession, the investigation "could not have been successfully concluded." (Pls.' Opp'n Ex. 53, at 2.) Bolen agreed that the "most important information was the admission [Deskovic] made to Investigator Stephens," and that "everything else hinged around that." (Pls.' Opp'n Ex. 46, at 701.) In fact, Bolen emphasized that the admission "was the paramount evidence . . .[,] and everything else was supportive and corroborative of it." (*Id.*) Bolen drove the point home when he wrote a letter to the Putnam County Sheriff after the trial, stating that the case was "one of the more difficult and problematical cases" he had ever handled, especially in light of the "seemingly insurmountable forensic evidence," but that the inculpatory statements made by Deskovic during Stephens' interrogation "played an extremely important role in ultimately persuading the jury of [Deskovic's] guilt." (Pls.' Opp'n Ex. 53, at 1.) And, as noted above, an internal District Attorney's office memo states that Deskovic was convicted despite DNA evidence that the semen at the crime scene was not his, based on Deskovic's supposed statement that he had not ejaculated during the crime. (Pls.' Opp'n Ex. 58.)

Further, there is enough evidence for a reasonable jury to find that Stephens knew the confession was coerced, and therefore unreliable. First, there is evidence that Stephens knowingly administered an unreliable polygraph examination, which initiated the sequence of events leading to Deskovic's confession. Dr. Charles Honts ("Honts"), Plaintiffs' polygraph

22

expert, who has reviewed all relevant documents and videos and has extensive experience in the field, opined that: (1) The Arther method used by Stephens is not a valid polygraph method, and is "particularly prone to errors with the actually innocent"; (2) the Arther method's shortcomings were well known within the polygraph profession in 1990; (3) the Arther method "was always considered a fringe technique that was primarily intended for use in eliciting confessions"; (4) Stephens was originally trained in the Backster technique, "a more mainstream and far more valid" method; (5) the average polygraph is ninety minutes long, and even the shortest estimate of Deskovic's interrogation, roughly five hours, is "outrageously long"; (6) Stephens used improper terminology during the interview; (7) Deskovic was left attached to the polygraph machine for a period of time Honts considers "abusive," and the duration of the attachment itself was likely to cause stress; (8) if Stephens raised his voice and used other aggressive techniques, as Deskovic alleges, Stephens' conduct would be consistent with the goal of obtaining a confession, and would not be conducive to a valid polygraph examination; (9) not giving a subject food for at least six hours is "completely contrary to accepted practice," and the caffeine (from the coffee Deskovic was given) could have further increased Deskovic's stress levels; (10) Stephens used a less accurate method of scoring the polygraph test, despite being trained in a more accurate method; and (11) Stephens made determinations of credibility using improper methods. (Pls.' Opp'n Ex. 36, at 5-9.) Honts concluded that these problems with Stephens' polygraph examination were "so out of the range of normal practice for the conduct of a valid polygraph examination as to be considered outrageous and contrary to minimally accepted practice in 1990 and before," and that Stephens' conduct was, in Honts' opinion, "abusive." (*Id.* at 7, 9.) In the end, the polygraph examination, according to Honts, was "consistent with a guilt

23

presumptive interrogation where the polygraph was used as an evidence ploy to elicit a confession." (*Id.* at 9.)

This potentially unreliable and abusive polygraph examination was critical in eliciting Deskovic's confession. Deskovic alleges that at the end of the exam Stephens said that Deskovic had failed the exam, and stated "You just told me within yourself, through the polygraph results, that you committed it. All we want you to do is to verbalize it." (Pls.' Opp'n Ex. 30, at 219.) Stephens testified at the September 1990 suppression hearing that he had determined that Deskovic should talk to McIntyre at that point, because Stephens felt that his interview was "no longer productive," and thought that changing the interrogator could help. (Pls.' Opp'n Ex. 35, at 288-90.)[24] At the trial, however, Stephens testified that Deskovic asked to speak with McIntyre of his own accord, and that Stephens went to get McIntyre at Deskovic's request. (Pls.' Opp'n Ex. 34, at 1029-30.)[25] Stephens then left the room, and McIntyre entered and (according to Deskovic) told Deskovic that the other officers wanted to harm him, but that McIntyre was holding them off, and that Deskovic had to help McIntyre by giving him information to give him "some bullets with which he could fight." (Pls.' Opp'n Ex. 30, at 227; Pls.' Opp'n Ex. 29, at 437.)

Second, there is evidence from which a reasonable jury could find that Stephens was aware of the coercive nature of McIntyre's interrogation of Deskovic, during which Deskovic confessed. McIntyre stated in his police report that his "entire interview [of Deskovic] was

---

[24] Exhibit 35 contains excerpts from Stephens' September 5, 1990 suppression hearing testimony in Deskovic's criminal trial.

[25] Exhibit 34 contains excerpts from Stephens' November 29, 1990 testimony in Deskovic's criminal trial.

monitored by Lt. Tumolo, Det. Levine, and Inv. Stevens [sic] and concluded at 1900 hours."
(Pls.' Opp'n Ex. 1, at 108.) When Stephens left the polygraph room, he went into the second
room with Tumolo and Levine, (Pls.' Opp'n Ex. 34, at 1031), where a speaker allowed them to
monitor the audio of what was taking place in the polygraph room, (Pls.' Opp'n Ex. 1, at 107).
Stephens testified in his 2010 deposition that he "heard some things" that went on in the
polygraph room while McIntyre questioned Deskovic, but that he was not listening "all the
time," and was not really focusing on it. (Pls.' Opp'n Ex. 19, at 373-74.) However, Stephens
testified at the 1990 trial that he "was able with [his] own ears to hear anything that took place
within the polygraph room," and that he was "able to hear what was going on" in the polygraph
room. (Pls.' Opp'n Ex. 34, at 1031, 1048.) Further, Deskovic alleges that immediately after he
gave the false confession to McIntyre, Tumolo "burst through the door" into the polygraph
room, and told Deskovic in a raised voice to repeat what he had just said. (Pls.' Opp'n Ex. 29, at
450.) This allegation, if true, suggests that the occupants of the second room not only could hear
what was happening between McIntyre and Deskovic, but, in fact, were listening. Stephens
further testified that, after the confession, Deskovic "had broken down and started to scream and
crawl under the polygraph chair and remained in what [Stephens] would call a fetal position."
(Pls.' Opp'n Ex. 35, at 291.) McIntyre's report states that after McIntyre had obtained the
confession, Tumolo and Stephens "attempted to continue the interview, but Deskovic repeated
the same information and upon reaching the same point . . . became extremely distraught, crying
and sobbing." (Pls.' Opp'n Ex. 1, at 108.) Given the evidence suggesting that Stephens knew
that he had conducted an unreliable polygraph examination, that Stephens knew that the actual
confession happened under coercive conditions, that Stephens had allegedly fabricated the
ejaculation statement, and that the confession and ejaculation statement were key to probable

25

cause, a reasonable jury could find that Stephens knew there was not probable cause to prosecute Deskovic.

As for malice, where "a jury could find that probable cause for the charges against the plaintiffs was lacking, . . . that finding alone would support an inference of malice." *Ricciuti*, 124 F.3d at 131; *see also Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003) ("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well."); *Jovanovic*, 2006 WL 2411541, at *11 ("Here, since Plaintiff has adequately alleged lack of probable cause and knowing perjury, Plaintiff has adequately alleged malice."). Thus, for the same reasons noted above, there is a material dispute about probable cause, and summary judgment is inappropriate as to this claim. *See McClellan v. Smith*, 439 F.3d 137, 145-46 (2d Cir. 2006) (vacating grant of summary judgment to defendant with respect to malicious prosecution claim where the factual issues surrounding the plaintiff's indictment were "sharply disputed," and where there was an evidentiary basis to conclude that the grand jury indictment could have been procured by fraud, perjury, or the testifying officer's personal animus toward the plaintiff); *Boyd*, 336 F.3d at 77 (finding that inconsistencies between officers' testimony, booking sheet, and plaintiff's testimony "move[d] beyond a simple conflict of stories or mistaken memories, and into the possibility that the police . . . lied in order to secure an indictment," and holding that, "construing all inferences in the light most favorable to [plaintiff], a jury could reasonably find that the indictment was secured through bad faith or perjury, and that there was malicious prosecution of [plaintiff]"); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 477 (S.D.N.Y. 2009) (denying summary judgment to defendant where plaintiff alleged inter alia that defendants conducted an unreliable lineup designed to induce witnesses to misidentify plaintiff and coerced a lineup witness into implicating plaintiff); *Blake*, 487 F. Supp.

26

2d at 211 (denying summary judgment where defendants allegedly gave false information to prosecutor).

### 2. Qualified Immunity

An arresting officer is entitled to qualified immunity on a malicious prosecution claim if "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *O'Neill v. Town of Babylon*, 986 F.2d 646, 649-50 (2d Cir. 1993) (internal quotation marks omitted); *see also Ullah v. Office of the Dist. Attorney*, No. 07-CV-2687, 2009 WL 2151357, at *4 (S.D.N.Y. July 20, 2009) (same). "[A]n arresting officer is entitled to qualified immunity as a matter of law if the *undisputed facts* and all permissible inferences favorable to the plaintiff show that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan*, 439 F.3d at 147-48 (alteration and internal quotation marks omitted) (emphasis in original). As to the allegedly coercive circumstances of the confession, "it was clearly established in 1989 that criminal suspects had a due process right to be free from official conduct designed to overcome the accused's will and produce an involuntary incriminating statement." *Weaver v. Brenner*, 40 F.3d 527, 536 (2d Cir. 1994); *see also id.* at 537 (denying qualified immunity to officers who in 1989 allegedly engaged in much less coercive conduct to obtain a confession than the conduct at issue in the instant case).[26]

---

[26] In *Weaver*, two plainclothes officers interrogated the plaintiff, an adult male who had been a schoolteacher for twenty years, at his house. 40 F.3d at 531. The officers stated that if the plaintiff cooperated they would keep the accusations out of the newspapers; read the accuser's statement to the plaintiff; loudly told the plaintiff that the statement was fact while slapping the paper loudly; told the plaintiff that if he did not work with the police it would be hard on the family; and falsely told the plaintiff that others had accused him of similar charges. *Id.* at 537.

27

Drawing all permissible inferences favorable to Plaintiffs, including that the Peekskill officers fabricated the ejaculation statement and coerced Deskovic's confession, a reasonable jury could find that officers of reasonable competence would agree that there was not probable cause to prosecute Deskovic, given the exculpatory DNA results and general lack of other evidence. The Court therefore finds that under both federal and state law, Stephens is not entitled to qualified immunity. *See Manganiello*, 612 F.3d at 165 ("In the present case, given the jury's findings that [defendant] misrepresented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly, and given the ample evidentiary support for those findings, the district court correctly concluded that no reasonable officer could have believed [defendant]'s actions to be lawful. [Defendant]'s motion for judgment as a matter of law based on qualified immunity was properly denied."); *Mejia*, 119 F. Supp. 2d at 273 (rejecting qualified immunity defense and noting that "one who gives false information to a prosecutor that he knows will induce a prosecutor to commence or continue proceedings against a plaintiff, knowingly violates the law and is not entitled to qualified immunity for his actions"); *see also Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006) (denying summary judgment on qualified immunity on state law malicious prosecution claim, noting that where "the record plainly reveals the existence of genuine issues of material fact relating to the qualified immunity defense[,] . . . New York courts are no different" from federal courts).

28

### E.  Failure to Intercede Claim (Count VIII)

Deskovic alleges that Stephens is liable for failing to intercede to prevent the use of

Deskovic's coerced confession.  (Pls.' Opp'n 18.)[27]  In particular, Deskovic claims that Stephens

was aware of McIntyre's coercive tactics, and should have informed Bolen of the coercive

circumstances of the interrogation.  (*Id.* at 19.)  Stephens claims that he did not hear the

confession or McIntyre's threats, and so he had no opportunity to intervene.  (Defs.' Reply 5.)

#### 1.  Leave to Amend

First, as Plaintiffs now move to amend their complaint to add this charge as to Stephens,

the Court must examine whether leave to amend should be granted.  Rule 15(a)(2) of the Federal

Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so

requires."  Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though liberally granted, may properly be

denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure

to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party

by virtue of allowance of the amendment, futility of amendment, etc.'"  *Ruotolo v. City of New*

*York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see*

*also Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) ("One appropriate

---

[27] This claim was not made against Stephens in the Third Amended Complaint. "It is well established that a party cannot assert a claim for the first time in its motion papers." *Global Crossing Bandwidth, Inc. v. Locus Telecomm., Inc.*, 632 F. Supp. 2d 224, 245 (W.D.N.Y. 2009); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998) (holding that plaintiff failed to state a securities fraud claim based on a duty to correct, since "an alleged duty to correct d[id] not appear anywhere in the amended complaint and did not enter the case until Wright mentioned it for the first time in her opposition memoranda to the motion to dismiss"). However, the Parties agreed at oral argument to deem the motion to amend Deskovic's Third Amended Complaint to have been made, and asked the Court to both decide this motion for leave to amend and rule on summary judgment as to the claim in this Opinion, as the issue was briefed alongside the other claims in the Parties' submissions.

29

basis for denying leave to amend is that the proposed amendment is futile."). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *Ruotolo*, 514 F.3d at 191 (internal quotation marks omitted); *see also Anthony v. City of New York*, 339 F.3d 129, 138 n.5 (2d Cir. 2003) ("[W]e have interpreted [Rule 15(a)] in favor of allowing the amendment absent a showing by the non-moving party of bad faith or undue prejudice.").

Here, there is no indication that the proposed amendment would be futile. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Plaintiffs allege that Stephens failed to intercede by misrepresenting the coercive circumstances of Deskovic's interrogation during his meetings with Bolen before trial, as well as when testifying at trial. As noted above, there are disputed issues of material fact as to whether Stephens heard McIntyre's statements to Deskovic when Stephens was in the second room, and therefore whether Stephens knew that Deskovic's confession was coerced. The Court therefore finds that the proposed amendment to include Stephens in the failure to intercede claim would not be futile.

There is no evidence of Plaintiffs' bad faith, and there is no undue prejudice to Defendants by allowing the amendment. Furthermore, there is no indication that further discovery would be needed, as the facts surrounding the relevant events have been exhaustively developed in the course of discovery. *See State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*,

30

*P.C.*, 246 F.R.D. 143, 149 (E.D.N.Y. 2007) (granting leave to amend where new claims would not significantly delay resolution of the matter because they arose from the same set of operative facts as the original complaint, and were intertwined with the original claims); *see also Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, No. 10-CV-3998, 2012 WL 98493, at *6 (S.D.N.Y. Jan. 11, 2012) (granting leave to amend, in part, where no additional discovery was necessary, and litigation would not be delayed); *Xpedior Creditor Trust v. Credit Suisse First Bos. (USA) Inc.*, 399 F. Supp. 2d 375, 383 (S.D.N.Y. 2005) (holding that, "[b]ecause the operative facts of Count III are not substantially altered by the proposed amendments, [the defendant] is not prejudiced by the proposed amendment to Count III"). Allowing Plaintiffs leave to amend would not expose Stephens to liability, unexpectedly and for the first time, for his acts during the Deskovic investigation: Stephens has been on notice for some time that he faces liability under the other claims that Plaintiffs have already brought against him, which arise from the same conduct. *See Knoll v. Merrill Corp.*, No. 02-CV-0566, 2003 WL 22682271, at *3 (S.D.N.Y. Nov. 12, 2003) (granting leave to amend where "[d]efendants have had ample notice of the possibility of these claims, and indeed have already filed briefs on this issue and should not be prejudiced by the addition of this claim").

Finally, this claim is not barred by the statute of limitations. An amendment made after the statute of limitations has run relates back to the date of the original pleading if, inter alia, "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B); *see also Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006) ("For a newly added action to relate back, the basic claim must have arisen out of the conduct set forth in the original pleading." (internal quotation marks omitted)). Here, the failure to intercede

31

claim clearly arose out of the conduct set out in the Third Amended Complaint, and therefore relates back for the purpose of the statute of limitations. *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86-87 (2d Cir. 1999) (holding that amended complaint related back where "the facts alleged in the original complaint clearly put [defendants] on notice as to the conduct . . . at issue in this action").

### 2. Summary Judgment

As there are material issues of disputed fact as to whether Stephens heard what McIntyre said to Deskovic while Stephens was in the second room, as discussed above, summary judgment as to the failure to intercede claim is inappropriate. *See Mejia*, 119 F. Supp. 2d at 280 (denying summary judgment to defendant on failure to intercede where the defendant was customs agent who was at the arrest scene but did not participate in arrest, because a reasonable juror could find that there was no probable cause to arrest plaintiff).

### 3. Qualified Immunity

A police officer is entitled to qualified immunity on a failure to intercede claim if it was objectively reasonable for him or her to believe that his or her fellow officers' conduct did not violate a suspect's clearly established statutory or constitutional rights. *See Ricciuti*, 124 F.3d at 129. "To obtain summary judgment on qualified immunity grounds in connection with a claim of failure to intercede to prevent an illegal arrest, a defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest." *Id.* Here, summary judgment on qualified immunity grounds is inappropriate. The Court has already noted above that a reasonable jury could find that Stephens knew that Deskovic's confession was coerced, and the jury could therefore find that reasonably competent

police officers in Stephens' situation could not disagree about the legality of Deskovic's prosecution.

### F. Conspiracy Claim (Count IX)

Plaintiffs allege that Stephens conspired with the Peekskill officers to deprive Deskovic of his "First, Fourth, Fifth, and Fourteenth Amendment rights not to be compelled to be a witness against himself, to be free from unreasonable searches and seizures, not to be deprived of his liberty without due process of law, to a fair criminal trial, and to access to the courts and executive clemency." (Deskovic Third Am. Compl. ¶ 251.) Plaintiffs allege that the "primary predicate constitutional violation was the coercion of [Deskovic's] confession, the harmful effect of which was later augmented and ensured by the fabrication of the 'ejaculation' statement." (Pls.' Opp'n 10.)

A Section 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (same); *Rodriguez v. City of New York*, No. 08-CV-4173, 2012 WL 1059415, at *13 (E.D.N.Y. Mar. 28, 2012) (same). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted).

Defendants argue that Plaintiffs have not presented evidence that there was an agreement between Stephens and any of his alleged co-conspirators. (Defs.' Mem. 17.) In particular, Stephens claims that his interactions with the Peekskill officers were limited, consisting of merely a conversation with Tumolo at a Christmas party in late 1989 or early 1990, a second

33

conversation with Tumolo sometime before the polygraph exam, the content of which Stephens does not remember, and the interactions on January 25, 1990. (*Id.*) Stephens also argues that he did not engage in any overt act "in furtherance of a goal to cause damages." (*Id.* at 18.)

### 1. Merits

As discussed above, the Court has already found that a reasonable jury could find that Stephens knew that Deskovic's confession was coerced, and that the ejaculation statement was falsely attributed to him. Deskovic has therefore shown an underlying unconstitutional injury. The Court next examines whether a reasonable jury could find that Stephens agreed with the Peekskill officers to coerce Deskovic's confession and falsely report that statement.

There is evidence that indicates that the Peekskill officers asked Stephens to conduct a polygraph examination specifically to elicit a confession, as Stephens testified that he was "known in the department as someone that was good at getting confessions during a polygraph exam," and that he "had a knack for it." (Pls.' Opp'n Ex. 19, at 192-193.) Indeed, Stephens' assertions are supported by numerous letters from police supervisors from other departments, thanking Stephens for conducting polygraph examinations in other cases that resulted in confessions. (Pls.' Opp'n Ex. 53, at 59, 60, 62, 65-66, 67, 70.) And, as noted, Tumolo, in his letter to the Putnam County Sheriff twelve days after the polygraph, stated that several interviews of Deskovic prior to Stephens' polygraph examination had "failed to produce a confession vital to this case as a lack of physical evidence, witnesses or investigative leads had critically hampered its progress." (*Id.* at 2.) Tumolo stated that Stephens, at the Peekskill officers' request, conducted the polygraph examination "and confirmed [Deskovic's] deception," then subsequently assisted the officers "in a final interrogation during which Deskovic confessed

to [the] crime, and was immediately arrested." (Pls.' Opp'n Ex. 53, at 2.) Tumolo claimed that without Stephens' assistance, the investigation would not have concluded successfully. (*Id.*)[28]

While this evidence arguably goes only to the Peekskill officers' motivation for choosing Stephens, the manner in which the polygraph examination was conducted suggests that Stephens conducted the exam to elicit a confession. Stephens employed methods and techniques that he arguably knew could produce unreliable results, as discussed at length above in the context of the malicious prosecution claim — notably: Stephens used the discredited Arther method and used an unreliable scoring method, despite being trained in more reliable methods; Stephens used improper terminology during the polygraph interview; Stephens conducted an exam that was excessively long; Stephens used various aggressive techniques that were not conducive to a valid exam; and Stephens did not give Deskovic food for at least six hours, and knew that Deskovic had drunk multiple cups of coffee. Further suggesting a conspiracy, Stephens left the polygraph room several times to discuss the results of the interrogation with the Peekskill officers, (Deskovic 56.1 ¶ 55; Pls.' Opp'n Ex. 34, at 1025; Pls.' Opp'n Ex. 35, at 247, 262, 270-71), and Stephens testified during the suppression hearing that he called in McIntyre to talk to Deskovic after the polygraph examination concluded, because Stephens felt that the interview was "no longer productive," and thought that changing the interrogator could help, (Pls.' Opp'n Ex. 35, at 288-90).

Thus, this is not a case where evidence shows that the defendants merely worked together, or communicated generally with each other. *See Cine SK8, Inc. v. Town of Henrietta*,

---

[28] Further supporting the theory that Stephens was chosen specifically to elicit a confession is the fact that at least two other witnesses in the investigation of A.C.'s murder were given polygraph examinations by a different officer. (Deskovic 56.1 ¶ 15.)

507 F.3d 778, 791-92 (2d Cir. 2007) (holding that a letter describing discussions between Board members did not support conclusion that the three members, whom a jury could find individually acted with racial animus, "had an understanding among themselves to do so"); *Scotto v. Almenas*, 143 F.3d 105, 114-15 (2d Cir. 1998) (concluding that "several telephone calls and other communications" were not sufficient to show conspiracy); *Zahrey v. City of New York*, No. 98-CV-4546, 2009 WL 1024261, at *11 (S.D.N.Y. Apr. 15, 2009) (dismissing conspiracy claim where plaintiff "provide[d] no evidence, absent the fact that the Individual Defendants worked together, that . . . an agreement existed"). Here, instead, a jury could find that Stephens knowingly conducted the polygraph examination as part of a joint effort to force a false confession out of Deskovic. *See Ricciuti*, 124 F.3d at 131 (denying summary judgment because, "[t]aking all of plaintiffs' evidence as true, a jury could find that Lopez knowingly took part with Wheeler in the distribution of a confession he knew to be false, and that he, together with Wheeler, lied about the circumstances surrounding [plaintiff's] arrest," and "[a] jury which so found might rationally infer that Wheeler and Lopez were jointly involved in a common scheme — a conspiracy to ensure that plaintiffs were detained on false charges"); *Blake*, 487 F. Supp. 2d at 218 (denying summary judgment to defendant on conspiracy claim, because plaintiff "put forth evidence to overcome a summary judgment motion on the issue of whether [defendants conspired] to deprive [plaintiff] of his constitutional rights by, among other things, having Garner falsely implicate [plaintiff]" in murders, where defendants were present for different parts of interrogation during which the witness was pressured to lie). Crediting Plaintiffs' evidence, a reasonable jury could find that: The Peekskill officers sought out Stephens for his knack for eliciting confessions; Stephens conducted what he knew was an unreliable polygraph examination while the Peekskill officers were listening; Stephens told Deskovic that the

36

polygraph showed that he was guilty; Stephens then turned Deskovic over to McIntyre and listened while McIntyre coerced a confession from Deskovic; and Stephens fabricated the ejaculation statement, and then later reported it to Bolen. From this, a reasonable jury could find both an agreement and an overt act, namely Stephens' deliberate use of unreliable methods and techniques designed to elicit a confession during the polygraph examination.

### 2. Qualified Immunity

While Stephens claims he is entitled to qualified immunity, he has not identified any changes in the legal standards for Section 1983 conspiracy claims or coerced confessions since 1989, such that behavior that would be unlawful today could have been considered reasonable in 1989. Instead, Stephens challenges the conspiracy claim on the merits. (Defs.' Mem. 23-24.) The Court already has held that qualified immunity is inappropriate as to the underlying constitutional violations, and as the standards for alleging a Section 1983 conspiracy were well established in 1989, Stephens is not entitled to qualified immunity on the conspiracy claim. *See Ricciuti*, 124 F.3d at 131 (reversing grant of summary judgment because actions that took place in 1989 supported a claim of conspiracy to prosecute plaintiff maliciously ).

### G. McGarr's Violation of Familial Rights Claim

McGarr claims that her right of familial association was violated, under both the First and Fourteenth Amendments, by Stephens' actions and failures to act, which ultimately led to her separation from Deskovic. (McGarr Second Am. Compl. ¶¶ 164-65.) This right is called both the right to familial association and the right to intimate association. *See Patel v. Searles*, 305 F.3d 130, 139 (2d Cir. 2002) (using both labels). The Court will use the two terms interchangeably.

37

"The source of the intimate association right has not been authoritatively determined."

*Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999); *see also Piscottano v. Murphy*, 511 F.3d 247,

278 (2d Cir. 2007) (same). In *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), the Supreme Court

suggested that the intimate association right is "a component of the personal liberty protected by

the Due Process Clause," *Adler*, 185 F.3d at 42, while in *City of Dallas v. Stanglin*, 490 U.S. 19

(1989), the Supreme Court discussed the right to intimate association as grounded in the First

Amendment, *see Adler*, 185 F.3d at 42 (discussing Supreme Court treatment of the right).

Indeed, courts have analyzed claims that involved retaliation for the First Amendment activities

of a family member under the First Amendment. *See id.* at 44 ("[A] spouse's claim that adverse

action was taken solely against that spouse in retaliation for conduct of the other spouse should

be analyzed as a claimed violation of a First Amendment right of intimate association."); *see*

*also Garten v. Hochman*, No. 08-CV-9425, 2010 WL 2465479, at *3 (S.D.N.Y. June 16, 2010)

("Courts in this circuit have acknowledged that a First Amendment right to intimate association

is implicated '[w]here a plaintiff is allegedly retaliated against for the First Amendment

activities of a family member.'" (alteration in original) (quoting *Agostino v. Simpson*, No.

08-CV-5760, 2008 WL 4906140, at *9 (S.D.N.Y. Nov. 17, 2008))); *Sutton v. Vill. of Valley*

*Stream of N.Y.*, 96 F. Supp. 2d 189, 192-93 (E.D.N.Y. 2000) (holding that plaintiff had stated a

claim for violation of his First Amendment right to intimate association where he alleged that his

employer harassed him in retaliation for his father's political activities).

"Where the intimate association right at issue is tied to familial relationships and is

independent of First Amendment retaliation concerns, however, the Second Circuit has

employed an analysis under the framework of the Fourteenth Amendment right to substantive

due process." *Garten*, 2010 WL 2465479, at *4; *see also Patel*, 305 F.3d at 135 (describing the

right as protected "as a fundamental element of personal liberty" and discussing it in the context "substantive due process cases" (internal quotation marks omitted)); *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999) (discussing the right to integrity of familial relationships under the Fourteenth Amendment); *Pizzuto v. Cnty. of Nassau*, 240 F. Supp. 2d 203, 208 n.2 (E.D.N.Y. 2002) ("However, because the freedom to associate guaranteed by the First Amendment protects associational interests related to speech and petition, and because those associational interests are not implicated in this case, I find that Plaintiffs' claim must be examined under the Fourteenth Amendment, rather than the First Amendment."). McGarr's claim seems to fit under the Fourteenth Amendment, as McGarr has not alleged any retaliatory action based on Deskovic's First Amendment activities.

Stephens argues that he is entitled to qualified immunity as to McGarr's claim, as it was objectively reasonable in 1990 for Stephens to believe that his actions did not violate McGarr's right to familial association. (Addendum of Defs. in Further Supp. of Mot. for Summ. J. 4 (Dkt. No. 285 (07-CV-9488 docket)).)[29] The Court begins, not with an analysis of whether a constitutional right was violated, but by examining whether a reasonable law enforcement officer in Stephens' position would have believed his or her conduct would violate McGarr's right to familial association. *See Pearson*, 555 U.S. at 236 (overruling *Saucier v. Katz*, 533 U.S. 194

---

[29] Although Stephens did not brief the issue of qualified immunity in the initial round of summary judgment briefing, qualified immunity was raised as an affirmative defense, briefed by both sides in a supplemental round of briefing (ordered by the Court), and discussed at length during oral argument. The qualified immunity defense was therefore "adequately develop[ed] . . . during pretrial proceedings." *Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir. 1995); *see also Kerman v. City of New York*, 374 F.3d 93, 111-12 (2d Cir. 2004) (same). This is consistent with higher court directives, as the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson*, 555 U.S. at 232 (internal quotation marks omitted).

(2001), and explaining that judges are no longer required to begin by deciding whether a

constitutional right was violated but are instead "permitted to exercise their sound discretion in

deciding which of the two prongs of the qualified immunity analysis should be addressed first").

The Supreme Court instructs that

> [t]o be clearly established, a right must be sufficiently clear that every reasonable
> official would [have understood] that what he is doing violates that right. In other
> words, existing precedent must have placed the statutory or constitutional
> question beyond debate. . . . [T]he right allegedly violated must be established,
> not as a broad general proposition, but in a particularized sense so that the
> contours of the right are clear to a reasonable official.

*Reichle v. Howards*, 132 S. Ct. 2088, 2093-94 (2012) (second alteration in original) (citations

and internal quotation marks omitted). Otherwise stated, to determine whether a right is clearly

established, courts must determine "whether (1) it was defined with reasonable clarity, (2) the

Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a

reasonable defendant would have understood that his conduct was unlawful." *Doninger v.*

*Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011); *see also Johnson*, 239 F.3d at 250 (holding that

qualified immunity applies "if either (a) the defendant's action did not violate clearly established

law, or (b) it was objectively reasonable for the defendant to believe that his action did not

violate such law" (internal quotation marks omitted)).

There cannot be much debate that as a general proposition, the right to familial

association had been established by 1990. According to the Second Circuit, "the general right to

intimate association has been clearly established since 1984 when *Roberts*[, 468 U.S. 609,] was

decided." *Patel*, 305 F.3d at 139; *see also Southerland v. City of New York*, 680 F.3d 127, 152

(2d Cir. 2012) ("We have long recognized that parents have a constitutionally protected liberty

interest in the care, custody and management of their children, and that the deprivation of this

40

interest is actionable on a substantive due process theory." (citations and internal quotation marks omitted)).

The more critical question here is whether, in 1990, the right was established "in a particularized sense so that the contours of the right [would have been] clear to a reasonable official," *Reichle*, 132 S. Ct. at 2094. In *Patel*, the Second Circuit defined a core set of clearly unlawful behavior: where police "engage[d] in an extended public and private defamatory misinformation campaign to destroy a family, hoping that those tactics *might* produce incriminating leads in a murder investigation." 305 F.3d at 140 (emphasis in original).[30] *Patel* acknowledged the "uncertainty as to the contours of the right" to familial association, but held that this uncertainty did "not extend so far as to suggest that a murder investigation erodes all of the 'critical buffers between the individual and the power of the State.'" *Id.* at 139 (quoting *Roberts*, 468 U.S. at 619). *Patel* stated that to "[e]mbrac[e] that view would render hollow the right to intimate association." *Id.* at 140. Thus, in *Patel*, the Second Circuit held that the officers who intentionally directed their efforts at Patel and his family were not entitled to qualified immunity. *See id.*

Here, however, there is no allegation that Stephens' behavior was intentionally directed at McGarr's relationship with Deskovic. Instead, Plaintiffs allege that Stephens' actions were

_____

[30] In *Patel*, officers "directly assaulted Patel's intimate family relations through lies and chicanery" in order "to falsely implicate Patel as a murderer." 305 F.3d at 137. Two officers believed that Patel had killed his mother and sister, and, frustrated with the lack of progress in the investigation, "engage[d] in an extended public and private defamatory misinformation campaign to destroy a family," *id.* at 140, lying to Patel's father, wife and siblings, publishing falsehoods in the local newspapers, and allegedly following Patel when he moved from Connecticut to Tennessee to continue these tactics, *id.* at 134. Patel alleged that because of the officers' actions, he had become ostracized from the majority of his family and friends, was no longer on speaking terms with his father and siblings, and had to leave his job and home in Connecticut. *Id.*

done "in order to send [Deskovic] to jail and remove him from [McGarr's] home." (McGarr's Opp'n 15.) Deskovic alleges that when he was driven to Stephens' office on January 25, 1990, he told the officers that his parents did not know where he was, and that when the officers asked whether he had told McGarr that he was undergoing a polygraph, he said that he had not. (McGarr 56.1 ¶ 93.)[31] Deskovic further alleges that he participated in the later part of the interrogation because he realized that he would not be allowed to go home unless the officers "heard what they wanted to hear." (Id. ¶ 95; Greenberger Decl. Ex. 67, at 483.)[32] Tumolo allegedly told Deskovic after the polygraph examination that they "could be here all night" if Deskovic did not repeat his confession to Stephens and Tumolo. (McGarr 56.1 ¶ 96; Greenberger Decl. Ex. 69, at 235.)[33] While it is plausible that the Peekskill officers and Stephens intended to isolate Deskovic in an unfamiliar setting in order to secure a confession, there is no allegation that they intended to isolate Deskovic from McGarr specifically, or that they did so with the intent to deny McGarr custody of Deskovic. Certainly, Deskovic's separation from McGarr was a foreseeable consequence of Stephens' actions, as Plaintiffs have adequately shown that Stephens knew that Deskovic was a minor child who lived with his mother, (Pls.' Opp'n Ex. 1, at 111), but there is no allegation that the separation was specifically intended to deprive McGarr of the custody or care of Deskovic. In fact, Plaintiffs allege that Deskovic was

---

[31] McGarr submitted a 56.1 Statement that incorporated the entirety of Deskovic's 56.1 Statement, and added several paragraphs specific to McGarr's claims. It is found at Docket Number 229 on the 07-CV-9488 docket.

[32] Exhibit 67 of the Greenberger Declaration contains excerpts from the May 10 and May 11, 2010 deposition of Deskovic. (Dkt. No. 228 (07-CV-9488 docket).)

[33] Exhibit 69 of the Greenberger Declaration contains excerpts from the June 28, 2007 50-H examination of Deskovic. (Dkt. No. 228 (07-CV-9488 docket).)

isolated from *all* contact allegedly to facilitate securing a confession, as demonstrated by Plaintiffs' claim that Deskovic's friend Martin Burrett, who had accompanied Deskovic to the Peekskill police station on January 25, 1990, was sent home by the Peekskill officers. (Deskovic 56.1 ¶¶ 29-30.) Nor did the Peekskill officers or Stephens intentionally interfere with Deskovic's relationship with McGarr in any other way: There is no allegation that they maligned McGarr, or did anything else to alienate Deskovic from her during the investigation.

Because Plaintiffs do not allege that Stephens' behavior was intentionally directed at the familial relationship, his alleged misconduct does not fall within the category of behavior that *Patel* held (in 2002) violated the right to familial association. Thus, the Court must examine whether Stephens' behavior was clearly unlawful in 1990, because "existing precedent . . . placed the statutory or constitutional question beyond debate." *Reichle*, 132 S. Ct. at 2093. There was no Second Circuit or Supreme Court case stating that such conduct was unlawful, as McGarr's counsel reluctantly acknowledged during oral argument.[34] Other circuit courts had split on the issue.[35] For example, the Tenth Circuit had established that an allegation of specific

---

[34] To the Court's knowledge, the only district court within the Second Circuit that had addressed whether demonstrating specific intent was necessary to make out this claim had summarily answered in the negative. *See Greene v. City of New York*, 675 F. Supp. 110, 114-15 (S.D.N.Y. 1987) (declining to impose an intent requirement in a Section 1983 "claim for deprivation of the parent-child relationship in the wrongful death context," arguing that to require, "in addition to the intent to shoot with reckless disregard as to the consequences, a specific awareness on the defendant's part that the plaintiff had children who would be deprived of his companionship if he were killed would effectively nullify the right altogether in the wrongful death context"). However, *Greene* cited neither Supreme Court nor Second Circuit decisions clearly establishing the proposition that a state actor could be held to violate the right to familial association absent a showing of the actor's specific intent to interfere with the family's relationship.

[35] While decisions by other circuit courts are obviously not binding precedent here, the Supreme Court has instructed that a right may be clearly established even absent "controlling authority" from the Supreme Court or the governing circuit court if there is or was a "robust

intent to interfere with the familial relationship is necessary to make out a constitutional claim, *see Trujillo v. Bd. of Cnty. Comm'rs of the Cnty. of Santa Fe*, 768 F.2d 1186 (10th Cir. 1985), and the First and Eighth Circuits had indicated that intent might be required, *see Harpole v. Ark. Dep't of Human Servs.*, 820 F.2d 923, 928 (8th Cir. 1987) ("Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct."); *Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8-9 (1st Cir. 1986), while the Ninth and Seventh Circuits had allowed such claims to go forward without a showing of specific intent, *see Kelson v. City of Springfield*, 767 F.2d 651 (9th Cir. 1985); *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984), *overruled by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005).

While the Supreme Court had not addressed this specific issue, it had noted in another substantive due process case that "[h]istorically, [the] guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property. No [prior] decision . . . support[s] the view that negligent conduct by a state official, even though causing injury, constitutes a deprivation under the Due Process Clause." *Daniels v. Williams*,

---

consensus of cases of persuasive authority" from the other circuits establishing the right. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (internal quotation marks omitted). Hence, the Second Circuit has from time to time cited case law from other circuits to show that courts generally were divided over the lawfulness of a particular behavior, as extra support for a finding that the behavior was not clearly unlawful. *See Wilkinson*, 182 F.3d at 107 n.10 (citing case law from the Eighth Circuit to support conclusion that challenged behavior was not clearly unlawful at time); *see also Doninger*, 642 F.3d at 350 ("Finally, our conclusion that whatever right Doninger may have had was not clearly established is buttressed by the similarities between this case and the Sixth Circuit's decision in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir.2007), decided only shortly after the events at issue here.").

44

474 U.S. 327, 331 (1986) (emphasis in original) (citations omitted) (collecting cases).[36] While this language could be interpreted merely to require that Stephens intentionally violated *Deskovic's* rights, it could also be interpreted to mean that for McGarr to have a claim, Stephens' must have intended to violate *McGarr's* rights, i.e., that Stephens had the specific intent to interfere with McGarr's familial relationship with Deskovic. Where, as here, no decision of the Supreme Court or Second Circuit had found a violation of the right of familial association "on facts even roughly comparable to those present in this case" by 1990, and "[o]n the contrary, some [Supreme Court] opinions [could have been] read as pointing in the opposition direction," the Court cannot say that conduct not intentionally directed at the familial relationship was clearly unlawful in 1990. *Ryburn v. Huff*, 132 S. Ct. 987, 990 (2012) (granting qualified immunity).

In conclusion, there is no evidence that Stephens intentionally interfered with McGarr's relationship with Deskovic (as distinguished from intentionally violating Deskovic's rights), and anything less than conduct intentionally directed at the familial relationship was not clearly established as unlawful within the Second Circuit at the time of Stephens' behavior in 1990.[37]

---

[36] In *Daniels*, an inmate brought a civil rights action to recover for injuries allegedly sustained when he slipped and fell on a pillow, left by a deputy sheriff, on the stairs of the jail where he was confined. 474 U.S. at 327.

[37] It bears noting that circuit courts are split to this day as to whether a showing of intentional interference with the familial relationship is required. Six circuit courts require a showing of intentional interference with the familial relationship, and either explicitly state or suggest that the intent requirement applies to parents' relationships with both minor and adult children. *See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 190-92 (3d Cir. 2009) (holding that "only deliberate executive conduct" gives rise to a familial association violation, and explicitly noting that this rule applies to both minor and adult children); *Lowery v. Cnty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008) (holding that the challenged "conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship" (internal quotation marks

The Court therefore holds that Stephens is entitled to qualified immunity on McGarr's familial

omitted)); *Reasonover v. St. Louis Cnty.*, 447 F.3d 569, 585 (8th Cir. 2006) ("A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship." (internal quotation marks omitted)); *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005) (holding that plaintiffs must allege "intentional action by the state to interfere with a familial relationship," and noting that without adopting specific intent requirements for this claim, courts risk "constitutionalizing all torts against individuals who happen to have families"); *Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994) (refusing to extend familial association claim "to encompass deprivations resulting from governmental actions affecting the family only incidentally"). While in *Valdivieso Ortiz*, 807 F.2d 6, the First Circuit was unclear about whether it had based its denial of a familial association claim on the lack of specific intent or the fact that the child at issue was an adult, in subsequent cases the First Circuit has clarified that even in cases involving minor children, specific intent is required. *See Soto v. Flores*, 103 F.3d 1056, 1062 (1st Cir. 1997) (citing *Ortiz* as requiring specific intent, and dismissing familial association claim as to minor children); *Manarite ex rel. Manarite v. City of Springfield*, 957 F.2d 953, 960 (1st Cir. 1992) (citing *Ortiz* as requiring specific intent). One circuit, the Eleventh Circuit, has stated in dicta that specific intent is necessary. *See Robertson v. Hecksel*, 420 F.3d 1254, 1259, 1260 n.5 (11th Cir. 2005) (holding that "a parent-child relationship between two independent adults does not invoke constitutional 'companionship' interests," and noting in dicta that even if it were to hold that right existed, mere negligence does not implicate the due process clause, and the mother had not alleged that the officer who shot her adult son acted with "more than negligence concerning her rights"). One circuit, the Ninth Circuit, has repeatedly stated that specific intent is *not* required, for adult, as well as minor, children. *See Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (holding that plaintiffs adequately alleged familial association claim with no discussion of specific intent); *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1991) (declining to impose *Trujillo*'s specific intent requirement on familial association claims). And four circuits, the Second, Fifth, Sixth, and D.C. Circuits, have not decided the issue. *See Patel*, 305 F.3d at 137 ("First, this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association. But, in any event, [plaintiff] has alleged facts sufficient to prove that the officers' conduct *was* intentionally directed at his family." (emphasis in original) (citation omitted)); *Butera v. District of Columbia*, 235 F.3d 637, 656 n.23 (D.C. Cir. 2001) ("Because we hold that a parent-child relationship between two independent adults does not invoke constitutional 'companionship' interests, we do not reach [defendant's] contention that [plaintiff's] claim fails because [defendant's] actions were not intentionally directed or aimed at her relationship with her son."). Further, district courts within the Second Circuit have split on the issue. *Compare Laureano v. Goord*, No. 06-CV-7845, 2007 WL 2826649, at *12 (S.D.N.Y. Aug. 31, 2007) (requiring the intentional targeting of "the intimate associations of a person," as opposed to "actions that indirectly affect those relationships"), *with Dusenbury v. City of New York*, No. 97-CV-5215, 1999 WL 199072, at *1 (S.D.N.Y. Apr. 9, 1999) ("[D]efendants argue that the state action must be directly aimed at disrupting the parent-child relationship. Courts, however, have recognized such a claim where the state action that affected the parent-child relationship was more than merely negligent without further allegations that the official was trying to break up the family.").

46

association claim.[38] *See Wilkinson*, 182 F.3d at 107 n.10 (noting, in context of abuse

investigation, that there is a difference between evaluating the appropriateness of a case worker's

actions, which "depends on the facts and events of a particular case," and "evaluating whether it

was objectively reasonable for a case worker to believe" that his or her actions were lawful,

which "depends on the clarity of existing law at the time of those events"); *see also Reasonover*,

447 F.3d at 585 (holding that defendants were entitled to qualified immunity for actions taken in

1983, as "any right to familial association was not sufficiently clear such that the defendants

reasonably could have understood they were violating it," because "[n]either the Supreme Court

---

[38] McGarr argues that because it was clearly unlawful in 1990 to coerce confessions and
fabricate evidence, Stephens is not entitled to qualified immunity on McGarr's familial relations
claim. (McGarr's Supp. Mem. Opposing Qualified Immunity 3 (Dkt. No. 286 (07-CV-9488
docket)).) McGarr cites *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007), and
*Southerland*, 680 F.3d at 151-52, for the proposition that so long as a defendant knew that his
behavior was unlawful in some way, he did not have to know which constitutional right he was
violating to lose the protections of qualified immunity. (McGarr's Supp. Mem. 3-4.) This claim
is not supported by the caselaw. *Russo* and *Southerland* both dealt with clearly established
rights, where the Second Circuit merely changed the "constitutional *label*" applied to those
rights, *Southerland*, 680 F.3d at 160 (emphasis in original), by clarifying that the rights should
be examined under the Fourth, and not the Fourteenth, Amendment. *See id.* ("It would be
inappropriate . . . to afford [defendant] qualified immunity on [plaintiffs'] claim solely because,
two years after the events in question, we shifted the constitutional *label* for evaluating that
claim from the Fourteenth to the Fourth Amendment." (emphasis in original)); *Russo*, 479 F.3d
at 212 ("Today we have clarified that Russo's claim should be treated under the Fourth
Amendment, rather than under substantive due process. But this clarification is of no
consequence to the question of whether the right was clearly established, because the proper
inquiry is whether the *right* itself — rather than its *source* — is clearly established." (emphasis
in original) (citation and internal quotation marks omitted)). These cases did not change the law
on qualified immunity to mean that, because the defendants had violated *any* constitutional
rights of *any* plaintiffs, qualified immunity was inappropriate on all claims by all plaintiffs, as
McGarr argues. To the contrary: The law grants qualified immunity when "the right allegedly
violated" is not established "in a particularized sense so that the contours of the right are clear to
a reasonable official." *Reichle*, 132 S. Ct. at 2094 (internal quotation marks omitted).

nor this court has clearly held wrongful prosecution and incarceration of a family member violates a right to familial association").[39]

### H. Putnam County

Defendants' only argument for summary judgment as to Putnam County is that Plaintiffs have failed to state a state law claim of malicious prosecution against Stephens, and that therefore Putnam County cannot be held liable under respondeat superior. (Defs.' Mem. 24.) As the Court has found that summary judgment is not appropriate on Plaintiffs' state law malicious prosecution claim, it holds that summary judgment is also inappropriate as to Putnam County. *See Sankar v. City of New York*, No. 07-CV-4726, 2012 WL 1116984, at *12 (E.D.N.Y. Mar. 30, 2012) ("Unlike claims brought pursuant to Section 1983, under New York state law, municipalities may be held vicariously liable for false arrest and malicious prosecution under a theory of respondeat superior. This applies even to discretionary actions by police officers where, as here, genuine issues of material fact exist as to whether there was probable cause for arrest. Accordingly, summary judgment is denied with respect to plaintiff's state law false arrest and malicious prosecution claims against defendant City of New York." (citations omitted)).

---

[39] The Court is not holding that McGarr would have to show conduct intentionally aimed at her relationship with Deskovic to make out a violation of her right to familial association; the Court is holding merely that Stephens is entitled to qualified immunity under the facts taken in a light most favorable to McGarr.

### III. Conclusion

For the reasons discussed above, the motions of Defendants Stephens and Putnam

County for summary judgment are denied as to Deskovic's claims and granted as to McGarr's

claims. The Clerk of Court is respectfully directed to terminate the motion pending in Case No.

07-CV-8150 (Dkt. No. 428) and the motion pending in Case No. 07-CV-9488 (Dkt. No. 223),

and dismiss Defendant Stephens from *McGarr v. City of Peekskill*, No. 07-CV-9488.

SO ORDERED.

Dated:       September 25, 2012
                White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

49

ECF Service List:

Nick J. Brustin, Esq.
Chloe Francis Cockburn, Esq.
Deborah L. Cornwall, Esq.
Jennifer Elizabeth Laurin, Esq.
Sarah A. Crowley, Esq.
Anna Benvenutti Hoffmann, Esq.
Neufeld Scheck & Brustin LLP
99 Hudson Street
New York, NY 10013
(917) 237-0338
Fax: (212) 965-9084
Email: nick@cnscivilrights.com
        chloe@nsbcivilrights.com
        debi@cnscivilrights.com
        jen@nsbcivilrights.com
        sarah@nsbcivilrights.com
        anna@nsbcivilrights.com
Counsel for Plaintiff Jeffrey Deskovic

Eric Hecker, Esq.
Elora Mukherjee, Esq.
Emery Celli Brinckerhoff & Abady, LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
(212) 763-5000
Fax: (212) 763-5001
Email: ehecker@ecbalaw.com
        emukherjee@ecbalaw.com
Counsel for Plaintiff Linda McGarr

James A. Randazzo, Esq.
Gaines, Gruner, Ponzini & Novick, LLP
11 Martine Ave., 8th Floor
White Plains, NY 10606
(914) 288-9595
Fax: (914) 288-0850
Email: jrandazzo@ggpnllp.com
Counsel for Daniel Stephens and Putnam County

Stephen Wellinghorst, Esq.
Robert Louis Delicate, Esq.
Harwood, Lloyd, LLC
130 Main Street
Hackensack, NJ 07601
(201) 359-3530

Email: swellinghorst@harwoodlloyd.com
Counsel for Daniel Stephens and Putnam County